1        CITY-COUNTY OF MONTGOMERY

2          PERSONNEL BOARD HEARING

3

4

5    IN RE APPEAL HEARING FOR:

6        L. M. HARTWELL,

7          Employee.

8    _____

9          CITY-COUNTY OF MONTGOMERY

10          PERSONNEL DEPARTMENT

11          27 Madison Avenue,

12      Montgomery, Alabama   36101

13          March 14, 2006

14          5 p.m.

15

16    BEFORE THE PERSONNEL BOARD:

17    Benita Froemming, Chairman

18    Charles B. Paterson

19    Johnny Baker

20

21

22

23    Taken by:   SELAH M. DRYER, CSR



```
 1              S T I P U L A T I O N

 2           IT IS STIPULATED AND AGREED by and

 3      between the parties through their

 4      respective counsel that the hearing of

 5      L. M. HARTWELL, may be taken before Selah

 6      M. Dryer, Notary Public, State at Large,

 7      at the City-County of Montgomery Personnel

 8      Department, 27 Madison Avenue, Montgomery,

 9      Alabama  36101-1111, on March 14, 2006,

10      commencing at approximately 5 p.m.

11           IT IS FURTHER STIPULATED AND

12      AGREED that the signature to and the

13      reading of the hearing by the witnesses is

14      waived, the hearing to have the same force

15      and effect as if full compliance had been

16      had with all laws and rules of Court

17      relating to the taking of hearings.

18           IT IS FURTHER STIPULATED AND

19      AGREED that it shall not be necessary for

20      any objections to be made by counsel to

21      any questions, except as to form or

22      leading questions, and that counsel for

23      the parties may make objections and assign
```

1    grounds at the time of trial or at the

2    time said hearing is offered in evidence,

3    or prior thereto.

4         In accordance with Rule

5    5(d) of the Alabama Rules of Civil

6    Procedure, as amended, effective May 15,

7    1988, I, Selah M. Dryer, am hereby

8    delivering to Wallace Mills, City

9    Attorney, the original transcript of the

10   oral testimony taken April 5, 2005, along

11   with exhibits.

12        Please be advised that this is the

13   same and not retained by the Court

14   Reporter, nor filed with the Court.

15

16

17

18

19

20

21

22

23

```
1                    I N D E X

2    WITNESSES:                          PAGE NO.

3    ASSISTANT CHIEF CARL WALKER              11

4         Direct by Mr. Mills                 11

5         Cross by Mr. Brannan                35

6         Redirect by Mr. Mills               83

7         Recross by Mr. Brannan              97

8         Redirect by Mr. Mills              106

9         Recross by Mr. Brannan             108

10   LEE M. HARTWELL                         111

11        Direct by Mr. Brannan             111

12        Cross by Mr. Mills                126

13        Redirect by Mr. Brannan           135

14        Recross by Mr. Mills              138

15        Redirect by Mr. Brannan           144

16        Recross by Mr. Mills              145

17   CLOSING STATEMENTS                     147

18        By Mr. Mills                      147

19        By Mr. Brannan                    149

20        Final Closing by Mr. Mills        153

21   CERTIFICATE                            155

22

23
```

```
 1                    INDEX OF EXHIBITS

 2      CITY EXHIBIT                        PAGE NO.

 3      1                                      14

 4      2                                      26

 5      EMPLOYEE EXHIBIT

 6      5                                      36

 7      1                                      37

 8      7                                      40

 9      Introduced, not marked                 45

10      4                                      46

11      2                                      51

12      3                                      54

13      9                                      57

14      10                                     58

15      11                                     60

16      12                                     62

17      13                                     65

18      14                                     68

19      15                                     70

20      16                                     76

21      17                                     76

22      18                                     78

23      19                                     81
```

| | EMPLOYEE EXHIBIT | PAGE NO. |
|---|---|---|
| 1 | | |
| 2 | 20, 21, 22 | 100 |
| 3 | 23 | 135 |

```
1              A P P E A R A N C E S
2   ATTORNEY FOR THE CITY OF MONTGOMERY:
3        Wallace D. Mills, Esq.
4        CITY OF MONTGOMERY
5        Legal Department
6        103 N. Perry Street
7        Suite 200
8        Montgomery, Alabama  36104
9
10  ATTORNEY FOR THE EMPLOYEE(S):
11       J. Bernard Brannan, Jr., Esq.
12       THE BRANNAN LAW FIRM
13       602 South Hull Street
14       Montgomery, Alabama  36104
15
16
17
18
19
20
21
22
23
```

1          I, Selah M. Dryer, a Notary Public

2     for the State of Alabama at Large, acting

3     as Commissioner, certify that on this

4     date, pursuant to the Alabama Rules of

5     Civil Procedure, and the foregoing

6     stipulation of counsel, there came before

7     the Board at the City-County of Montgomery

8     Personnel Department, 27 Madison Avenue,

9     Montgomery, Alabama  36101-1111,

10    commencing at approximately 5 p.m. on

11    March 14, 2006, L. M. HARTWELL, witness in

12    the above cause, for oral examination,

13    whereupon the following proceedings were

14    had:

15

16          MS. FROEMMING:    Thank you

17    for coming.

18          My name is Benita Froemming.

19    I'm Chairman of the Personnel Board and to

20    my right is Johnny Baker and to my left is

21    Charlie Paterson.

22          Two members of the Board

23    constitute a forum; but tonight we have

1    all three, so it's a full house.

2                   When an employee has been

3    dismissed or demoted, the burden of proof

4    falls on the City.  And in all other types

5    of hearings the burden is on the

6    employee.

7                   All testimony is given under

8    oath in a discharge case.  The employee

9    cannot be compelled to testify, but if he

10   takes the stand voluntarily he may be

11   cross-examined as to any relevant matter.

12                  This hearing is informal and

13   need not be conducted according to

14   technical rules relating to evidence and

15   witnesses.  And all relevant evidence will

16   be admitted, including hearsay.

17                  Parties are requested to

18   refrain from presenting repetitious or

19   irrelevant evidence.  And the Board

20   reserves the right to exclude witnesses

21   not under examination and will do so at

22   the request of either party.

23                  Would you like to invoke the

```
1    rule?
2                    MR. BRANNAN:  We would.
3                    MR. MILLS:  Yes, ma'am.
4                    MS. FROEMMING:  At this
5    point in time anybody who's going to
6    testify, please stand and raise your right
7    hand.  And if you would, would you please
8    swear them in?
9                    COURT REPORTER:  Yes.
10               (Witnesses sworn.)
11                   MS. FROEMMING:  Mr. Mills
12   and Mr. Brannan, would you like to make
13   opening remarks?
14                   MR. MILLS:  Do you want
15   to, Berney?
16                   MR. BRANNAN:  I think we
17   can put on the evidence about as fast as
18   anything.
19                   MS. FROEMMING:  All right.
20   Regarding witnesses that we have listed,
21   we just want to make sure that -- and we
22   have mentioned this in the past -- if any
23   of this attests to the character of the
```

1  defendant -- if you have a large number --

2  that are going to do that, one would

3  suffice.

4              MR. BRANNAN:   That's not

5  what we will be calling him for.

6              MS. FROEMMING:   Okay.   We

7  just want to make sure on that.   All

8  right, call your first witness.

9              MR. MILLS:   We call

10  Assistant Chief Carl Walker.

11

12       ASSISTANT CHIEF CARL WALKER,

13  being first duly sworn, was examined and

14  testified as follows:

15

16  DIRECT EXAMINATION BY MR. MILLS:

17       Q.    Chief, will you state your

18  name for the Board, please.

19       A.    I am Carl Edward Walker.

20       Q.    Do you work for the Montgomery

21  Fire Department?

22       A.    Yes, sir.

23       Q.    Were you sworn earlier?

1        A.    Yes, I was.

2        Q.    What is your rank with the

3 Montgomery Fire Department.

4        A.    I am the assistant fire chief

5 of the Montgomery Fire Department.

6        Q.    Are you in charge of any

7 particular division?

8        A.    Yes, I am.

9        Q.    Which division?

10       A.    I am the supervisor of Fire

11 Suppression Division.

12       Q.    And does Firefighter Hartwell

13 work for you in that division?

14       A.    Yes, sir.

15       Q.    Did you have occasion to

16 recommend disciplinary action beginning in

17 August of 2005 against then Sergeant

18 Hartwell?

19       A.    Yes, I did.

20       Q.    Will you tell the Board what

21 charges you brought against Mr. Hartwell?

22       A.    The charges that I brought

23 against Sergeant Hartwell at the time was

1    a recommendation to Deputy Chief Jordan

2    from me.  The recommendation was for

3    disciplinary action based upon a chain of

4    events involving Sergeant Hartwell at the

5    time.  The first being a claim of being

6    sick while on duty.  Secondly, refusing to

7    bring a return-to-duty doctor's

8    certificate, violating a chain of command

9    through written communications, and making

10   false statements claiming bias and

11   mistreatment by District Chief Kelley

12   Gordon.

13        Q.    What was your recommendation

14   that the punishment against Firefighter

15   Hartwell be?

16        A.    My recommendation was demotion

17   from the rank of sergeant to firefighter.

18        Q.    Now tell the Board, if you

19   will, what the difference is between

20   sergeant and firefighter in terms of their

21   duties?

22        A.    Looking at the sergeant

23   duties, the sergeant duties -- it's

1    classified as sergeant slash engineer,

2    which means he is an apparatus operator

3    and he is a working supervisor, which

4    means he supervises two to three

5    firefighters that are beneath him.

6         Q.    What is the pay difference

7    between sergeant and firefighter because

8    of this demotion?

9         A.    I believe it's about $30.

10        Q.    Do you think that's per pay

11   period?

12        A.    And I think it -- it's

13   probably pay period.  At the most, it

14   could be broken into $15 per pay period.

15        Q.    Was it your intention to take

16   away his money or what was the intention

17   behind the demotion?

18        A.    The intention was to demote

19   him from the rank of sergeant and not to

20   decrease his pay -- you wouldn't

21   normally.

22        Q.    Does the firefighter have the

23   same supervisory responsibility that a

1   sergeant has?

2        A.      No, sir.

3        Q.      So if I understand it right,

4   he's been charged with refusing to obey an

5   order?

6        A.      Yes, sir.

7        Q.      With being disrespectful to a

8   superior?

9        A.      That's correct.

10       Q.      Violating the chain of

11   command?

12       A.      Yes, sir.

13       Q.      And making untrue and false

14   accusations against a superior officer?

15       A.      That's correct.

16       Q.      I'm going to show you a

17   document that I believe was attached to

18   one of the charging documents that you

19   prepared.  I've marked this as No. 1 on

20   the top corner, Exhibit 1.  Is that the

21   document that you attached to the charging

22   documents in this case?

23                   (WHEREUPON, a document was

1              marked as Exhibit No. 1 and is

2              attached to the original

3              transcript.)

4        A.    Yes, sir, it is.

5        Q.    Does it outline the charges

6   that Sergeant Hartwell, at the time, the

7   rules violations that he was charged with?

8        A.    Yes, sir.

9        Q.    Specifically it enumerates in

10  Article 11, Section 1100 several

11  subsections:  A, B and C.

12       A.    Yes.

13       Q.    And several subsections of

14  1101?

15       A.    Yes, sir.

16       Q.    And 1102?

17       A.    Yes, sir.

18       Q.    And finally 1103; is that

19  right?

20       A.    Yes, sir.

21       Q.    And at the bottom it says

22  prior record also considered?

23       A.    Yes, sir.

1    Q.    Tell the Board if you will,

2  Chief, what happened.  I believe all of

3  this began on August the 4th; is that

4  correct?

5    A.    Yes.

6    Q.    Tell the Board, if you will in

7  your own words, what happened on August

8  the 4th and how these events came to

9  pass.

10    A.    If I could sum up the day of

11  August 4th, Sergeant Hartwell at the time

12  was hired, as we term it, to work

13  overtime.  Which means he had worked a

14  shift, his shift prior, and he was hired

15  the next following day of the next shift

16  to work an overtime shift.  To kind of sum

17  it up, later on in the day when he found

18  out that he had to pull a detail at

19  another station -- and that station had a

20  lot of work to be done -- he claimed to be

21  sick.  Prior to telling his officer that

22  he was sick and that he needed to go home,

23  he had that morning revealed to some

1    firefighters at the drill field that if he

2    had to go on detail at Station Three that

3    he would claim that he was sick -- that he

4    would be sick -- that he would claim that

5    he would be sick and that he would go

6    home -- and he was heard by some fellow

7    firefighters at the drill field when he

8    made that statement.

9          Q.    Who was the captain for whom

10   he was going to work that day, August the

11   4th?

12         A.    He was going to work at a

13   station where Lieutenant Donny Adams was

14   the officer in charge.

15         Q.    Had Captain Burkett arranged

16   for Hartwell to work that day?

17         A.    Yes, sir.   Captain Burkett was

18   the commanding supervisor for that shift.

19         Q.    And then did Captain Burkett

20   call Lieutenant Adams at Station Three at

21   some point and inform him that Sergeant

22   Hartwell was not going to come because he

23   was sick?

1          A.      Yes, sir.  And that's -- it's
2     protocol for the district supervisor to
3     call the officer to advise the officer of
4     who he would have coming to pull the
5     detail, and what time he would be coming.
6          Q.      When he called Lieutenant
7     Adams and told him that Hartwell was sick,
8     what did Lieutenant Adams tell him?
9          Lieutenant Adams basically laughed
10    and said, okay.  He said that.  In other
11    words, meaning he said that he would go
12    home if he would have to come on detail --
13    basically.  It's not verbatim.
14         Q.      When you say, "go on
15    detail" -- now if I understand it right,
16    that meant he was going to Truck 45; is
17    that right?
18         A.      Yes, sir.  He was going to
19    another station, and we call that detail.
20    When you are not working at your house.
21    When you are working at another house, and
22    we call it a detail.  So he was going to
23    another house to complete that shift.

1      Q.    Did that particular house have

2    some extra duties that were scheduled for

3    that day?

4      A.    Yes, sir.  It was my

5    understanding that they had a pretty heavy

6    workload that day -- :  Changing hose, et

7    cetera, et cetera.

8      Q.    In fact if I read it right, I

9    think they were going to inventory one of

10   the heavy rescue vehicles that day; is

11   that right?

12     A.    Yes, sir.

13     Q.    And change the hose out on

14   Engine Three?

15     A.    Yes, sir.

16     Q.    When Hartwell returned to work

17   on August the 7th, who was his District

18   Chief on that particular day?

19     A.    The District Chief was Kelley

20   Gordon.

21     Q.    Did Chief Gordon talk to

22   Sergeant Hartwell about his being sick?

23     A.    Yes, he did.

1          Q.     What did he tell him?

2          A.     He told him that he -- that he

3     was sick on August the 4th and that he

4     went to, I believe, PriMed or he went to

5     the doctor.

6          Q.     Hartwell told Gordon that?

7          A.     Yes.

8          Q.     How did Chief Gordon respond?

9          A.     Chief Gordon responded by

10    asking Sergeant Hartwell if he would --

11    upon his next day or next shift at work --

12    if he would bring a doctor's

13    certificate -- a return to work doctor's

14    certificate stating that he did indeed go

15    to the doctor.

16         Q.     What was Hartwell's response?

17         A.     Hartwell's response was,

18    basically, I can't do that, or I won't do

19    that, or I was advised not to bring a

20    doctor's certificate.

21         Q.     At some point was that

22    instruction repeated by Chief Gordon at

23    some point?

1       A.    Yes.  If I recollect at least

2    twice he asked him again if he would just

3    bring the certificate in the next day you

4    come to work.

5       Q.    Did he ask him or did he tell

6    him to?

7       A.    No, sir.  He told him to.

8       Q.    What was the response on the

9    two successive commands?

10      A.    The same as the first one.  I

11   can't do that, or I'm not required to do

12   that, or I was advised not to.

13      Q.    Is it normal, Chief, if

14   somebody is sick, or is it standard

15   procedure for a Chief or a Captain or an

16   Officer to ask for or require a return-to-

17   duty slip from a doctor?

18      A.    Yes, sir, it is.  It's at the

19   discretion of the officer.

20      Q.    Is it important for the

21   officers to know that their firefighters

22   are healthy when they are on shift?

23      A.    Yes, sir, it is.

1    Q.    Did you get some communication

2    after that from Sergeant Hartwell after he

3    had his conversation with Chief Gordon?

4    A.    Yes, I believe I did.  Yes.

5    Q.    What happened?  What did you

6    get?

7    A.    Let me not rely on my

8    recollection.  Let me look at my notes for

9    a minute.  I did receive a communication

10   letter -- and I believe that the gist of

11   the letter was from Sergeant Hartwell

12   explaining to me what actually happened on

13   that day involving him going home with a

14   sick leave.

15   Q.    Was that dated about August

16   the 7th, around the same time Chief Gordon

17   talked to him?

18   A.    Yes, sir.

19   Q.    How did you receive that

20   letter or memo from Sergeant Hartwell?

21   A.    Well, I took offense to it

22   because it's not procedure that Sergeants

23   write letters directly to the Assistant

1    Chief or any higher ranking person without

2    first going through his company officer.

3        Q.    Did it come directly to you or

4    did it come up through the ranks?

5        A.    My understanding is that it

6    came directly to me.  Now, he may have --

7    he may have distributed some other

8    letters, but it was sealed to me.

9        Q.    I see.  What's the proper

10   procedure?  If Sergeant Hartwell wants to

11   get communication to you, what's proper

12   procedure for that?

13       A.    He starts first with his

14   immediate supervisor, which would be his

15   company officer.

16       Q.    That would be a lieutenant or

17   captain?

18       A.    Yes, sir.

19       Q.    Is it normal for that to get

20   passed up through the chain of command to

21   you through those officers?

22       A.    Yes, sir, it is possible.

23   Going back I did find his communications

1    to me.  And I believe the way it went is

2    that he wanted to handmail me a letter.

3    The letter was brought into question by

4    the District Chief because his company

5    officer gave it to the District Chief to

6    bring downtown to me.  The District Chief

7    questioned that letter as to whether or

8    not the Captain knew the contents of it

9    and did he actually permit it or sign off

10   on it.  The captain's response was

11   basically no, I did not sign off on the

12   letter and I basically did not give him

13   permission.  And I believe how it went

14   then is that the District Chief, Kelley

15   Gordon, told the Captain to open the

16   handmail envelope, read the contents, and

17   then sign off on it.  That was done and

18   then the District Chief allowed that

19   handmail to come to me.

20        Q.    Now is that the first time you

21   got a letter directly from Sergeant

22   Hartwell?

23        A.    No, sir.

1      Q.     How many times have you
2   received a letter directly from him?
3      A.     At least two, possibly three.
4      Q.     I'm going to show you a
5   document.  It's a memo dated August the
6   17th of 2004.  I'm going to ask you if you
7   recognize that.
8      A.     Yes, sir.  This is a memo
9   filed that I wrote for my personal file
10   concerning Sergeant Hartwell's addressing
11   a written communication to me.
12      Q.     And this was August 17th of
13   2004, correct?
14      A.     Yes, sir.
15      Q.     This was a full year before
16   the events we are talking about now,
17   right?
18      A.     Yes, sir.
19      Q.     I believe it's in the last
20   paragraph you talk about Hartwell being
21   informed of the fact that he's not
22   supposed to be sending these letters
23   directly to you?

1      A.      Yes, sir.  I wrote:  Future

2   circumventing under the chain of command

3   from this sergeant in this regard when is

4   not necessary will result in actions taken

5   in the form of a written reprimand.

6      Q.      Does it say in there -- a

7   little bit past that -- that District

8   Chiefs Holland and Petrey had both

9   informed him that he wasn't supposed to do

10  that?

11     A.      Yes, sir.

12     Q.      Is it written in the Fire

13  Department Manual that he's not supposed

14  to do that?

15     A.      It is written that he's

16  supposed to follow the chain of command,

17  meaning starting with his immediate

18  supervisor.

19     Q.      I'm going to show you another

20  memo that's dated September the 20th, 2004

21  and ask you if you recognize that?

22                  (WHEREUPON, a document was

23                  marked as Exhibit No. 2 and is

```
 1                attached to the original

 2                transcript.)

 3         A.     Yes, sir.  This, again, is a

 4   memo of written communication from

 5   Sergeant Hartwell to me.

 6         Q.     Was this done after you

 7   received yet another communication from

 8   him?

 9         A.     Yes, sir.

10         Q.     And this was after the

11   previous memo and after District Chiefs

12   Holland and Petrey had told him that he

13   wasn't supposed to be sending them

14   directly to you; is that right?

15         A.     Yes, sir.

16         Q.     Does it say in there that you

17   had no choice but to charge him with rules

18   violations?

19         A.     Yes, sir.  Displayed behavior

20   of disrespect continued.  It leaves me no

21   other choice than to bring charges against

22   Sergeant Hartwell for failure to obey

23   officers and district chief orders
```

1  pertaining to the circumvent of the chain

2  of command.

3          Q.    I'll show you another document

4  that is a September 25, 2004 Form 30B.

5  I'm going to ask you if you've seen that

6  before?

7          A.    Yes, sir.  I have reviewed

8  this document.

9          Q.    Is this the write-up that was

10 generated subsequent to that memo that you

11 just talked about?

12         A.    Yes, sir.

13         Q.    And this was a counseling that

14 was done by -- was it his captain or

15 district chief?

16         A.    District chief.

17         Q.    Written in the bottom right-

18 hand corner, what does that say?

19         A.    Sergeant Hartwell refused to

20 sign the form.

21         Q.    And this documents a verbal

22 counseling session that was had by his

23 then District Chief Petrey regarding that

1    letter; is that correct?

2         A.    Yes, sir.

3         Q.    Now, Chief, the next charge

4    that you brought against Sergeant Hartwell

5    is for making untrue and false and

6    slanderous allegations against a

7    superior.  Tell the Board, if you will,

8    what happened in that situation.  How it

9    came to your attention and what the

10   allegations were.

11        A.    District Chief Kelley, if I

12   recollect the chain of events, came to me

13   and told me that he had received a letter

14   allegedly accusing him of being a racist

15   because -- and to substantiate Sergeant

16   Hartwell's claim as him being a racist --

17   indicated that he had a Confederate tattoo

18   on his arm.  Chief Kelley was very

19   disturbed by that.

20        Q.    This was an accusation made by

21   then Sergeant Hartwell?

22        A.    Yes, sir.

23        Q.    About Chief Gordon, right?

1        A.      Yes, sir.

2        Q.      Was that investigated?  Did

3    the department look into that?

4        A.      Yes.  The department had

5    visited that situation years prior --

6    somewhere in 1990s.  The department had

7    said that the tattoo was perfectly in line

8    with a tattoo policy that we have.  In

9    other words, it did not violate any tattoo

10   policies and that he had every right to

11   have that tattoo.

12       Q.      Did the department question

13   him about why he had that tattoo?

14       A.      I think perhaps during the

15   initial investigation and claims.  Chief

16   Kelley told me some accounts of how he

17   came about the tattoos.  So the question

18   perhaps was asked by the department at

19   some time.

20       Q.      What was your understanding

21   about how he got the tattoo?

22       A.      The way he explained it to me,

23   he was a Navy man.  And he says, Chief

1  everybody in the Navy has a tattoo --
2  which you take that with a grain of salt.
3  But he said I was 17 years old, I was out
4  drinking one night, my buddy and I passed
5  by this tattoo parlor -- I was from
6  Alabama -- my Navy buddies called me Bama
7  or Alabama -- so he walks into this tattoo
8  parlor and he said I want that one right
9  there that says Alabama and I want the
10 Confederate flag tattooed on my arm.  And
11 he's had it since age 17 or 18.
12       Q.    How long have you worked with
13 Chief Gordon?
14       A.    I have worked with Chief
15 Gordon all of his career.  I think Chief
16 Gordon has approximately 17, 18 years in
17 the department.
18       Q.    Have you worked closely with
19 him?  Do you know him on a daily basis?
20       A.    Yes, sir.  I've worked closely
21 with him for the last three years since
22 he's been District Chief.
23       Q.    Did you have contact with him

1    before that when he became district chief?

2        A.    Yes, sir.  Become the officer,

3    captain and also as lieutenant,

4    lieutenant-in-training.

5        Q.    Did you have any reason to

6    believe that he was a racist or that he

7    treated anybody unfairly or unequally?

8        A.    No, sir.  I've never had that

9    thought in my mind.  I've never witnessed

10   him being considered as such and I didn't

11   consider him as being as such.

12       Q.    Now these accusations that

13   Sergeant Hartwell made, were they made

14   after he and Chief Gordon had had some

15   problems?

16       A.    Yes, sir.

17       Q.    And some of those problems

18   we've talked about here?

19       A.    Yes, sir.

20       Q.    In fact Chief Gordon was

21   Sergeant Hartwell's district chief for

22   quite a while when he was at several

23   stations; is that right?

```
1          A.      At least one other station,
2    yes.
3          Q.      That was Station 13?
4          A.      Station 16, I believe.  At one
5    time Sergeant Hartwell was stationed at
6    Station 16.
7          Q.      Wasn't he also at 13 at some
8    point?
9          A.      At this particular time that
10   we are speaking of, yes, he was at Station
11   13.
12         Q.      And that's where Chief Gordon
13   pretty much stays during his shift?
14         A.      That's his house.  Yes.
15         Q.      Has Sergeant Hartwell made any
16   other similar allegations in the past?
17         A.      Concerning the Confederate
18   flag?
19         Q.      Well, any allegations like
20   that against any other officer?
21         A.      Yes, sir.  We go back to his
22   previous station, Station 16.  He made
23   reference to his captain, Captain Dennis,
```

1    at the time about something to the effect

2    that he made a statement that -- to

3    District Chief Petrey in writing -- that

4    he bluffed Captain Dennis on one occasion

5    and played the race card by asking him if

6    he was a racist.

7         Q.    Had he and Captain Dennis had

8    some problems at Station 16?

9         A.    Yes, they had some problems.

10        Q.    And that had to do with

11   parking places and where sergeants could

12   sleep in that station?

13        A.    Where he could sleep, not

14   sergeants -- but where he could sleep.

15        Q.    Okay.

16              MR. MILLS:   That's all.

17

18   CROSS-EXAMINATION BY MR. BRANNAN:

19        Q.    Chief, that statement about

20   saying he was alleging Dennis was a

21   racist, you said that was made in writing

22   by Hartwell.  That wasn't in writing about

23   Hartwell was it, that was a memo from --

1      A.    It was a memo from one of my

2   District Chiefs, District Chief John

3   Petrey, I believe.

4      Q.    So when you say it was in

5   writing it wasn't in writing -- that that

6   was something that Hartwell put in

7   writing, was it?

8      A.    It was in writing from

9   District Chief Petrey.

10      Q.    Now, y'all introduced -- and I

11   don't know what number you had on it --

12   but a counseling form stating that on

13   August the 11, 2004.  Did you look at

14   this?

15      A.    Yes, I have that one.  I'm

16   sorry.  This is a different one.  Let me

17   see that.

18              MR. MILLS:  No, that's it.

19      Q.    (MR. BRANNAN)  You see right

20   here?  The first two that occurred on

21   August the 11th?

22      A.    Yes.

23              MR. PATERSON:  Is this No.

1    3 y'all are talking about?

2                     MR. MILLS:  Yes.

3                     MR. BRANNAN:  And I don't

4    have a copy of this.

5         Q.    (MR. BRANNAN)  I'm going to

6    show you what I've got marked as

7    Employee's Exhibit No. 5.  That daily

8    journal would show who was on duty that

9    day, would it not?

10                    (WHEREUPON, a document was

11                    marked as Employee's Exhibit

12                    No. 5 and is attached to the

13                    original transcript.)

14        A.    Yes, sir.

15        Q.    Is Sergeant Hartwell even on

16   duty on August the 11th?

17        A.    No, sir.

18        Q.    Okay.

19                    MR. BRANNAN:  We move to

20   introduce that.

21        Q.    (MR. BRANNAN)  Chief, I want

22   us to try to get clear on this situation

23   about the tattoo policy.  Isn't it true

1    that Sergeant Hartwell complained about

2    that originally in 1999 before Kelley

3    Gordon was any form of District Chief and

4    before Kelley Gordon was ever above him or

5    his supervisor?

6            A.    Yes, sir.

7            Q.    And the tattoo policy has been

8    in effect since 1999; is that correct?

9            A.    I believe that's correct, yes,

10   sir.

11           Q.    I'm going to show you what's

12   marked as Employee's Exhibit No. 1.  Take

13   a look at that, please, sir.  Is that the

14   policy?

15                 (WHEREUPON, a document was

16                 marked as Employee's Exhibit

17                 No. 1 and is attached to the

18                 original transcript.)

19           A.    Yes, sir.

20           Q.    The tattoo policy we've been

21   talking about?

22           A.    Yes, it is.

23           Q.    On that policy that we have

1    there it talks about how and when you can

2    have a tattoo and it refers to

3    unauthorized tattoos.  It says anywhere on

4    the body that are obscene and/or advocates

5    sexual, racial, ethnic or religious

6    discrimination are prohibited in and out

7    of uniform.  Tattoo brands that are

8    prejudicial to the good order and

9    discipline or of the nature that tends to

10   bring discredit upon the Montgomery Fire

11   Department of the City of Montgomery are

12   prohibited in and out of uniform.  That's

13   the policy, is it not?

14          A.    Yes, sir.

15          Q.    And it goes on to state just

16   being able to cover it up with some form

17   of the uniform or anything doesn't work --

18   you can't do that, you can't have it; can

19   you?

20          A.    I don't know it verbatim to

21   say that.

22          Q.    Okay.  And it goes on to say

23   that Montgomery Fire Department members

```
1    with existing tattoos or brands before
2    they placed the policy not meeting
3    acceptable Fire Department appearance and
4    image will be required to remove the
5    tattoos or brands.  It states that too,
6    doesn't it?
7          A.    Yes.
8          Q.    Move to introduce Exhibit
9    1. Kelley Gordon's tattoo is a Confederate
10   flag with a skull in the middle of it,
11   isn't it?
12         A.    You know I don't recall
13   really.
14         Q.    It's on his arm right here.
15         A.    Yes.  About the skull that is.
16         Q.    I understand.  But you know
17   that the Confederate flag with whatever
18   it's got in it is right there on the side?
19         A.    Yes.
20         Q.    Are you familiar with the
21   skull and the Confederate flag being an
22   insignia of skinheads?
23         A.    No, I'm not.
```

```
 1          Q.     Now, in August of 2005, Kelley
 2    Gordon sent you a memo that I've marked as
 3    Exhibit 7.  And in that memo he talks
 4    about the Confederate flag tattoo in
 5    there, does he not?
 6                      (WHEREUPON, a document was
 7                      marked as Defendant's Exhibit
 8                      No. 7 and is attached to the
 9                      original transcript.)
10          A.     Yes, sir.
11          Q.     And in that memo he talks
12    about how back in 1999 Officers Hartwell
13    and Troy Harris had complained about that
14    tattoo.
15          A.     Yes, sir.
16          Q.     And he states that they had
17    complained up the chain of command about
18    him having that tattoo.
19          A.     Yes, sir.
20          Q.     And it talks about it as late
21    as 2005?
22          A.     Well, he brought it up again,
23    yes.
```

1    Q.    Okay.

2              MR. BRANNAN:    Move to

3    introduce Exhibit 7.

4    Q.    (MR. BRANNAN)  In fact when

5    the complaint was made about the tattoo,

6    it was long before he was his chief.  And

7    then when he became his chief and started

8    disciplining Hartwell, Hartwell brought it

9    back up, didn't he, and said disciplining

10   me because I complained back in 1999;

11   isn't that true?

12   A.    I didn't understand it to

13   happen that way.

14   Q.    Well then what was Hartwell

15   bringing it up to you about it again?

16   You've already testified that Hartwell

17   brought it up to you complaining about

18   that Confederate flag.

19   A.    I think he brought it up

20   because he was being disciplined and he

21   wanted something to bring up against Chief

22   Kelley to --

23   Q.    When you say Chief Kelley you

1    mean Chief Gordon?

2         A.    Chief Gordon, yes.

3         Q.    Did you even think that maybe

4    you might want to look to see if Gordon

5    was disciplining him differently than

6    other people because of the fact he had

7    complained on him in '99 about that

8    Confederate flag?

9         A.    I did look.  We talked.  Chief

10   Gordon and I did talk about the whole

11   situation.  And as I have explained to the

12   Board what took place, I had no reason to

13   believe that Kelley was doing this out of

14   malice towards Sergeant Hartwell.

15        Q.    Well, in fact you testified

16   earlier that Kelley Gordon was his

17   District Chief when he was written up and

18   investigated about this sick-leave

19   incident.  Didn't you testify to that?

20        A.    Yes, sir.

21        Q.    He was really not his district

22   chief, though, was he?

23        A.    That's correct.

```
 1        Q.     He was not his chief.  He
 2   stayed on in the morning to handle a
 3   problem that he perceived was Hartwell --
 4   and Hartwell wasn't even working under him
 5   that day -- Hartwell had another district
 6   chief.  Kelley Gordon was on the shift
 7   before.
 8        A.     Kelley Gordon, the shift that
 9   he worked overtime on, was Kelley Gordon's
10   shift.  He was not on Kelley Gordon's
11   shift. -- Sergeant Hartwell was not.
12        Q.     But isn't it true that Kelley
13   Gordon stayed late after his duty hours
14   and kept Hartwell after the duty hours so
15   he could deal with him on a circumstance
16   when he was not his district chief.
17        A.     Well, actually he is the
18   district chief because he was district
19   chief of that district.
20        Q.     Well, don't you have one for
21   each shift?
22        A.     That's correct.
23        Q.     And wouldn't that be the
```

1    proper chain of command?

2        A.    It was a captain working that

3    day, August 4th.

4        Q.    Okay.  But there was also a

5    different district chief for that day, for

6    that shift other than Kelley Gordon.

7        A.    A captain was working that day

8    as district supervisor.

9        Q.    Because the district chief

10    that should have been there was off?

11        A.    That's correct.  Which was

12    Gordon.

13        Q.    Kelley Gordon was on the shift

14    before, stayed late to discipline him on

15    this issue concerning the sick leave.

16        A.    Yes, sir.

17        Q.    Now, as far as the Confederate

18    flag, this is what the insignia looks like

19    that the city has now for the Fire

20    Department, isn't it?

21        A.    That's correct.

22        Q.    What this is would be a

23    firefighter's because it's silver.  What

1    you've got is gold because you are a
2    chief?
3          A.     Yes, sir.  Officer.
4          Q.     Officer.  This is what was
5    replaced, was it not?
6          A.     Yes, sir.
7          Q.     When was this replaced?
8          A.     I don't recall.
9          Q.     It's been in the last year or
10   so, wasn't it?
11         A.     No.  It's been longer than a
12   year.
13         Q.     Okay.  It's been in the last
14   four years?
15         A.     Perhaps.
16         Q.     And it was replaced because it
17   had the Confederate flag on it, didn't it?
18         A.     No, it wasn't replaced because
19   of that.
20                MR. BRANNAN:  I don't have
21   them marked but, I introduce those two.
22                (WHEREUPON, documents were
23                introduced and are attached to

```
 1                    the original transcript.)
 2        Q.    (MR. BRANNAN)  Now, let's talk
 3   about the sick leave policy.  Chief Gordon
 4   decided that he was going to deal with him
 5   on violation of a sick leave policy; is
 6   that right?
 7        A.    Not exactly.
 8        Q.    Well, are you familiar with a
 9   policy that the department has concerning
10   sick leave?
11        A.    I am.
12        Q.    I'll show you what's been
13   marked as Employee's Exhibit No. 4 and ask
14   you if that is that policy?
15                   (WHEREUPON, a document was
16                    marked as Employee's Exhibit
17                    No. 4 and is attached to the
18                    original transcript.)
19        A.    Yes, it is.
20        Q.    And that policy states it
21   deals with getting a doctor's excuse, does
22   it not?  Second page.
23        A.    That's correct.
```

1       Q.     Here it states at the
2    discretion of a company officer or
3    district supervisor, a physician excuse
4    may be required from an employee using
5    paid sick leave.  That's the language that
6    it has, does it not?
7       A.     Yes, that's correct.
8       Q.     Now, Sergeant Hartwell was not
9    using paid sick leave when he left on a
10   day that he was volunteering to work an
11   extra day, was he?
12      A.     I'm not sure I understand what
13   your question is.
14      Q.     Well, could he have applied
15   for sick leave that day?
16      A.     I think he can.
17      Q.     So I can volunteer for an
18   extra day that's not my assigned shift, be
19   working overtime, and then say I'd like to
20   have sick leave because I'm not feeling
21   well?
22      A.     I believe you can.
23      Q.     You know he's not eligible for

1    sick leave working overtime on an extra

2    shift.

3         A.    If he becomes sick, he's sick.

4         Q.    He just gets paid for the

5    overtime up until when he gets sick and

6    leaves.  He can't be on overtime and get

7    overtime sick leave.

8         A.    Okay.

9         Q.    Now if this language says that

10   an officer may ask for a doctor's excuse

11   if the employee is using paid sick leave.

12   He can ask for it if he's not using paid

13   sick leave, because y'all don't meddle in

14   everybody's health and what their problems

15   with health are unless it's related to

16   work and your sick leave policy; isn't

17   that true?

18        A.    What is the question?

19        Q.    Well, the question is:  Y'all

20   don't go dabble into everybody's health

21   conditions down there and trying to figure

22   out what kind of health they are in unless

23   it has something to do with employment, do

```
 1   you?
 2          A.     I think that's more of a
 3   statement than a question.  I don't
 4   understand what your question is.
 5          Q.     Do you?  That's the question.
 6          A.     Do we what?
 7          Q.     Do you meddle into everybody's
 8   health condition down there?
 9          A.     No, we don't meddle into
10   health conditions.
11          Q.     In fact you understand that
12   there are rules that keep you from doing
13   that, don't you?
14          A.     We do not meddle into people's
15   health conditions.
16          Q.     Did Kelley Gordon go and get
17   memos and statements and things from
18   people concerning this -- whether or not
19   Hartwell was sick?
20          A.     Yes.
21          Q.     And he went around and asked
22   people to give him memos or do reports and
23   whatever y'all call --
```

1     A.    He asked for documents on what

2    was stated on the drill field by Sergeant

3    Hartwell.

4     Q.    Was there another firefighter

5    who said that he ate the same thing at

6    lunch that Hartwell did and he had stomach

7    cramps?

8               MR. MILLS:  I'm going to

9    object.  It's not relevant.  He's not

10    being written up for being sick.

11               MR. BRANNAN:  It's totally

12    relevant if he ate the same thing the man

13    ate.

14               MR. MILLS:  He was written

15    up for not following an order to get a

16    doctor's return-to-work slip.  That's it.

17               MR. BRANNAN:  Well if

18    that's their position, then we won't go

19    forward with that because I think they've

20    got documentation that he's not required

21    to do that.  He was not written up for

22    saying he was sick and he wasn't.

23               MR. MILLS:  No.

```
1                    MR. BRANNAN:  Okay.
2          Q.    (MR. BRANNAN)  Now, did you
3    have any input on determining what the
4    recommended discipline was going to be for
5    Sergeant Hartwell -- that he would be
6    demoted?
7          A.    It was my recommendation.
8          Q.    It was your recommendation,
9    wasn't it?
10         A.    Yes.
11         Q.    And one of the things that he
12   is charged with, I think, is that he
13   didn't follow the chain of command; is
14   that correct?
15         A.    Yes.
16         Q.    I'm going to show you what's
17   marked as Employee's Exhibit 2.  Is that
18   the chain of command policy?
19                (WHEREUPON, a document was
20                marked as Employee's Exhibit
21                No. 2 and is attached to the
22                original transcript.)
23         A.    Yes.
```

1          Q.     The memos that Hartwell sent

2    up the chain to you -- you testified in

3    the Mayor's Hearing that they should not

4    have been addressed to you; is that

5    correct?

6          A.     Yes.

7          Q.     They should have been

8    addressed to his company officer rather

9    than to you?

10         A.     Yes.

11         Q.     How does that purport with

12   this policy saying that they should be

13   addressed to the person and the station

14   number that you are sending them to?  So

15   if he wants to get a memo to a District

16   Chief, he's not to address it to the

17   District Chief, he's to address it to his

18   company officer.  Is that what your

19   testimony is?

20         A.     Yes.

21         Q.     How does that add up with the

22   department's policy that shows right here

23   the example is from William A. Ross,

1  Firefighter, to James O. Smith, District

2  Chief?

3       A.     Because that's not common

4  practice.

5       Q.     It's the policy.

6       A.     But the district chiefs and

7  firefighters have been instructed as to

8  the proper chain of command for the

9  heading of a letter.

10      Q.     But this right here is the

11  interdepartmental communications policy

12  Section 963 Proper Interdepartmental

13  Communication.

14      A.     1992.

15      Q.     Exactly.  That's the one.  And

16  I asked you and you checked your file to

17  make sure it was right, didn't you?

18      A.     Yes.

19      Q.     And it was right.  This is the

20  policy and it shows directly from a

21  firefighter to a district chief.

22      A.     Yes.

23                   MR. BRANNAN:   We move to

1    introduce Exhibit 2.

2        Q.    (MR. BRANNAN)   Now, I

3    requested in discovery a file that you

4    said you kept on all these memos that you

5    get.  Correct me if I'm wrong, but I

6    didn't get it.  But I do have a number of

7    memos that I have been able to find in

8    other areas -- and I'm going to show you

9    what's marked as Exhibit 3.  Will you look

10   through those and see if those aren't

11   Interdepartmental Fire Department memos?

12                (WHEREUPON, a document was

13                marked as Employee's Exhibit

14                No. 3 and is attached to the

15                original transcript.)

16       A.    Yes, they are.

17       Q.    Is any one of them there

18   addressed to the person right above the

19   firefighter?

20       A.    These letters here are a

21   request from the district chief.  It's a

22   directive from the district chief.  It was

23   an investigation and the district chief in

1  his investigation asked firefighters to

2  write to him letters of document.

3        Q.    Well, how about this one right

4  here -- the very first one.  You've got it

5  right here.  Look at the very first one

6  right there.  This is from Firefighter D.

7  M. Adams to District Chief W. Young.  It

8  has nothing to do with Young asking him to

9  do an investigation.  It has to do with a

10  complaint about the sergeant's test,

11  doesn't it?

12        A.    Yes, it does.

13        Q.    Now, are you aware of any of

14  these individuals being written up for a

15  chain of command?

16        A.    No.

17        Q.    Any one of these individuals

18  here ever complain on Gordon about that

19  tattoo?

20        A.    None of these.

21        Q.    Okay.

22              MR. BRANNAN:  Move to

23  introduce Exhibit 3.

1       Q.    (MR. BRANNAN)  Now in

2  recommending the discipline for Hartwell,

3  did you feel it was consistent with what

4  you had done in the past with other

5  employees of the fire department?

6       A.    I did.

7       Q.    Are you familiar with a

8  Firefighter R. L. Rainer?

9       A.    I know him.  Yes.

10      Q.    Are you familiar with the

11  situation where he was asked to bring a

12  doctor's excuse as a result of him being

13  on sick leave and him forging the doctor's

14  excuse?

15      A.    I believe I recollect that,

16  yes.

17      Q.    Brought two separate forgeries

18  in so he could get sick leave?

19      A.    Yes.

20      Q.    And you recommended for him

21  just a 15-day suspension, did you not?

22      A.    I believe that's correct, yes.

23             MR. BRANNAN:  I move to

```
1     introduce 9.
2                     (WHEREUPON, a document was
3                     marked as Employee's Exhibit
4                     No. 9 and is attached to the
5                     original transcript.)
6          Q.    (MR. BRANNAN)  Are you
7     familiar with District Chief J. L.
8     Jennings?
9          A.    Yes, I am.
10         Q.    Are you familiar with you
11    making claims of her just completely
12    insubordinate to you?
13         A.    Yes, I do.
14         Q.    And you made that claim and
15    had her investigated about that more than
16    once, have you not?
17         A.    Only once.
18         Q.    You also had a situation where
19    y'all had to bring her in and talk to her
20    about driving around and stalking
21    somebody, didn't you, another
22    firefighter's wife?
23         A.    I played no part in that.
```

1      Q.    But you are aware that that

2   occurred, aren't you?

3      A.    Yes.

4      Q.    And there were incidents where

5   she had problems with firefighters where

6   you had to -- they made complaints on her

7   and you transferred, is it, Jones to get

8   him out from under her?

9      A.    I don't recollect Jones --

10   perhaps Quinnley, not Jones.

11      Q.    Okay.  And she's a district

12   chief -- she's still a district chief.

13      A.    Yes.

14      Q.    And you recommended a

15   suspension for her and she was suspended.

16   But she's had these charges against her

17   and nobody's ever recommended a demotion,

18   have they?

19      A.    I recommended a 29-day

20   suspension.

21            MR. BRANNAN:  I move to

22   introduce Exhibit 10.

23            (WHEREUPON, a document was

1          marked as Employee's Exhibit

2          No. 10 and is attached to the

3          original transcript.)

4     Q.    (MR. BRANNAN)  Are you

5   familiar with circumstances in a memo you

6   wrote concerning Sergeant A. C. Gibson?

7     A.    That's been a while.  I need

8   to look at that one.

9     Q.    2003.  I will be glad to have

10   you look at it.

11     A.    I'm sure I did.  I just can't

12   remember what it was concerning.  Yes,

13   this is mine.

14     Q.    Now, Gibson was a sergeant; is

15   that correct?

16     A.    Yes.

17     Q.    And he and Gordon got into a

18   situation where he was yelling at·Gordon;

19   is that correct?

20     A.    Yes.  It states that, that

21   Sergeant Gibson yelled out.

22     Q.    And you stated that Gordon

23   says he was rude and disrespectful and he

1    was talking out of control and causing a

2    scene in front his fellow firefighters?

3         A.    Yes.

4         Q.    And the problem here was he

5    was telling Gordon that if he went to the

6    doctor it was going to be on work time

7    because he wasn't going to do it on his

8    off-duty time; is that correct?

9         A.    Yes.

10        Q.    And he ended up getting a

11   five-day suspension; is that correct?

12        A.    Yes.

13        Q.    He was not demoted, correct?

14        A.    Yes.

15                MR. BRANNAN:    Move to

16   introduce Exhibit 11.

17                (WHEREUPON, a document was

18                marked as Employee's Exhibit

19                No. 11 and is attached to the

20                original transcript.)

21        Q.    (MR. BRANNAN)   Were you

22   involved in anything concerning a

23   Firefighter W. M. Jones and a problem he

1    had with a Sergeant Huffman?

2        A.    No, sir.

3        Q.    If you would, take a look at

4    this for me and see if that is anything

5    you remember and know anything about.

6        A.    I know some details of this

7    incident.  Yes.

8        Q.    This was a firefighter that

9    just refused to do something that he was

10    told to do and got in an argument with a

11    sergeant; is that correct?

12        A.    Yes.

13        Q.    And one of the things involved

14    had to do with the chain of command, too,

15    didn't it?

16        A.    I'm not so sure about it.

17        Q.    With this, action was taken

18    against him because he had been

19    disrespectful and such to the sergeant; is

20    that correct?

21        A.    Yes.

22        Q.    And he got a five-day

23    suspension?

```
1        A.    Yes.
2                    MR. BRANNAN:   Move to
3    introduce 12.
4                    (WHEREUPON, a document was
5                    marked as Employee's Exhibit
6                    No. 12 and is attached to the
7                    original transcript.)
8        Q.    (MR. BRANNAN)   Are you
9    familiar with the incident when
10   Firefighter Stan Martin refused a direct
11   order from Sergeant, at that time,
12   Hartwell and a Form 30 was prepared on
13   this and no action was taken -- and in
14   fact the Form 30 was signed off as void.
15   Are you familiar with that?
16       A.    Yes.
17       Q.    And Martin was charged with
18   disobeying a direct order to do something
19   by Hartwell, was he not?
20       A.    Yes, I believe that was.
21       Q.    But the Form 30 on that was
22   refused and just marked off with just a
23   void on it.
```

1                    MR. BRANNAN:  We will mark

2    that as an Exhibit.

3          Q.    (MR. BRANNAN)  Is that just

4    marked off void?

5          A.    Yes.

6          Q.    No action was taken against

7    Martin for refusing a direct order from

8    Hartwell when he was a sergeant, was

9    there?

10         A.    I believe he may have been

11   transferred.  I can't recall.  He may have

12   been transferred.

13         Q.    There was no difference from

14   him refusing a direct order from Hartwell

15   than Hartwell refusing bringing in this

16   doctor's excuse, was it?  You are saying

17   that was a direct order.

18         A.    Yes, sir, there is a

19   difference.

20         Q.    And what is that?

21         A.    Is that he disobeyed a

22   commanding officer, a chief officer.

23         Q.    Oh, so in the fire service you

1  can disobey a sergeant but you can't

2  disobey a district chief.

3       A.    I said he, Sergeant Hartwell,

4  disobeyed a direct order from a senior

5  officer.

6       Q.    But Martin disobeyed a direct

7  order from a sergeant?

8       A.    Yes.

9       Q.    Whose initial is on that back

10 page of that void?

11      A.    MJ.

12      Q.    Who is that?

13      A.    Miford Jordan.

14      Q.    What's his rank?

15      A.    Deputy fire chief.

16      Q.    He's your superior officer,

17 isn't he?

18      A.    Yes, sir.

19      Q.    So somehow this got up to

20 him -- and because it was Hartwell that's

21 been disobeyed, it gets void?

22      A.    I don't think it happened that

23 way.

1              MR. BRANNAN:   Move to

2     introduce 13.

3                   (WHEREUPON, a document was

4                   marked as Employee's Exhibit

5                   No. 13 and is attached to the

6                   original transcript.)

7          Q.     Now, you are in --

8          A.     I do tell you what I do feel

9     about that.   I think --

10         Q.     Well, you'll have your

11    opportunity to do that when your lawyer

12    asks you.   I'm going to go on to something

13    else.

14         A.     -- Sergeant Hartwell abused

15    his power in that situation.

16         Q.     I'll show you another memo

17    from you concerning Fire Medic A. D.

18    Rose.  Now you did the memo on that, but

19    he's not in fire suppression.  He's a

20    medic, isn't he?

21         A.     That's correct, yes, sir.

22         Q.     Why would you have done a memo

23    on him?

1      A.     Because I was assigned to do

2   it.

3      Q.     And the situation with Rose

4   was that he refused a direct order, didn't

5   he?

6      A.     No, sir.  He was

7   disrespectful.

8      Q.     Well, didn't the captain tell

9   him -- didn't somebody come into the

10  station to get his blood sugar checked?

11     A.     That's correct.

12     Q.     And he'd been in there

13  before.  It was an elderly gentleman and

14  he came in and asked him to check his

15  blood sugar?

16     A.     I believe that was correct,

17  yes, sir.

18     Q.     And the captain told Rose to

19  do it, didn't he?

20     A.     Yes, sir.

21     Q.     And Rose didn't do it.

22  Instead he told the captain that he knew

23  where the kit was and that he could go do

1    it.

2         A.    He did make that statement.

3         Q.    He said, Captain, you are a

4    paramedic and you know where the kit is,

5    why don't you check it?  That's what he

6    said, didn't he?

7         A.    Yes, sir.

8         Q.    Well, that's refusing an order

9    to go check the blood sugar, is it not?

10        A.    But I believe he did do it.

11        Q.    Did he also tell the captain:

12   I'll tell you like I told the officers at

13   training, I expect my paycheck every two

14   weeks unlike you, you depend on it.  And

15   he's telling the captain that during this

16   discussion, is he not?

17        A.    Yes, he did.

18        Q.    And he got 15 days, didn't he?

19        A.    Yes, he did.

20        Q.    And that was based on your

21   recommendation?

22        A.    Yes, sir.

23             MR. BRANNAN:  Move to

```
 1   introduce Exhibit 14.
 2                 (WHEREUPON, a document was
 3                 marked as Employee's Exhibit
 4                 No. 14 and is attached to the
 5                 original transcript.)
 6        Q.    (MR. BRANNAN)  Do you remember
 7   doing one on Palmer?
 8        A.    Yes, sir.
 9        Q.    His name is J. A. Palmer?
10        A.    James A.
11        Q.    Let me show you what's marked
12   as Exhibit 15.  Palmer got into it with a
13   superior officer also, didn't he?
14        A.    Yes.
15        Q.    And you wrote the memo on him
16   also, didn't you?
17        A.    Yes.
18        Q.    And in that you stated he's
19   been having an attitude problem for a
20   while; is that correct?
21        A.    Yes, I believe I stated that.
22        Q.    And all of this concerned over
23   him trying to go around the chain of
```

1    command; is that correct?

2         A.    Yes, in part.  That was one of

3    the things that he was advocating.

4         Q.    Well that was one of the

5    things, but he did a few others.  I mean

6    he was in more trouble than just the chain

7    of command, wasn't he?

8         A.    Not in this letter I don't

9    think.  Subsequently, yes, he was.

10        Q.    Well, you listed here on the

11   back all of the violations and there are

12   more than that -- just that chain of

13   command, wasn't it?  If you look on your

14   next-to-last page, you have a few things

15   he's violated.

16        A.    Yes.  Chain of command.

17        Q.    He was disrespectful and not

18   following the chain of command and he

19   received a five-day suspension, did he

20   not?

21        A.    Yes.

22        Q.    Based on your recommendation?

23        A.    Yes.

```
 1                    MR. BRANNAN:  Exhibit 15.

 2               (WHEREUPON, a document was

 3               marked as Employee's Exhibit

 4               No. 15 and is attached to the

 5               original transcript.)

 6          Q.    (MR. BRANNAN)  Now, one of the

 7    charges that you have brought against

 8    Sergeant Hartwell is that he made untrue

 9    statements about Chief Kelley Gordon; is

10    that correct?

11          A.    Yes.

12          Q.    What are the untrue statements

13    that he made?

14          A.    I don't believe Chief Kelley

15    is a racist.

16          Q.    Okay.  So you are saying that

17    he said Kelley Gordon was a racist.  Did

18    he say that in writing somewhere?

19          A.    I don't recall if he spelled

20    it out as racist or exercising a racial

21    attitude.

22          Q.    Well, in fact what he said --

23    that what y'all charged him with -- was
```

```
1    from a memo that he said in his opinion

2    Kelley Gordon was biased against him; is

3    that correct?

4         A.    I have a memo recalling bias

5    used.

6         Q.    Well, you have recommended a

7    man for demotion and one of the things you

8    are saying that he did was he said things

9    that were slanderous.  That was the term

10   y'all used earlier in some of your

11   documentation building up to this, and

12   that were untrue about Chief Kelley

13   Gordon.  And I want you to tell me exactly

14   what he did that you are basing that on.

15   You are right now saying I remember

16   something about bias.  I want to know.

17   You are the man that recommended his

18   demotion.  What was it he said about

19   Kelley Gordon that you consider to be

20   untrue?

21        A.    He said that he used the

22   Confederate flag to intimidate him,

23   basically.  And Chief Gordon never used
```

the Confederate flag to intimidate anyone.

Q.    Do you see how if you had reported somebody when they weren't your superior -- if you had reported them up the chain about the Confederate flag and if you read the rule it says that if it's offensive you can't have it.  You can't just cover it up -- you can't have it. Can you see why a man might be intimidated if all of a sudden that person is his officer?

A.    He had -- Chief Kelley had been his commanding officer prior to this incident on August the 4th and it was never brought up.

Q.    Exactly.  And he had written him up before August the 4th, too, hadn't he?  He'd written him up long before this sick leave situation, had he not?

A.    And it was deserved every time he did it.

Q.    Well let me ask you about that.  If a station fails an inspection,

1  the company officer is the one that's

2  written up on that, is that not true?

3        A.    Not necessarily.

4        Q.    Isn't that the procedure?

5  That the company officer is the one

6  responsible and is written up if there is

7  a failed inspection?

8        A.    That could be, yes.

9        Q.    And Kelley Gordon came in and

10  wrote up every individual firefighter in

11  the station because that station had

12  failed an inspection?

13        A.    He wrote a memo on everyone.

14        Q.    Well, it was an appraisal --

15  it was one of your forms.  It was a

16  firefighter form.

17        A.    And the reason why he did it

18  was because he sat each person down and

19  talked to them -- and it was just merely a

20  documentation.

21        Q.    Well, it's what's called an

22  appraisal, wasn't it?

23        A.    Yeah, I believe it was.  At

1    that time it was a 30D.  Now it's a Form

2    28.  And any time you talk to a person

3    about anything you should do a Form 28.

4         Q.    But back then it was the first

5    level of discipline, was it not?

6         A.    Yes.

7         Q.    So you get that and it'd go in

8    your file, then if you got disciplined

9    again you'd get that "Mustard Form" as

10    y'all call it.  That would be the next

11    one, wouldn't it?

12         A.    If it warrants, yes, or you

13    could get the Mustard Form right after

14    that if it warrants.

15         Q.    Sure.  But that is a form of

16    discipline is what my question is -- what

17    Kelley Gordon came in and presented them

18    all with in that fire station?

19         A.    No, it wasn't a discipline.

20    It was a documentation that he counseled

21    with those persons about the cleaning of

22    the station and how he wanted it cleaned.

23    Now, that's how he perceived it and that's

1   how he presented it to me.

2        Q.    Well, you saw the form and it

3   was telling them what they had done wrong?

4        A.    And he documented what he told

5   them.

6        Q.    Were you aware that Hartwell

7   was on vacation at the time they failed

8   the inspection?

9        A.    Yes, I was.

10       Q.    And are you aware that when he

11  said that doesn't pertain to me, I'm not

12  signing that, I wasn't even here -- that

13  Kelley Gordon writes him up for refusing a

14  direct order?

15       A.    He wrote counseling forms on

16  all the personnel.

17       Q.    I understand.  But he wrote a

18  Mustard Form on one person in that

19  station -- the man that was on vacation

20  when it didn't pass -- who signed his form

21  after he talked to his company officer.

22       A.    Let me see that form.  I don't

23  recall that.  I don't recall that.  Not to

1  say that it didn't happen -- I just don't

2  recall it.

3        Q.    Here is the Employee Appraisal

4  Review Record.  That's what he was giving

5  to all of them -- even the man that was on

6  vacation when it happened.

7        A.    And Sergeant Hartwell signed

8  it.

9        Q.    Exactly.  He did, didn't he?

10  His signature is on it.

11                  MR. BRANNAN:   And that was

12  16.

13                  (WHEREUPON, a document was

14                  marked as Employee's Exhibit

15                  No. 16 and is attached to the

16                  original transcript.)

17        Q.    (MR. BRANNAN)  If you would

18  now look at what's marked as 17.  That's a

19  Mustard Form -- that's a discipline, isn't

20  it?

21                  (WHEREUPON, a document was

22                  marked as Employee's Exhibit

23                  No. 17 and is attached to the

1                    original transcript.)

2        A.      Yes.

3        Q.      So 16 is the form that he gave

4   Hartwell.  And Hartwell says, I wasn't

5   there.  I was on vacation.  I don't know

6   whether I need to sign that.  He says sign

7   it.  Hartwell says, can I talk to my

8   officer?  Talked to the officer.  Then

9   Hartwell signs it.  And then 17, Gordon

10  goes ahead and writes him up for refusing

11  a direct order.

12       A.      Yes.

13               MR. BRANNAN:  Move to

14  enter 16 and 17.

15       Q.      (MR. BRANNAN)  Now that was

16  back in 2003, was it not?

17       A.      Yes.

18       Q.      Let me show you what's marked

19  as Exhibit 18.  In June of 2003 Hartwell

20  sends to Gordon a memo complaining about

21  him abusing his authority with him, with

22  Hartwell.  Is that not a complaint based

23  on abuse of authority towards Hartwell?

```
1          A.     I didn't consider it a

2     registered complaint.

3                    MR. BRANNAN:  Well, move

4     to introduce Exhibit 18.

5                    (WHEREUPON, a document was

6                    marked as Employee's Exhibit

7                    No. 18 and is attached to the

8                    original transcript.)

9          Q.     (MR. BRANNAN)  You are aware

10    that Hartwell has complained about the way

11    he was treated by Kelley Gordon from as

12    far back as 2003?

13         A.     No, I'm not aware of that.

14         Q.     Now, Hartwell had a situation

15    where he complained about Captain Norman,

16    did he not?

17         A.     I'll have to see that.

18         Q.     Okay.  This is a memo from you

19    to Chief Jordan, isn't it?

20         A.     Okay.  Yes, I recall this.

21         Q.     And Hartwell was complaining

22    because of Norman and others violating the

23    tobacco policy?
```

```
1          A.    Yes.
2          Q.    Now the fire department has a
3     tobacco policy, doesn't it?
4          A.    Yes.
5          Q.    Zero tolerance, isn't it?
6          A.    Yes.
7          Q.    You can't smoke?
8          A.    No.
9          Q.    You can't dip?
10          A.    No.
11          Q.    No tobacco at all?
12          A.    That's correct.
13          Q.    Norman admitted to you that he
14     used tobacco.  He said he used it in
15     uniform, admitted doing it in front of
16     other men, and told you he just didn't
17     know if he was going to quit or not.
18     Isn't that true?
19          A.    That's basically how it
20     happened, yes.
21          Q.    And the only thing y'all did
22     was y'all transferred Hartwell because he
23     had complained about something that
```

1    somebody admitted to.  Didn't take any

2    action against Norman, did you?

3         A.    I think Norman was transferred

4    at the time.

5         Q.    Norman told you that Chief

6    McKee had seen him smoking, didn't he --

7    you put it in your memo?

8         A.    Let's see if I wrote that.

9    Now if I wrote it, I said it.

10        Q.    Well, this may not be the one

11   it's in -- but look and see -- but I think

12   it's in this one.

13        A.    I don't see that in there.

14        Q.    Did you want anything done to

15   him?  Did you want him punished or

16   anything?

17        A.    Who is that?

18        Q.    Norman.

19        A.    We had somewhat of a cessation

20   program which we never really followed

21   through on it.  He was supposed to seek

22   counseling first and then go through the

23   cessation period and blah, blah, blah --

1   it never was enforced.

2        Q.    You put a quote in here from a

3   previous -- you said -- a former fire

4   department head once paraphrased this

5   quote and you wrote:  If the officers of

6   the Montgomery Fire Department don't

7   provide proper supervision and leadership,

8   the department suffers directly and the

9   public indirectly.

10       A.    Yes, I wrote that.

11       Q.    And that was referring to

12  Norman and the blatant violation of the

13  tobacco policy; is that correct?

14       A.    I wrote that, yes.

15       Q.    But he was not disciplined at

16  all.

17                MR. BRANNAN:  Exhibit 19.

18  I have no further questions.

19                (WHEREUPON, a document was

20                marked as Employee's Exhibit

21                No. 19 and is attached to the

22                original transcript.)

23

REDIRECT EXAMINATION BY MR. MILLS:

    Q.    Chief, how long have you been working with the Montgomery Fire Department?

    A.    Twenty-nine years, eight months today.

    Q.    Now, why do you have it out for Lee Hartwell?

    A.    I don't have anything against Lee Hartwell.

    Q.    Now, come on, Chief, don't you sit up in your office every day and try to figure out a way to get back at Sergeant Lee Hartwell?

    A.    No, sir.  As a matter of fact I was one of the most instrumental ones of him getting promoted to sergeant.

    Q.    Let me ask you this: Firefighter W. M. Jones, that Mr. Brannan talked to you about, got five days of suspension for being disrespectful to a superior officer.  What are you going to demote him to?

1      A.    There is no other rank below a
2  firefighter.
3      Q.    You can't demote him, can
4  you?
5      A.    No, sir.
6      Q.    But he got five days
7  suspension, right?
8      A.    Yes, sir.
9      Q.    In fact he was complaining
10 that day because he wanted to drive a
11 truck, wasn't he?
12     A.    I believe that's correct, yes,
13 sir.
14     Q.    So he basically was
15 complaining because he wanted to take on
16 more responsibility in his company; is
17 that right?
18     A.    Yes, sir.
19     Q.    What about Firefighter Palmer,
20 what are you going to demote him to?
21     A.    There is no rank lower than
22 firefighter.
23     Q.    He got five days for being

1   disrespectful, too; is that right?

2       A.    Yes, sir.

3       Q.    Now that was the only charge

4   he was charged with, correct?

5       A.    Yes, sir.

6       Q.    What about Rainer, Firefighter

7   Rainer -- can't demote him either, can

8   you?

9       A.    No, sir.

10      Q.    Now he got 15 days; is that

11  right?

12      A.    Yes, sir.

13      Q.    And as I understand it, you

14  recommended more than that; is that right?

15      A.    Yes, sir.

16      Q.    What did you recommend?

17      A.    I believe it was 29, sir.  I

18  think that may have been the case where it

19  was reduced somewhere along the lines.

20      Q.    That's right.  And wasn't it

21  because Firefighter Rainer was apologetic

22  and remorseful about his actions?

23      A.    Yes, sir.

1    Q.    Fire Medic A. D. Rose, what do
2  you demote him to?
3    A.    There is no rank below the
4  rank of firefighter.
5    Q.    You recommended 15 days for
6  him, right?
7    A.    Yes, sir.
8    Q.    Now, you didn't recommend any
9  days off for Mr. Hartwell; is that right?
10    A.    No, sir.
11    Q.    District Chief Jennings, did
12  she refuse a direct order?
13    A.    No, sir.
14    Q.    Did she make false allegations
15  about anybody?
16    A.    No, sir.
17    Q.    Did she violate a rule after
18  she had been told twice formerly not to
19  violate that rule any longer?
20    A.    No, sir.
21    Q.    And she got 29 days off the
22  payroll; is that right?
23    A.    Yes, sir.

1          Q.    And isn't it true that

2    Sergeant G. L. Boyd who got written up for

3    being disrespectful and disobeying an

4    order was also demoted from sergeant to

5    firefighter and he also got 29 days of

6    suspension?

7          A.    That's correct.

8          Q.    So what you recommended for

9    Sergeant Hartwell, former Sergeant

10   Hartwell, is actually less punishment than

11   what Sergeant Boyd got for some of the

12   same actions; is that right?

13         A.    Yes, sir.

14         Q.    I believe you wanted to

15   elaborate on Lieutenant Johnson.  There

16   was some event that Mr. Brannan talked

17   about -- and did you want to elaborate on

18   that or was that the direct order that

19   Sergeant Hartwell had given to another

20   employee?

21         A.    Was that Martin?

22         Q.    Martin, was that it?  I don't

23   know.  It was one that you wanted to

1  expand on and Mr. Brannan didn't want you

2  to.

3        A.    Well, I'm sorry, I can't --

4  I'm sorry.

5        Q.    Well, that's all right.  We

6  will move on.  What kind of employee was

7  Sergeant Hartwell?

8        A.    Sergeant Hartwell is a person

9  who is capable of being a sergeant.  He

10  works well on the fire ground.  He

11  basically worked well with the firemen

12  under him.  Sergeant Hartwell is an

13  intimidating person.  Sergeant Hartwell

14  does not like to be told what to do by

15  officers.

16        Q.    That's a pretty difficult

17  thing to have in the fire department?

18        A.    It is as though he resents

19  being told what to do from people above

20  him.

21        Q.    Do you want him driving your

22  fire truck?

23        A.    No, sir, not any longer.

1      Q.    Do you want him supervising
2   one of your line companies if say a
3   lieutenant or captain is out on a
4   particular shift?
5      A.    No, sir -- which is the basis
6   why I recommended the demotion because in
7   the absence of the officer he would be in
8   charge of that company.
9      Q.    Was the demotion meant as a
10  punishment for Hartwell or simply because
11  you didn't feel like he possessed the
12  capabilities to be in command of that
13  situation?
14     A.    It was not punishment.  I did
15  not want him to be in the position to be
16  company officer in the absence of the
17  officer.
18     Q.    I want to talk a little bit
19  about this August the 4th incident where
20  Chief Gordon asked then Sergeant Hartwell
21  to bring in a doctor's excuse for having
22  been sick.  Am I right to understand that
23  the shift that Hartwell had volunteered to

1    work and that he went home in the middle

2    of was Chief Gordon's shift?

3          A.    Yes, sir.

4          Q.    Whose responsibility would it

5    have been to write him up or to ask for a

6    doctor's excuse in that situation?

7          A.    Chief Gordon.

8          Q.    Do you think it was anything

9    out of line by Chief Gordon asking him for

10   the doctor's excuse and staying behind his

11   normal shift to do that?

12         A.    No, sir.

13         Q.    Mr. Brannan asked you several

14   questions about sick leave and doctor's

15   excuses.  Let me ask you this:  The

16   firefighter volunteered to work a shift,

17   can he just leave any time he gets ready?

18         A.    No, sir.

19         Q.    Does it cause a problem if he

20   decides to leave in the middle of that

21   shift?

22         A.    It could, yes.

23         Q.    And isn't it true that in most

1    occasions where a firefighter is working

2    overtime on a shift it's because there is

3    a vacancy or some engine company or truck

4    company is shorthanded already?

5          A.    There's a need.   There was a

6    need, yes.

7          Q.    And in fact the sick leave

8    policy that we all looked at a little

9    while ago doesn't say that Chief Gordon or

10   any other chief cannot ask for a return to

11   work slip on an employee that had been

12   sick, now doesn't it?

13         A.    Yes, sir, that's correct.

14         Q.    It just establishes what

15   should be done when sick leave is taken;

16   is that correct?

17         A.    Yes, sir.

18         Q.    Let me ask you this:   If I

19   decide to go join the fire department, do

20   I have to pass a physical test?

21         A.    Yes, sir.

22         Q.    If I had health problems that

23   mean I can't carry a fire hose or I can't

1    go into a fire, can I be a member of the
2    Montgomery Fire Department?
3         A.    The chance is you could not.
4         Q.    So does the department have a
5    vested interest in the health of its
6    firefighters?
7         A.    Yes.
8         Q.    If you've got a firefighter
9    that's sick that shows up for duty on a
10   truck company, do you want that sick
11   firefighter riding that truck?
12        A.    No, sir.
13        Q.    Does it propose a safety risk
14   to people if you do that?
15        A.    Yes, it does.
16        Q.    We talked about this Mustard
17   Form that Chief Gordon wrote on Hartwell
18   after the cleaning incident at the fire
19   station.  Isn't it true, Chief, that
20   Hartwell was the only one in that station
21   who said no, I'm not going to sign that
22   form?
23        A.    Yes, sir.

```
1          Q.    Isn't it true that that's why
2     he was written up?
3          A.    Yes, sir.
4          Q.    And isn't it true that he was
5     a troublemaker, causing problems on that
6     day in that station?
7          A.    Yes, sir.
8          Q.    And that's not something new
9     for Hartwell, is it?
10         A.    No, sir.
11         Q.    How many firefighters do you
12    have under your command?
13         A.    Approximately 354.
14         Q.    As it regards chain of
15    command, isn't it the real point, Chief,
16    that every time a firefighter has a
17    problem he can't be writing you a memo or
18    writing you a letter because you don't
19    have time to deal with 350 firefighters
20    and their daily complaints?
21         A.    Well, the point is -- is that
22    he knows the chain of command and he
23    deliberately -- he was deliberately
```