```
 1    addressing letters to me.
 2         Q.    And he did that after he was
 3    written up for doing that the year before?
 4         A.    Yes.
 5         Q.    And after at least two
 6    district chiefs verbally told him not to
 7    do that; is that correct?
 8         A.    Yes.
 9         Q.    Now, isn't it the point in
10    that policy to allow the company level
11    officers and the district level officers
12    to deal with their own employees to keep
13    from all of those coming to you?
14         A.    That's the whole point.  A lot
15    of things could come to me don't
16    necessarily have to because there are
17    senior officers as well between myself and
18    say a sergeant and a firefighter.  I think
19    it's out of disrespect on Hartwell's part
20    that he circumvented his officer and
21    district chief.  I think that shows how
22    disrespectful he was of them.
23         Q.    Now you testified a little
```

1  while ago about Hartwell complaining about

2  Captain Norman.  In fact Hartwell has a

3  habit of complaining about superior

4  officers, doesn't he?

5       A.    Yes, sir.

6       Q.    In fact he's complained about

7  tobacco, hasn't he?

8       A.    Yes, sir.

9       Q.    He's complained about using

10  telephones on duty, hasn't he?

11       A.    Yes, sir.

12       Q.    He's complained about tattoos,

13  hasn't he?

14       A.    Yes, sir.

15       Q.    And those are only the things

16  that I read about in the hour before I

17  came to this hearing.  Are there more

18  things that he's complained about in his

19  years of service with the fire

20  department?

21       A.    Yes.

22       Q.    Okay.

23       A.    Only after he had been

1    admonished about something is when the

2    complaint comes.  Captain Norman had told

3    him not to wash his personal vehicle

4    anymore while on duty.  He took offense to

5    that so he squealed on Sergeant Norman

6    about tobacco.  That's how that came

7    about, because Captain Norman had told him

8    never again to wash his vehicle.  So he

9    revealed that Captain Norman was using

10   tobacco.

11        Q.    In the time that you've worked

12   with Hartwell, has anything ever been his

13   fault?

14        A.    It doesn't seem as though it

15   has.  I see that it has been his fault.

16        Q.    But has he ever taken

17   responsibility for it?

18        A.    No, sir.

19        Q.    And isn't it important in your

20   division for somebody in a supervisory

21   capacity to be able to take responsibility

22   for their own actions?

23        A.    Yes, sir.

```
 1        Q.     Okay.
 2                   MR. MILLS:   That's all.
 3
 4   RECROSS-EXAMINATION BY MR. BRANNAN:
 5        Q.     Chief, when he complained
 6   about the tobacco he was right, wasn't he?
 7        A.     Sure, he was.
 8        Q.     And when he complained about
 9   the tattoo -- some folks can consider a
10   Confederate flag with the skull in the
11   middle of it offensive, couldn't they?
12        A.     I can't speak for other
13   people.
14        Q.     Well, you have to because you
15   are a district chief --
16        A.     I can't speak for what other
17   people assume what a flag means to them.
18        Q.     But you are responsible, for
19   what, three hundred and something
20   firefighters?
21        A.     Yes.
22        Q.     And is it your position that
23   he should be written up because he
```

1    complains that he believes that violates

2    the policy -- the tattoo policy?

3         A.    That's not why he was written

4    up.

5         Q.    Well, he's complaining.    I

6    didn't say that's why he's written up.

7         A.    You just said --

8         Q.    No, I said he has complained

9    that that was why he was written up.

10        A.    Does that make it true because

11   he said it?

12        Q.    Well, we will let the Board

13   read the policy and decide whether a

14   Confederate flag with the skull in the

15   middle might be in violation of that.    He

16   was right on the cell phone, too, wasn't

17   he?

18        A.    What about that cell phone?

19        Q.    Well, y'all were talking about

20   him complaining about officers using cell

21   phones and he was right on that, too,

22   wasn't he?  They were violating the

23   policy.

1      A.    I took his word that what he
2  said about the cell phone was true.
3      Q.    Well, you also talked to the
4  officers and found out that they were
5  using the cell phones in violation of the
6  policy.
7      A.    I have no quarrel with that.
8      Q.    But you just said that he's
9  just a complainer.  He's complained about
10 tattoos, he's complained about tobacco,
11 he's complained about cell phones -- but
12 every time you found that he was right.
13     A.    He was right only in helping
14 his cause about when he was admonished by
15 an officer.  He has used, himself, a cell
16 phone.
17     Q.    The problem you have had with
18 him is he has been a conscience down
19 there -- what we refer to as a whistle-
20 blower, hasn't he?
21     A.    I don't classify him as a
22 whistle-blower.  I classify him as a
23 person who resents authority.  And when

1   authority calls him to task, then he digs
2   dirt, yes.
3        Q.    How many years has he been a
4   firefighter?
5        A.    I believe he's in his 20th
6   year.
7        Q.    And he didn't have all of
8   these problems until Kelley Gordon got to
9   be a district chief, did he?
10       A.    Well, he's always have had
11  some situations even when -- before he
12  was --
13       Q.    I looked through his personnel
14  file -- y'all furnished it to me.  He had
15  a situation because he was having a
16  problem keeping his weight down.  Wasn't
17  he having some problems with that?
18       A.    Yes.
19       Q.    I'm going to show you what's
20  marked as Exhibits 20, 21 and 22.  And
21  these are referred to as Employee
22  Commendation Records.  There are forms
23  y'all have down there.  What are these

```
 1   forms?
 2                 (WHEREUPON, documents were
 3                 marked as Employee's Exhibit
 4                 Nos. 20, 21, 22 and is
 5                 attached to the original
 6                 transcript.)
 7        A.    Employee Commendation Records.
 8        Q.    What period of time do those
 9   individual exhibits cover?
10        A.    June of 2005 through January
11   of 2006.
12        Q.    That covers this time period
13   and past this time period that you've
14   demoted him, does it not?
15        A.    Yes, it does.
16        Q.    And all the way through there
17   it says he's doing a good job, doesn't it?
18        A.    I said that a minute ago.
19        Q.    He's being commended, isn't
20   he?
21        A.    Yes, it says that.
22        Q.    And you did say that a minute
23   ago.
```

1      A.    I said that also.

2      Q.    But you said that you weren't

3  punishing him -- you just didn't want him

4  driving your fire truck and supervising

5  your officers.  It wasn't for punishment.

6  Is that correct?

7      A.    Yes.

8      Q.    Do you understand, sir, that

9  there is a merit system here that you

10  can't just say oh, never mind and take

11  away somebody's position which is a

12  property right -- just oh, never mind I

13  don't think you ought to be it?

14      A.    My recommendation was based

15  upon more than just what you just said.

16      Q.    Well, you understand that this

17  is punishment to take away someone's rank,

18  don't you understand that?

19      A.    Okay.  I agree with you.  I

20  mean it's not a big deal with me if you

21  say it's punishment -- if he perceives it

22  to be punishment.

23      Q.    Well, you said it wasn't.

1        A.    It wasn't my intention to
2    punish him.
3        Q.    It was your decision to make a
4    new management decision and just take him
5    away from being a sergeant.
6        A.    Because he is not capable of
7    following orders, so I don't feel like he
8    should be in the position to give orders.
9        Q.    And you consider a 15-day
10   suspension as being more harsh than taking
11   away someone's rank?
12       A.    I don't recall saying that.
13       Q.    Well, with a question -- you
14   said, well he got a suspension.  Hartwell
15   didn't get a suspension.  Taking away a
16   man's rank is the next best thing to
17   firing him, isn't it?
18       A.    Not necessarily.
19       Q.    Well, you realize that in a
20   15-day suspension he can't come down here
21   and have a right to come before this Board
22   and present his case.  You understand
23   that, don't you?

```
 1          A.     Yes, I do.
 2          Q.     But with a demotion he does
 3    have that right because it's worse
 4    punishment?
 5          A.     Yes.
 6          Q.     Now Boyd, y'all talked about
 7    Sergeant Boyd being demoted and suspended
 8    for 29 days.
 9          A.     That's correct.
10          Q.     What race is Sergeant Boyd?
11          A.     He's an African-American.
12          Q.     Who was he having a problem
13    with that caused him to be suspended and
14    demoted?
15          A.     Chief Gordon was his captain
16    at the time.
17          Q.     And Chief Gordon wouldn't talk
18    to him, would he; he was a sergeant and
19    Chief Gordon took a firefighter -- there
20    was a problem between him and a
21    firefighter -- took the firefighter in and
22    talked to him and wouldn't talk to Boyd
23    and that's what Boyd got mad about, wasn't
```

1    it?

2         A.    It didn't happen that way.

3         Q.    Well, tell me how it happened

4    then.

5         A.    I don't recall how it happened

6    and I don't understand what it has to do

7    with Sergeant Hartwell.

8              MR. PATERSON:  Excuse me

9    gentlemen, what does that have to do with

10   this hearing?

11             MR. BRANNAN:  What it has

12   to do with it is that we believe that he

13   was treated the same as Hartwell because

14   of the predisposition to treat people that

15   way by Kelley Gordon.  But we won't go any

16   further.

17        A.    Boyd never referred to his

18   tattoo on his arm.

19        Q.    (MR. BRANNAN)  And I wouldn't

20   expect that to affect Gordon.

21             MR. BRANNAN:  No further

22   questions.

23

REDIRECT EXAMINATION BY MR. MILLS:

Q.    Isn't it true, Chief, that the only firefighters that we looked at and prepared for this hearing were the ones that they named and isn't it true that all of those firefighters are firefighters who served under Gordon?

A.    Let me say this and I'm speaking to you as counsel. Chief Gordon is a person who does not turn away from when a person violates the rule or have inappropriate behavior. He is a person who does not mind doing paperwork. He is a person who does not mind coming for a Personnel Board. I do have some officers who when people violate rules have inappropriate behavior, they turn their head because they don't want to walk the line with the paperwork with discipline procedure. Chief Gordon is a person who does not turn a blind ear to things that go in his district. He requires the best out of people. And he does not take

1  kindly to people violating rules.  That's

2  just how I see him.  That's how he has

3  always been.  He's consistent that way.

4      Q.    Let me ask you this, Chief:

5  Has Hartwell ever made a complaint against

6  you?

7      A.    No, sir.

8      Q.    Has he ever accused you of

9  anything?

10      A.    No, sir.

11      Q.    Have you and him ever had a

12  personal conflict?

13      A.    No, sir.

14      Q.    So why would you want to

15  single him out?

16      A.    It's not me.  I have never

17  singled him out.

18      Q.    Do you believe that Chief

19  Gordon has singled him out?

20      A.    No, sir, I don't.

21      Q.    Let me ask you about Chief

22  Gordon.  Do you and he see each other

23  socially outside of work?

```
 1          A.      No, sir.
 2          Q.      Are y'all good buddies?
 3          A.      No, sir.
 4          Q.      Have you ever had dinner with
 5     him?
 6          A.      No, sir.
 7          Q.      Have you ever been to visit
 8     his family or house?
 9          A.      No, sir.
10          Q.      Okay.
11                  MR. MILLS:  That's all.
12
13     RECROSS-EXAMINATION BY MR. BRANNAN:
14          Q.      Have you ever turned Gordon
15     down when he recommended something from
16     one of his subordinates?
17          A.      What do you mean turned him
18     down?
19          Q.      Have you ever said no, this is
20     wrong, we are not going forward with it?
21          A.      Yes, I have.  I have counseled
22     with him on some issues where I thought
23     maybe he's that, you know -- and I felt it
```

1   was my job that on certain issues that

2   hey, let's look at it a little different.

3   I have done that.

4          Q.    Did you help Mr. Mills get up

5   the documents that we requested through

6   our subpoena?

7          A.    No, sir.  I had no knowledge

8   of what you had.

9          Q.    And Mr. Mills questioned you

10  about that and you really didn't know

11  about that?

12         A.    The question he asked me -- I

13  didn't know that he had those documents

14  and that you had the documents that you

15  showed the Board.

16         Q.    So you are not saying that

17  what we requested was anything to do with

18  Kelley Gordon, did you, because you don't

19  know?

20         A.    I would have to say I don't

21  know.

22         Q.    Sure.

23                    MR. BRANNAN:  No further

1   questions.

2               MS. FROEMMING:  Are you

3   through?

4               MR. MILLS:  Yeah, I'm

5   through.

6               MS. FROEMMING:  Can he be

7   excused?

8               MR. MILLS:  He may.

9               MS. FROEMMING:  You may be

10  excused.  Call your next witness.

11              MR. MILLS:  We rest.  I

12  don't have any further witnesses.

13              MS. FROEMMING:

14  Mr. Brannan?

15              MR. BRANNAN:  I call

16  Firefighter Hartwell.

17              MR. PATERSON:  Let me ask

18  you this:  Do you intend to call all of

19  these people out in the hall?  If you

20  don't, turn them loose.  Do you want to

21  take a minute and do that?

22              MR. BRANNAN:  Let me talk

23  to him a second and see.

1        MR. PATERSON:   Okay.

2

3              6:47 p.m.

4           (Short break.)

5              6:51 p.m.

6

7           LEE M. HARTWELL,

8    being first duly sworn, was examined and

9    testified as follows:

10

11   DIRECT EXAMINATION BY MR. BRANNAN:

12        Q.    If you would state your name

13   for the Board.

14        A.    My name is Lee M. Hartwell.

15        Q.    If you would please speak up

16   real loud so they can hear all the way

17   across.

18        A.    Lee M. Hartwell.

19        Q.    How long have you been with

20   the Montgomery Fire Department?

21        A.    Nineteen years and six months.

22        Q.    Prior to 2003 did you have

23   dealings with Kelley Gordon as your

1    supervisor?

2         A.    No.

3         Q.    And your first dealings were

4    after he became a district chief?

5         A.    Yes.

6         Q.    Back in 1999 did you file a

7    complaint?

8         A.    Yes, sir.

9         Q.    What was your complaint about?

10         A.    About the tattoo.

11         Q.    Describe what you saw, the

12    tattoo.

13         A.    I saw it as offensive.

14         Q.    Was that investigated as far

15    as you know?

16         A.    Not to my knowledge, I never

17    did get back with them.

18         Q.    So nobody ever reported back

19    to you?

20         A.    No, sir.

21         Q.    Once Kelley Gordon got to be

22    your district chief, how soon after that

23    did he first write you up on something?

1          A.    I want to say about a month,
2     might be two months.
3          Q.    So the first month or two he
4     had already written you up?
5          A.    Yes, sir.
6          Q.    This incident we've heard
7     about where you were presented a
8     discipline that you were supposed to sign
9     concerning the station failing an
10    inspection -- where were you when they
11    failed the inspection?
12         A.    I was on vacation.
13         Q.    Had you been on a two-week
14    vacation?
15         A.    Yes, sir, seems like longer
16    than that.
17         Q.    Did your officer at the
18    station tell you anything about what
19    happened as far as the inspection?
20         A.    No, sir.
21         Q.    Did he tell you anything about
22    whether you should sign the form or not?
23         A.    After we went into the room

1    and talked about it, he kind of explained

2    to me, then I came out and signed the

3    form.

4         Q.    What was your understanding of

5    the rules of the Montgomery Fire

6    Department as far as a failure inspection

7    and a disciplinary form going into a file?

8         A.    Well the officer is

9    responsible for the station, so if anybody

10   is going to be wrote up it will be the

11   officer.  Now it's left up to the officer

12   to write commands up.

13        Q.    So the chain of command would

14   be the district chief would only write up

15   the officer?

16        A.    Yes, sir.

17        Q.    When Kelley Gordon came in,

18   did he have a disciplinary form for each

19   man sitting at the table?

20        A.    Yes, sir.

21        Q.    Had all of the other men been

22   there at the time of the inspection?

23        A.    Yes, sir.

1  Q. Were you the only one that was

2 on vacation?

3  A. To my knowledge, yes, sir.

4  Q. Now when you tried to discuss

5 that with District Chief Gordon, what did

6 he tell you?

7  A. He told me to shut up.

8  Q. How many times did he use the

9 term "shut up" as you were trying to tell

10 him you were on vacation?

11  A. He told me twice.

12  Q. Did he raise his voice to you?

13  A. Yes, sir.  He stood up at the

14 end of the table and he hollered and told

15 me to shut up twice and he made me

16 acknowledge.

17  Q. You signed the form, did you

18 not?

19  A. Yes, sir.

20  Q. But he wrote you up anyway for

21 refusing to sign the form?

22  A. Yes, sir.

23  Q. Did you continue to have him

1    write you up after that?

2        A.    He put a Mustard on me after

3    that scene.

4        Q.    When you say a "Mustard"

5    that's a form, isn't it?

6        A.    That's a form.  Yes, sir,

7    that's what we call it.

8        Q.    Y'all call it a Mustard Form

9    because that's the color of it?

10       A.    Color of it, right.

11       Q.    And that is another level of

12    discipline; is that right?

13       A.    Yes, sir.

14       Q.    Did he also give you two or

15    three Mustard forms right in a row in

16    August?

17       A.    Yes, sir, he did.

18       Q.    Tell us about those.  What

19    were they for?

20       A.    He said I gave a false

21    statement, broke the chain of command, and

22    disobeyed a direct order.

23       Q.    Now, the direct order was

1   about the doctor's excuse; is that

2   correct?

3          A.    Yes, sir.

4          Q.    Were you aware at the time you

5   talked to him of the language of the City

6   of Montgomery's policy that said that a

7   officer may request a medical -- a

8   doctor's excuse if the person is on paid

9   sick leave?

10         A.    Yes, sir.

11         Q.    Did you say that to him at

12  that time?

13         A.    Well, when he asked me I told

14  him that I was advised that I didn't have

15  to give him that.  And then after he asked

16  me again, then I told him about the

17  policy.

18         Q.    About the policy.  And when

19  the policy says that you "may", if they

20  are trying to get paid sick leave, did

21  that lead you to believe that you can

22  unless they are trying to get paid sick

23  leave?

1        A.    Yes, sir.

2        Q.    Do you have a health condition

3    that you weren't interested in dealing

4    with, with the fire department?

5        A.    Yes, sir.

6        Q.    Was that your reason for not

7    wanting to give the medical excuse?

8        A.    Yes, sir.

9        Q.    There is a memo or --

10    somewhere in the form it says something

11    about you saying you had been to PriMed.

12    Had you told anybody you went to PriMed?

13        A.    No, sir.

14        Q.    Where had you been?

15        A.    I had been to my doctor.

16        Q.    And is that the specialist

17    that treats you for the condition that you

18    were concerned with?

19        A.    Yes, sir.

20        Q.    Did you discuss and explain

21    your understanding of the policy

22    concerning that request of a medical

23    excuse to Gordon?

1        A.      Did I explain to him?

2        Q.      Yes.

3        A.      Yes, sir.

4        Q.      Now, as far as the chain of

5    command when you addressed memos to Chief

6    Walker, did you give a copy of the memo

7    you were sending to Chief Walker to each

8    person up the chain of command?

9        A.      Yes, sir.

10       Q.      Did you ever deliver any one

11   of those documents to Chief Walker

12   yourself?

13       A.      No, sir.

14       Q.      Were each one of them

15   delivered to Chief Walker by your district

16   chief?

17       A.      Yes, sir.

18       Q.      Did you give your district

19   chief a copy of each one of those?

20       A.      Yes, sir.

21       Q.      Even though your complaints

22   were on your district chief, did you hand

23   him -- or hand your captain -- a copy to

1  give to your district chief?

2          A.    Yes, sir.

3          Q.    Were you aware of the wording

4  of the policy concerning the chain of

5  command?

6          A.    Yes, sir.

7          Q.    And the example of how to use

8  the chain of command shows the firefighter

9  sending it addressed to the district

10  chief.

11          A.    Yes, sir.

12          Q.    It states to send it to who

13  you want to send it to.

14          A.    Yes, sir.

15          Q.    So you would address it to

16  Walker?

17          A.    Yes, sir.

18          Q.    Have a copy prepared for each

19  officer of the line and have them deliver

20  it to Walker?

21          A.    Yes, sir.

22          Q.    Do you think that you complied

23  with the policy on the chain of command?

```
 1          A.      Yes, sir.

 2          Q.      Now, you've been charged with

 3   making false statements about District

 4   Chief Gordon.  And the statements you've

 5   made were and that you've been charged

 6   with was that in your opinion he was

 7   biased towards you.

 8          A.      Yes, sir.

 9          Q.      Is that your opinion?

10          A.      That's my opinion.

11          Q.      Is that a false statement?

12          A.      No, sir.

13          Q.      Do you believe that you are

14   treated differently by Gordon than other

15   firefighters?

16          A.      Yes, sir.

17          Q.      The day that you got sick, had

18   you volunteered to work overtime?

19          A.      Yes, sir, I did.

20          Q.      Was there another firefighter

21   that also had problems from eating the

22   same thing you did?

23          A.      Yes, sir.
```

1      Q.    And did he advise the
2   hierarchy with the fire department that he
3   had had stomach problems also?
4      A.    Yes, sir.  He put it in a
5   letter.  He put it in a letter that he
6   did, Lieutenant Stevens.
7      Q.    Now, when you were written up
8   over the doctor's excuse, were you working
9   on Kelley Gordon's shift?
10     A.    Yes, sir.  Well -- yes, sir --
11  I was working that day but he wasn't
12  there.
13     Q.    Okay.  Well, I'm talking about
14  when you were written up, not when you
15  were working that day.
16     A.    Oh, when I was written up?
17     Q.    Yes.
18     A.    No, sir.
19     Q.    Who was the officer that was
20  working the day that you got sick?
21     A.    It was Captain Burkett.
22     Q.    Did Captain Burkett ever
23  complain to you or question you at any

1  time about whether or not you were really

2  sick?

3          A.    No, sir.

4          Q.    Did he ever ask you for a

5  doctor's excuse?

6          A.    No, sir.

7          Q.    To write you up and to

8  question you about a doctor's excuse, did

9  Kelley Gordon stay late?

10         A.    Yes, sir, he did.

11         Q.    And it was after his shift had

12 gotten off when he called you in and

13 questioned you about that?

14         A.    Yes, sir.

15         Q.    You've been a sergeant down

16 there.  Is it common practice that if a

17 man is not on sick leave for them to ask

18 him to give them some kind of medical

19 information?

20         A.    Is it common practice?

21         Q.    Yes.

22         A.    No, sir, not to my knowledge.

23         Q.    And in fact in your opinion

1    that's a violation of the policy?

2          A.    Yes, sir.

3          Q.    You had been disciplined

4    before 2003 for failure to meet weight; is

5    that correct?

6          A.    Yes, sir.

7          Q.    You had been suspended for

8    that?

9          A.    Yes, sir.

10         Q.    Had you had the ongoing

11   problems for all of those years that you

12   had since Kelley Gordon got to be the

13   chief, do you think they would have made

14   you a sergeant?

15         A.    If I had the ongoing problems?

16         Q.    Yeah.   The problems you've had

17   since 2003 when he got to be the district

18   chief; if you've been having those kinds

19   of problems before you made sergeant, do

20   you think they would have made you a

21   sergeant?

22         A.    No, sir, they wouldn't have.

23         Q.    Do you want your rank back?

1          A.     Yes, sir.

2          Q.     Do you plan on retiring when

3    you get your 20 years in?

4          A.     I don't know.  I might, I

5    might not.

6          Q.     But you're six months away

7    from that?

8          A.     Yes, sir.

9          Q.     Is it your request that this

10   Board allow you to have your rank back

11   because it was taken away from you

12   unlawfully?

13         A.     Yes, sir.

14         Q.     Do you believe that your rank

15   was taken away from you because you used

16   your right to speak out and call people on

17   the carpet that were violating the rules?

18         A.     Yes, sir.

19         Q.     And one of those who got it

20   all started was Kelley Gordon?

21         A.     Yes, sir.

22         Q.     Okay.

23                    MR. BRANNAN:   No further

1    questions.

2

3    CROSS-EXAMINATION BY MR. MILLS:

4         Q.    Mr. Hartwell, why didn't you

5    just go get a doctor's excuse.

6         A.    Sir?

7         Q.    Why didn't you just go get a

8    doctor's excuse.

9         A.    Get a doctor's excuse?

10         Q.    Yeah.

11         A.    Well, sir, you know, it's my

12    private health.  I wasn't using sick leave

13    or nothing so -- it's my private health.

14    I got ulcer, so I went to a specialist

15    and, you know, the City shouldn't know

16    about my personal problem, if it's not

17    interfering with my job.

18         Q.    How are we to know whether or

19    not it interfered with your job if you

20    don't bring a doctor's excuse?

21         A.    Because we take a physical

22    every year.  We take an agility test every

23    year and I passed it every year.

1          Q.    And in fact you had to take a
2    physical when you hired into the fire
3    department, didn't you?
4          A.    Yes, sir.
5          Q.    And you had to pass certain
6    physical requirements?
7          A.    Yes, sir.
8          Q.    And ever since then you are
9    required to stay in shape and be healthy,
10   right?
11         A.    Yes, sir.
12         Q.    So ever since you hired on
13   with the fire department they've been
14   interested in your health.
15         A.    What do you mean by interested
16   in my health?
17         Q.    They have been staying on top
18   of whether or not their firefighters,
19   including you, are healthy enough to
20   perform that job, correct?
21         A.    Yes, sir.  They just take us
22   out there and do a little agility test in
23   October.

1       Q.    So you substituted your

2    judgment in front of your district chief

3    as to whether or not you ought to be able

4    to ride that truck that day, right, when

5    you came back to work?

6        A.    Sir, I had worked 24 hours.

7        Q.    Right.

8        A.    Right. So I was off -- so I

9    already had came back and my district

10    chief was Petrey, Chief Petrey, and he

11    didn't ask me for nothing.

12        Q.    But you substituted your

13    judgment, didn't you?

14        A.    I substituted my judgment?

15        Q.    Why didn't you get a doctor's

16    excuse? Is it only because you didn't

17    think Chief Gordon had any business or any

18    right asking you for such a thing?

19        A.    Sir, I wasn't using sick

20    leave.

21        Q.    I don't care about the sick

22    leave.

23        A.    And plus --

1      Q.    Show me, cite to me the rule

2   that says a district chief cannot ask you

3   to bring a fitness-for-duty slip from a

4   doctor?

5      A.    Because that's my own personal

6   thing.  What did I do to deserve one?

7      Q.    Tell me what rule.  You are

8   all about the rules tonight --

9      A.    Yes, sir.

10      Q.    -- tell me what rule says that

11   the Montgomery Fire Department cannot

12   require that you undergo or present to

13   them proof that you are physically capable

14   of performing your duty?

15      A.    It says right there on the use

16   sick leave, it said that.

17      Q.    No, sir.

18      A.    It don't?

19      Q.    No.

20      A.    Yes, it do.

21      Q.    It says when a chief may under

22   that sick leave ask for an excuse.

23      A.    When using paid sick leave and

I was not using paid sick leave.

Q.    That's right, you weren't. You don't fall under that --

MR. PATERSON:   Excuse me. Y'all are talking over each other -- please -- we can't follow you.

Q.    (MR. MILLS)   The truth is, Mr. Hartwell, that you have had a problem with Kelley Gordon since he became your supervisor, haven't you?

A.    I have a problem with him?

Q.    Yeah.

A.    No, sir.  The only thing that I had was the tattoo he had but I don't have a problem with it until he, you know, until that situation came up.

Q.    And he didn't do anything to you other than wear a tattoo, did he?

A.    Excuse me?

Q.    Did he do anything to you beyond wearing a tattoo that caused you to have a problem with him?

A.    Sir, I don't -- about him

1    wearing that tattoo, it's just offending
2    me.  I never said I had a problem with
3    him -- not until 2003, that's when we got
4    a problem.
5         Q.    That's when he became your
6    supervisor, right?
7         A.    No.  I ain't have no problem
8    with him then until he wrote me up and
9    then we were trying to discuss that I
10   wasn't -- I was on vacation I didn't have
11   nothing to do with it.
12        Q.    Well, let's talk about that.
13   At that meeting that you just talked about
14   and you testified a little while ago you
15   kept trying to tell him during his meeting
16   with other firefighters at that table, all
17   about how you weren't going to sign this
18   form; is that right?
19        A.    No, sir.  He was talking first
20   and then after I was fixing to ask him
21   about the form because I wasn't there.
22   That's when he jumped up, started shouting
23   telling me to shut up.

1       Q.   Were any of the other

2  firefighters talking while he was giving

3  his lecture?

4       A.   Well, I never did neither.  I

5  waited until he got through.

6       Q.   I'm talking about before you

7  spoke up?

8       A.   Was any other firefighters

9  talking.

10      Q.   Uh-huh.

11      A.   Well, they were there, they

12  knew what happened.

13      Q.   But you were the only one at

14  the table causing a problem, weren't you?

15      A.   Sir?

16      Q.   You were the only one at the

17  table when he was giving his lecture --

18  for lack of a better word -- that was

19  causing a problem, weren't you?

20      A.   I didn't say nothing until he

21  got through.

22      Q.   Okay.  You said it in the

23  presence of the firefighters though,

1  didn't you?

2      A.   No.  I was going to ask him,

3  but he already told me to shut up two or

4  three times in front of the firefighters.

5      Q.   And you didn't shut up when he

6  told you to shut up, did you?

7      A.   Yes, sir, I did.  I never did

8  say another word.

9      Q.   Then why did he tell you

10  twice?

11      A.   Why did he tell me twice?

12      Q.   Yeah.

13      A.   Because the first time he said

14  it I didn't saying nothing, and then he

15  made me acknowledge and he told me to shut

16  up twice.  He said shut up, shut up -- and

17  I had never said nothing.  And then he

18  made me acknowledge and then I said yes,

19  sir.

20      Q.   Is it your testimony,

21  Mr. Hartwell, that after 19 and a half

22  years with this department that a district

23  chief cannot counsel with a firefighter?

```
 1          A.    I didn't say that, sir.

 2          Q.    You just said that the normal

 3    procedure was for the district chief to go

 4    to the captain, captain to lieutenant,

 5    lieutenant to sergeant and then sergeant

 6    to firefighter.  Is that not true?

 7          A.    That's chain of command.

 8          Q.    Are you telling this Board

 9    that a district chief cannot counsel with

10    a firefighter?

11          A.    I said that's the chain of

12    command.  I'm not saying what he can't do.

13    They got the chain of command.

14          Q.    In fact you have seen that

15    happen in your career many times, haven't

16    you?

17          A.    Have I seen that?

18          Q.    Uh-huh.

19          A.    Yes, I have.

20          Q.    In fact if Chief McKee wanted

21    to counsel with you -- the fire chief the

22    head of the whole fire department -- he

23    could do that, couldn't he?
```

1          A.      He could do what he want to.

2          Q.      That's right because he's a

3     superior officer, isn't he?

4          A.      I guess so.

5          Q.      Okay.

6                  MR. MILLS:   That's all.

7

8     REDIRECT EXAMINATION BY MR. BRANNAN:

9          Q.      Had this chain of command

10    issue had been something that had been

11    ongoing back and forth, you being

12    threatened to be written up from the time

13    back in 2003?

14         A.      Had the chain of command been

15    going on?

16         Q.      Yes.

17         A.      Yes.

18         Q.      Them complaining about the way

19    you were following the chain of command?

20         A.      Yes, sir.

21         Q.      On your behalf haven't I

22    written the City and given them the

23    documentation that showed how you were

1    properly following the policy on the chain

2    of command?

3         A.    Yes, sir.

4         Q.    In December of 2004?

5         A.    Yes, sir.

6         Q.    They still wrote you up for

7    it.

8                   MR. BRANNAN:   Exhibit 23.

9                   (WHEREUPON, a document was

10                  marked as Employee's Exhibit

11                  No. 23 and is attached to the

12                  original transcript.)

13        Q.    (MR. BRANNAN)  Mr. Hartwell,

14   you didn't testify that a district chief

15   couldn't counsel with a firefighter.

16   Instead you testified -- correct me if I'm

17   wrong -- that the district chief if he was

18   going to write anybody up would write up

19   the company officer?

20        A.    Yes, sir.

21        Q.    And then the company officer

22   would write up any firefighter or sergeant

23   that he felt was responsible for the

1    failed inspection?

2          A.    Yes, sir.

3          Q.    Did you feel like that it was

4    unfair and improper for Kelley Gordon to

5    be yelling at you to shut up when he's

6    trying to put a counseling form on you for

7    something that you weren't even there for?

8          A.    Yes, sir.

9          Q.    Did you feel like you were out

10   of order because you tried to talk to him

11   about that?

12         A.    Yes, sir.

13         Q.    But you ended up signing the

14   form, did you not?

15         A.    Yes, sir.

16         Q.    He wrote you up anyway?

17         A.    Yes, sir.

18         Q.    Now he's talked about you and

19   your complaining.  Have you complained

20   about anything through -- and you have

21   done it through the chain -- have you

22   complained about anything that was untrue

23   that they didn't end up finding that you

1    were right on?

2        A.    Had I complained about

3    anything that was not true?

4        Q.    That after they got through

5    with their investigation they came back

6    and said Hartwell, you are wrong on this?

7        A.    No, sir, they didn't.

8              MR. BRANNAN:  No further

9    questions.

10

11   RECROSS-EXAMINATION BY MR. MILLS:

12       Q.    Mr. Hartwell?

13       A.    Yes, sir.

14       Q.    Your attorney just submitted

15   to the Board a letter dated December of

16   2004 that was written to the City Legal

17   Department after some events that occurred

18   at Station 16.  Is that right?

19       A.    Yes, sir.

20       Q.    And those events at Station 16

21   were, yet another occasion, where you were

22   found -- or at least thought or counseled

23   by some of your supervisors -- for having

1    done something you weren't supposed to

2    do.  Is that right?

3        A.    Like what?

4        Q.    Well if I recall it right, you

5    were told that you could no longer sleep

6    on the east side of the fire station where

7    you had been staying by yourself; is that

8    correct?

9        A.    Where I had been staying on

10   that shift by myself, yes, sir.

11       Q.    And then that company

12   officer -- I believe it was a captain at

13   roll call or at least in the presence of

14   other firefighters -- stated that from

15   thence forward no sergeant would be

16   allowed to sleep over there.  That

17   sergeants would have to sleep on the same

18   side as the firefighters; is that right?

19       A.    Yes, sir.

20       Q.    And that's because there was a

21   car that kept getting parked on Ray

22   Thorington Road on that side of the fire

23   station and somebody had made a comment

1     that they thought somebody was slipping

2     into that station at night, didn't they?

3          A.     He put it in letter form.

4          Q.     But after that comment was

5     made, you went and you talked to your

6     lawyer and you had your lawyer send off a

7     letter to the City Legal Department,

8     didn't you?

9          A.     Sir, they pulled me downtown

10    and they accused me of bringing a woman

11    through the side door.  That's why I went

12    to my attorney.  Because that was not

13    true.

14         Q.     But you weren't disciplined

15    for that, were you?

16         A.     Sir?

17         Q.     You weren't disciplined for

18    that, were you?

19         A.     Sir?

20         Q.     You weren't disciplined for

21    that, were you?

22         A.     Was I disciplined?

23         Q.     Yeah.

1    A.    No, sir.  After I got my

2    attorney and he wrote you, no, sir.

3    Q.    So if the pattern that Chief

4    Walker talked about wherein every time

5    somebody called you on the carpet for

6    something you want to strike back, that

7    you can't take orders from your superiors.

8    This is just another example of that,

9    right?

10    A.    No, sir.  They took me

11    downtown, they accused me of bringing a

12    woman to the side door and that was not

13    true.  Okay.  That's why I went and got an

14    attorney -- because that was not true.

15    Q.    But nobody tried to discipline

16    you for it, did they?

17    A.    I don't know what the City is

18    going to do.

19    Q.    Why did you need an attorney?

20    A.    Because I don't know what the

21    City is going to do later so I wanted

22    out -- because that was not true and all

23    over the department my name was

1    slandered.  Every time I go on detail or

2    go somewhere people say there goes

3    Sergeant Hartwell bringing women to the

4    station -- and plus I was married and then

5    my wife got hold of it.  That's why I went

6    to get my lawyer.

7         Q.    You were on A-Shift at that

8    time; isn't that right?

9         A.    I can't remember.  I guess so.

10        Q.    And the complaint that was

11   received by the department was that every

12   night that A-Shift was on, there was a car

13   that seemed to be parked in the turning

14   lane on Ray Thorington Road just short of

15   that on the east side of that fire

16   station; is that right?

17        A.    Yes, sir.

18        Q.    And there are two barracks in

19   that fire station, aren't there?

20        A.    The barracks, yes, sir.

21        Q.    There is an east barracks and

22   the west barracks.

23        A.    Yes, sir.

1    Q.  And the east barracks has a

2 door out the east side of the building?

3    A.  Yes, sir.

4    Q.  And during your shift you were

5 the only firefighter that was sleeping in

6 that east barracks; is that right?

7    A.  Yes, sir.

8    Q.  And your captain simply made a

9 statement at roll call that from that

10 point forward no sergeants were to be

11 allowed to sleep in those barracks.  The

12 sergeants have been allowed to sleep over

13 there, right?

14    A.  Yes, sir.

15    Q.  He didn't say Hartwell can't

16 sleep over there anymore, he didn't say

17 there is a woman slipping in -- he just

18 said that sergeants can't sleep over there

19 anymore; is that right?

20    A.  Yes, sir.  But the letter --

21 can I?

22    Q.  Yeah.

23    A.  But the letter said it was

1    happening on A-Shift and they seen a

2    figure going through the side door.  So

3    I'm over there on A-Shift and you see a

4    figure going through the side door and he

5    put it in letter form.

6          Q.    Who wrote the letter?

7          A.    Lieutenant Gamble.

8          Q.    Was he your superior officer?

9          A.    No, sir.

10         Q.    In fact he was not even on

11   your shift, was he?

12         A.    No, sir.  It was Lieutenant

13   Johnson.

14         Q.    So the letter came from

15   somewhere else, it wasn't your direct

16   supervisor?

17         A.    Well, he was at that station.

18   He was a lieutenant at that station.

19   Lieutenant Johnson was on duty.

20         Q.    Okay.

21               MR. MILLS:  That's all.

22

23   REDIRECT EXAMINATION BY MR. BRANNAN:

1      Q.    I'm going to show you what's

2    marked as Exhibit 23 and I sent you a copy

3    back at the time.  Is this a memo from D.

4    Watson saying that he was told that Gamble

5    was out telling people that you were

6    bringing a woman in the fire station?

7        A.    Yes, sir, that's it.

8        Q.    Did they ever take any action

9    against Gamble?

10       A.    No, sir, not to my knowledge.

11          MR. BRANNAN:  Move to

12    introduce 23.  No further questions

13

14    RECROSS-EXAMINATION BY MR. MILLS:

15       Q.    Mr. Hartwell, didn't the

16    Montgomery Fire Department do an Internal

17    Affairs Investigation on that whole

18    incident?

19       A.    Sir, I can't -- they never got

20    to me about doing an internal.

21       Q.    Were you ever questioned by a

22    member of the Investigative Division of

23    the fire department?

1          A.      About that?

2          Q.      Yeah.

3          A.      Not to my knowledge.  I cannot

4     remember.

5          Q.      You can't remember?

6          A.      No, sir.

7          Q.      You just said they brought you

8     downtown and accused you of --

9          A.      Chief Walker is the one that

10    questioned me about that.  Okay.  Chief

11    Walker was.

12         Q.      So you are saying you don't

13    remember giving a statement to one of the

14    investigative officers?

15         A.      About that?

16         Q.      Yeah.

17         A.      Oh, yes, sir, I did.  My

18    fault.  Yes, it was.  Yes, sir.

19         Q.      And Gamble was questioned as

20    well, wasn't he?

21         A.      I don't know if Gamble was

22    questioned or not.

23         Q.      And your captain was

1    questioned, wasn't he?

2        A.    I don't know if he was

3    questioned or not.

4        Q.    Okay.

5                MR. MILLS:  That's all.

6                MR. BRANNAN:  No further.

7    We will rest.

8                MR. MILLS:  We rest.

9                MS. FROEMMING:  Okay.  Any

10   closing remarks?

11

12                CLOSING REMARKS

13

14   BY MR. MILLS:

15       I want to put in a nutshell what Chief

16   Walker has said.  It has always been

17   maintained that Firefighter Hartwell does

18   a good job on the fire ground.  Nobody's

19   ever disputed that.  But Firefighter

20   Hartwell has a problem with authority.  He

21   has a problem taking orders.  He has a

22   problem when somebody finds something

23   wrong with something he's done.  And that

1    is at the heart of what we are here about

2    now.  Chief Walker has gotten letter after

3    letter, after letter from Hartwell.  It's

4    not about him performing his duty.  It's

5    about the trouble that he causes when they

6    are not putting out fires.  And that's as

7    big -- he spends most of his day doing

8    that.  He doesn't go put out fires.  He

9    tries to keep peace in the department so

10   that when it's time to go put out a fire

11   everybody goes and does what they are

12   supposed to do.  And a part of that is to

13   have a near militaristic type of

14   discipline in that department.  So that

15   when you tell somebody to go in that house

16   and do a primary search that they will do

17   it.  That they don't stand around and say

18   yeah, but I've been here longer, or I

19   ought not have to do that, or I'm sick

20   today.  You don't question it.  You go in

21   because people's lives are at stake --

22   that's what this is about and this man who

23   has been here for 28 years decided that

1   although he had supported Hartwell in

2   getting his sergeant stripes, tried to

3   help Sergeant Hartwell along, he decided

4   that he didn't want to risk his other

5   people or the lives of the people of

6   Montgomery with him being a supervisor

7   anymore.  And that's all this is about.

8

9   BY MR. BRANNAN:

10      It would be nice if that's all this

11  was about.  What this is about is:  You've

12  got a man that understands the rules

13  probably better than the 28-year veteran

14  over there.  And he calls people to task

15  whether they are the chief on down.  If

16  the rule is there, it should be followed.

17  Well, he does that.  And when he does,

18  he's the one that gets demoted.  You've

19  got the paperwork on a district chief

20  that's done -- you name it.  She's had a

21  confrontation with everybody down there

22  and has never been even recommended for

23  demotion.  But she doesn't question --

1    she's not questioning their rules, she's

2    just arguing with them.  He sends memos

3    and he says this person is doing this, and

4    just because they are higher officer they

5    should follow the rules also.  Well, next

6    thing you know it comes back with the

7    accusation against him that he's the one

8    at fault.  They've turned it around and

9    said that it's the result of him being in

10   trouble is why he does this.  It's like

11   the chicken before the egg.  But the

12   problem is:  He complains and then they

13   write him up.  And this situation with

14   Gordon, you can read the policy any way

15   you want to.  The policy is clear.  His

16   tattoo violates the policy.  But the issue

17   is not whether it violates the policy or

18   not.  The issue is this man wrote a memo

19   saying that that offended him and he felt

20   like it violated the policy.  Well, they

21   didn't do anything about it.  And there

22   wasn't a problem until all of a sudden

23   Gordon gets to be his district chief.

1    That's sticking in Gordon's craw to the

2    point in 2005 he writes a memo and talks

3    about the 1999 complaint that he made

4    about the tattoo.  He's been there almost

5    20 years.  He hasn't had problems.  And

6    then all of a sudden he gets Gordon as his

7    chief and he's written up, and written up

8    and written up and guess what --

9    everything they say he's written up on,

10   he's right and they're wrong.  They say

11   show me in the policy where it says that a

12   district chief can't ask for a medical

13   excuse or something from the doctor.

14   Well, you can't just ask people for

15   medical records, you've got to have a

16   reason.  Well, guess what -- they have

17   language that says when they can ask for

18   one.  You may in your discretion ask for

19   one when someone is off on paid sick

20   leave.  Well, the converse of that is you

21   may not if they are not.  You can't just

22   interfere with somebody's medical

23   records.  And that's what they're asking

```
 1    to do.  That's what they were trying to
 2    do.  We are not saying whether he was sick
 3    or not.  What we are saying is he refused
 4    this direct order.  Well, a direct order
 5    that has no basis for any reason is one
 6    that he doesn't have to follow if the
 7    rules say that he doesn't have to follow
 8    them.  That's what the rules said.  As far
 9    as the situation with the chain of
10    command, their own policy uses the exact
11    example he's been following.  When we
12    wrote them back in December '04, we didn't
13    do that without looking at the policy.  We
14    didn't do that without sending them some
15    memos that showed what they were doing.
16    In this case we asked them to furnish us
17    because when we did the Mayor's Hearing,
18    Walker says I've got a file of all these
19    memos -- of memos that come directly to
20    me.  And I said, okay.  When we filed for
21    our request we asked for those records --
22    that memo file he had.  Because guess
23    what, it would have been that thick with
```

1   memos addressed from firefighters to

2   sergeants and everybody to him -- because

3   that's the way the policy is.  But we

4   didn't get that.  Bottom line is this man

5   has been their conscience.  He's close to

6   having his retirement in and Kelley Gordon

7   comes in, in 2003 and, guess what, his

8   life changes completely.  Just one year

9   before that or two years before that they

10  make him a sergeant.  He's doing fine.

11  You've seen the reports and what a good

12  job he's doing.  But because Kelley Gordon

13  is there all of a sudden now, he isn't fit

14  to be a sergeant.  They can't just take

15  that away from him for no reason and

16  that's what's happened here.

17

18  FINAL BY MR. MILLS:

19      The missing piece is why.  Why would

20  Kelley Gordon single this man out?  And

21  why would this man single him out?  Why

22  would he support Kelley Gordon instead of

23  this man.  A man that wears a Confederate

1    flag on his arm.  This man knows something
2    about racism.  He's been in that
3    department for 28 years and he can get on
4    that stand and tell you about racism in
5    that department.  So why would any of
6    these people single out poor little Lee
7    Hartwell, the great savior of the
8    Montgomery Fire Department.
9        Thank you.
10                MR. PATERSON:  Thank
11   y'all.  It's nice when both lawyers are
12   both prepared.
13                MS. FROEMMING:  We will
14   get together and come up with a decision
15   through Ms. Montoya's office.
16              * * * * * * * * * * * * * * * * * * *
17                7:26 p.m.
18              HEARING ADJOURNED
19
20
21
22
23

```
 1              C E R T I F I C A T E

 2

 3    STATE OF ALABAMA   )

 4    MONTGOMERY COUNTY )

 5              I hereby certify that the above

 6    and foregoing proceeding was taken down by

 7    me in stenotype, and the questions and

 8    answers thereto were transcribed by means

 9    of computer-aided transcription, and that

10    the foregoing represents a true and

11    correct transcript of the proceeding given

12    by said witness upon said hearing.

13              I further certify that I am

14    neither of counsel nor of kin to the

15    parties to the action, nor am I in anywise

16    interested in the result of said cause.

17

18                        SELAH M. DRYER, CSR

19

20

21    My Commission Expires
      July 2, 2006
22

23
```

**ORIGINAL**

FROM:    Deputy Chief R. E. Howard

DATE:    September 3, 1999

Master Letter File # 8-4

RE:    Tattoo/Brand and Body Piercing Policy

This memorandum incorporates a new Montgomery Fire Department Policy on tattoos/brands and body piercing. The Montgomery Fire Department recognizes that tattoos/brands and body piercing are a matter of personal choice and is allowable except when they are prejudicial to the good order and discipline of the fire service, or of a nature that tends to bring discredit upon the Montgomery Fire Department and/or otherwise do not present an acceptable appearance as a City of Montgomery Fire Department employee. Certain tattoos, brands, and body piercing are prohibited. They are as follows:

> a. Unauthorized: Tattoos/brands anywhere on the body that are obscene and/or advocate sexual, racial, ethnic, or religious discrimination are prohibited in and out of uniform. Tattoos/brands that are prejudicial to the good order and discipline or of a nature that tends to bring discredit upon the Montgomery Fire Department and the City of Montgomery are prohibited in and out of uniform.

> b. Inappropriate: Tattoos/brands will not be exposed or visible above the collar bone when wearing an open collar uniform, or on the wrist of hands when wearing a Class "A" long sleeve shirt.

> c. Body Piercing: Members are prohibited from attaching, affixing or displaying objects, articles, jewelry or ornamentation to or through the ear, nose, tongue or any exposed body part (includes visible through the uniform).

Any member obtaining unauthorized or inappropriate tattoos, brands or body piercing will be required to remove them at their own expense. Using uniform items to cover such tattoos, brands or body piercing is not an option. Members failing to remove unauthorized or inappropriate tattoos, brands or body piercing in a timely manner will be subject to discipline including, but not limited to, dismissal.

Members should not be allowed to display any tattoos, brand or body piercing that would detract from an appropriate professional image while in uniform. The Chief of the Montgomery Fire Department or his designee, will use

determining an appropriate fire department image and the acceptability of tattoos, brands or body piercing displayed by members in uniform. Montgomery Fire Department members with existing tattoos or brands before the implementation of this policy not meeting an acceptable Fire Department appearance and image will be required to remove the tattoos or brands if the Chief of the Fire Department or his designee deems that the circumstances are warranted. Otherwise, fire department personnel with existing tattoos or brands will be grandfathered for purposes of compliance with this rule and regulation. Any member of the Fire Department who chooses not to comply with appropriate Fire Department personnel standards is subject to disciplinary action including, but not limited to, dismissal.

EXHIBIT

2

## INTERDEPARTMENTAL COMMUNICATIONS

Sec.  963,. Proper Interdepartmental Communication:


TO:    James O. Smith, District Chief

FROM:  William A. Ross, Firefighter

DATE:  January 1, 1992

RE:    Proper Interdepartmental Communication
       form letter

Sir:

All interdepartmental communications are  to be one copy, typed
using single spacing and on one side only.

Write about one subject per letter.  Be brief and to the point.
Use  no abbreviations.  Use  block  style  form  (no  paragraph
indentions, complimentary close at left hand margin).

The complimentary close  should  be  "Respectfully".  Sign your
name using first name,  middle  initial,  and  last  name.  You
should also  include  your  rank, station and division to which
you are assigned.

Forward promptly via chain of command (from your Officer to you
District Chief, etc.) address to the person and station number.

Respectfully,



William A. Ross, Firefighter
Station 20, District III


Sec.  964,  **All other Information:**  Information  not pertaining
to fires  or  other  emergencies  shall be approved by the Fire
Chief  of  the  Department  through the proper channels, before
release to any news media.

Sec. 965,  Any  correspondence  written  on  City  Letterhead
Stationery must be approved by the Fire Chief's Office.

TO:     W.E. Young, District Chief

**EXHIBIT**

*ex 3*

FROM: D.M. Adams, Firefighter

DATE: July 17, 2002

RE:     Meeting with Mayor Bright

Sir:

On June 13, 2002 I turned in a letter filing a grievance pertaining to the Sergeants examination. This letter was instrumental in starting an investigation into the allegations of cheating on the test. When the test results came out July 11, 2002. It was obvious that the investigation was over. On July 11, 2002 I turned in a letter to D/C W.E. Young requesting to see Chief McKee in regards to my grievance. Instead of seeing Chief McKee I was directed to Assistant Chief W.D. Davis. Assistant Chief Davis was unable to answer some of my concerns. Assistant Chief Davis stated he would set up a meeting between Deputy Chief Jordan and I. The following morning D/C Young called me and stated that Deputy Chief Jordan and Chief McKee had refused to see me regarding the Sergeants examination.

I am requesting your assistance in my request to have a meeting with Mayor Bright. I am requesting your guidance in the proper procedure in obtaining this meeting. Your consideration in this request is greatly appreciated.

Respectfully,

D.M. Adams, Firefighter
District II, Station 3

TO:       M. H. Stoudenmier, District Chief

FROM:   K. T. Nichols, Firefighter

DATE:    December 7, 2002

RE:       Incident with Firefighter J. A. Palmer

Sir:

On November 25, 2002 Firefighter J. A. Palmer had ask Lieutenant R. R. Reeves to speak to Assistant
Chief C. E. Walker and Lieutenant R. R. Reeves told him no.  Then Firefighter J. A. Palmer asks again and
Lieutenant told him no again.  So, then Firefighter J. A. Palmer asked why that he could not call Assistant
Chief C. E. Walker. I felt that Firefighter J. A. Palmer really did nothing wrong.

Respectfully

K. T. Nichols, Firefighter
Station 12,District III

TO:     K.D.Gordon,Captain

FROM:   S.D.Wooten, Firefighter

DATE:   December 7,2002

RE:     Lieutenant Reeves and Firefighter J.A.Palmer


Sir:


On November 25, 2002 I remember Firefighter J.A.Palmer
asking Lt.Reeves if he could call his District Chief.
Lieutenant Reeves denied his request.I do not remember
any other specific statements made by either person.


Respectfully,

*Scotty Wooten*

Scotty D.Wooten,Firefighter
Station 3,District II

*KB*

TO:       K.D. Gordon, Captain

FROM:   A.M. Wilson, Firefighter

DATE:    December 7, 2002

RE:       Incident on the morning of November 25

Sir:

On the above date, I, A.M. Wilson reported to Station Three for my normal duty. We had roll call at 0755 hours. During roll call, F/F Palmer wanted to talk to Chief Bolling to discuss issues discussed at roll call. Lieutenant Reeves told F/F Palmer not to call Chief Bolling. Weather he did or not, I do not know. After roll call, I went to the engine room to check off the apparatus.

Respectfully,

A.M. Wilson, Firefighter
District II, Station Three

## MEMORANDUM

TO:        Deputy Fire Chief M. Jordan

FROM:      Firefighter R. L. Rainer

DATE:      February 14, 2003

RE:        Suspension

Sir,

I do no wish to appeal my recommended suspension to the review board. I accept the charges and twenty-nine day suspension recommended by Assistant Chief C. E. Walker.

*R.L. Rainer*

R. L. Rainer, Firefighter
Station 14, District III

TO:          K. Bolling, District Chief

FROM:        C. D. Lindsey, Firefighter

DATE:        December 9, 2002

RE:          Incident on Nov. 25, 2002

Sir,

On this date during roll call, Firefighter Palmer asked Lt. Reeves for permission to call 23. Lt Reeves denied his request and told him to put his request in writing and submit it for Captain Gordon's approval. Firefighter Palmer pressed the issue, again requesting permission to call 23. He was denied a second time. I stepped out of the watch shack before the issue was resolved.

Respectfully,

C. D. Lindsey, Firefighter
Station 3, District III

To:    M. Jordan, Deputy Chief

From:  D. G. Sambor, Captain
       Internal Affairs

Date:  January 9, 2003

Re:    Firefighter Robert Rainer

Upon your orders on January 9, 2003 I located Doctor Taylor to authenticate the documents that were produced by Firefighter Rainer on 12/30/02 and 1/2/03. Doctor Taylor reviewed the return to work documents dated 1-2-03 and 12-30-02 that were given to the Fire Department by Firefighter Rainer. Doctor Taylor stated that the documents were not authentic. Doctor Taylor informed me that the last time Robert Rainer was examined by him was September 11, 2001. Doctor Taylor did sign a return to work form that indicated that Firefighter Rainer could return to work on September 18, 2001. Doctor Taylor signed the original document on September 11, 2001. Doctor Taylor does not wish to pursue any criminal charges against Firefighter Rainer.

Doctor Taylor allowed me to obtain the return to work document that he originally provided to Robert Rainer. The original return to work document along with Doctor Taylor's business card is attached to this letter.

On January 14, 2003 I obtained a statement from Firefighter Rainer in the Internal Affairs Office. During the statement I questioned Firefighter Rainer about the return to work documents. Firefighter Rainer admitted in a taped statement that he falsified the documents. Firefighter Rainer stated that he obtained a copy of the original document and changed the date to 12/30/02 using liquid paper. Firefighter Rainer stated that the second document dated 1/2/03 was a blank that he received from a friend. The friend traced the second document dated 1/2/03 from the copy dated 12/30/02.

It is clear that Firefighter Rainer did falsify produce two Doctor excuses and freely admits to that fact. It is also clear that Firefighter Rainer was ordered by his supervisors to produce these doctor excuses. This matter is being turned over to you for your review.

To:     M. Jordan, Deputy Chief

From:   G. C. Cremeens, Lieutenant *GCC*

Date:   April 21, 2004

Re:    Actions on the morning of April 21, 2004

Sir;

On the above date I left City Hall at approximately 0920 in route to the
Montgomery Police Department head quarters. I drove east on Madison Ave to
Ripley St. After meeting with a detective I left at approximately 0945 in route to
Training on Court St. I drove west down Jefferson St. to Court St. I left training at
approximately 1000 in route to the Montgomery County Sheriff s Department on
Perry St. I drove south on Court St. to Madison Ave. I drove east on Madison Ave
and turned south onto Hull St. I drove down Hull St. I turned north onto Perry St.
and continued to The Sheriffs Department I left at approximately 1020 in route to
the city lot to meet with a detective at the City Forensics Lab. I drove north on
Perry St to Madison Ave. and turned east onto Madison and traveled to Perry St. I
turned north on Perry St and proceeded to the city lot. I left the lab at approximately
1050 heading to Station #2. I proceeded south on Ripley St to Madison Ave. I
traveled west on Madison Ave. to Bibb St. and took a left onto Whitman. I went
south on Whitman to Clayton St. I turned west onto Clayton and proceeded to the
rear of Station #2. I realized the personnel were having school so I left within
approximately five minutes. I left heading towards the south side of town. I took
Mildred St. to Court St and was called and told to report downtown.

TO:      K. Bolling, District Chief

FROM:   J. A. Palmer, Firefighter

DATE:    December 9, 2002

RE:      Roll Call

Sir:

On that morning after the reading of the journal I asked Lt. Reeves if he would call,
And see if you could setup another appointment for me to see Chief Walker.
Lieutenant Reeves responded with the statement, You don't want to go there.
At that time I ask if he would give me permission to call. He denied my request and I said
alright. I did not intend to be disrespectful and don't feel that I was. An officer must also
Realize that his character is accurately reflected in the personnel under his command and
Supervision, and must also bear in mind that courtesy in the intercourse between superior
and subordinate is productive of mutual confidence and respect.  No disrespect intended.
Reason for permission to talk to Chief Walker once again to request transfer.

Respectfully,

J. A. Palmer, Firefighter
Station 3, District II

KB

TO:    Miford Jordan, Deputy Chief

FROM:  A.C. Gibson, Sergeant

DATE:  May 23, 2003

RE:    Suspension

Sir,

I accept Assistant Chief Walker's recommendation for 5 days suspension without pay.

Respectfully,

A.C. Gibson, Sergeant
Truck 46 , District II

EXHIBIT
4

## MEMORANDUM

**TO:**     All Fire Department Personnel

**FROM:**   Deputy Fire Chief M. Jordan

## MASTER LETTER FILE #1 – 5

**RE:**     Use of Paid Sick Leave

Paid sick leave is a benefit granted to employees by the City of Montgomery. Sick leave is provided to continue the salary of eligible employees who are absent from work due to illness or injury.

Paid sick leave may also be used for the care of an ill or injured immediate family or household member. When an employee is unable to perform his / her job duties due to illness or injury, the employee shall devote his / her full attention to recovery and **shall not engage in any activity that might aggravate or prolong the illness or injury. With the exception of permission from the Deputy Fire Chief, an employee shall remain at home for the duration of the illness or injury except to the extent necessary to attend an appointment with a physician, obtain medication or therapy treatment.** If an individual is absent from duty **two consecutive shifts** on paid sick leave, that employee shall not work his / her part-time job or other activities before returning to duty with the Fire Department.

To receive paid sick leave a member must notify his / her district and company supervisor that he / she will be absent from work due to illness or injury prior to the beginning of his / her scheduled workday (no later than 7:30 a.m.). If it becomes necessary for a supervisor to contact you while on paid sick leave, it is your responsibility to have your current home phone number and address available at your assigned workstation. Answering machines or paging devices are not considered a means of contact.

If an employee is on paid sick leave prior to a schedule vacation, the employee **will be** required to work one full shift before vacation leave (annual leave) will be granted.

At the discretion of a company office or district supervisor a physician excuse may be required from an employee using paid sick leave. When an employee is absent from duty for a prolonged length of time due to illness, fractures, surgery, etc., he / she will be required to submit a return to full duty excuse from his / her physician before returning to duty.

MJ/sh

*August 8, 2001*

# Daily Journal

EXHIBIT
5

Shift  C

Company # Engine 16

Day Wednesday

Date: August 11, 2004

ON DUTY

Subs., Vac., Holiday, S.L., A.L., P.L.

Officer  J. W. Dennis, Captain

Sergeant  W. L. Miliner                                    DOT

F/F J. A. Palmer

F/F W.K. Williams

F/F

F/F

F/F

F/F

Dist. Chief  M.F. Smith                          J. L. Jennings

D/C Aide  T. Clark

Company School:  Time  1000          Company School:  Time  1400

Subject:  Apparatus  Hrs.  1          Subject:  Protective Breathing  Hrs.  1

Subject:  Hrs.          Subject:  Hrs.

## EMERGENCY RUNS

| | | | |
|---|---|---|---|
| 1 | | 7 | |
| 2 | | 8 | |
| 3 | | 9 | |
| 4 | | 10 | |
| 5 | | 11 | |
| 6 | | 12 | |

Motor Miles:  24032-35

Lunch  1200-1230

Supper:  1800-1830

Truck Inventory:  W. L. M. *WLM*

Knox Box Key  *JW*

FORM
3/27/2003

Night Watches:

| | | |
|---|---|---|
| 1 | Sgt. Miliner | 2200-0100 |
| 2 | Williams | 0100-0400 |
| 3 | Palmer | 0400-0715 |
| 4 | Sgt. Miliner | 0715-0800 |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

Shift Officer:

*JW Dennis*                          *Capt*

Name                          Title

EXHIBIT
7

TO:     C.E. Walker, Assistant Fire Chief

FROM:  K.D. Gordon, District Fire Chief 汉 ??? G

DATE:  August 19, 2005

RE:     Compliance with Master Letter File #8-4 (Tattoo/Brand and Body Piercing)

Sir:

This letter is in response to a complaint from Sergeant L.M. Hartwell dated August 17, 2005 and titled, "Body Tattoo". He charged me with violating Master letter #8-4.

Sergeant Hartwell has recently received counseling for violating rules set by the Montgomery Fire Department and The Personnel Board. This is an attempt to lesson the severity of his rule violations.

In September 1999 I was assigned to the Division of Training. J.W. McKee was Fire Chief and Ronnie Howard was Deputy Fire Chief. Chief Howard notified me of a complaint made by Firefighter L.M. Hartwell and Troy Harris pertaining to the Tattoo Policy. The Policy had only been in effect for about two days. Chief Howard directed me to come to his office in order to address this complaint. I went directly to his office.

Chief Howard said he received a complaint from L.M. Hartwell and Troy Harris regarding the tattoo of a confederate flag on my right arm. He said they were offended by it and requested action be taken. Chief Howard said he was designated by Chief McKee as his representative to make a decision on the complaint. He reviewed the policy with me and asked numerous questions regarding the tattoo. In conclusion he said there was no problem and if he needed anything else he would let me know. I told him, "If you require me to have it removed, I will make the appointment today".

Nothing else has been said by anyone until now, six years later. I feel this complaint is in direct response to Sergeant Hartwell's recent written reprimand for disobeying an order.

Attached is a picture of the visible tattoo while in a short sleeve uniform. The same uniform Sergeant Hartwell states I proudly display the tattoo. This is another case of Sergeant Hartwell making false statements.

Sergeant Hartwell states in his complaint, "D/C Gordon's actions within the fire department with personnel in the past, coupled with the confederate flag on his arm only opens up the subject of whether he is prejudice. This is a blind statement and I challenge anyone to investigate this allegation and show prejudice.

I am requesting a copy of this letter along with his complaint letter be attached to the Form 30 regarding him making false statements.

I am in compliance with Master Letter File 8-4 as of September 1999 only a few days after the policy was implemented.  This was ruled by Deputy Chief Howard the representative of Fire Chief McKee.

If the decision is overturned I will do what is necessary to comply with the ruling.

Respectfully,

K.D. Gordon, District Fire Chief
Station 13, District II

EXHIBIT

_9_

MEMORANDUM


TO:      Deputy Chief Miford Jordan

FROM:    Assistant Chief C. E. Walker

DATE:    January 27, 2003

RE:      Firefighter R. L. Rainer.
         Engine Co. No. 14


I have received written documentation from District Chief M. W.
Petrey concerning rules violations and behavior unbecoming of
Firefighter R. L. Rainer of Engine Company No. 14 on "A" Shift.

On the morning of December 24, 2003, Firefighter Rainer called
in to be placed on sick leave.  He told District Chief Petrey
that his ankle was bothering him and he was hurting and didn't
feel that he could perform his job for that shift.   District
Chief Petrey advised Firefighter Rainer to see a physician and
bring a release to full duty upon returning to duty.
(Firefighter Rainer advised District Chief Petrey that his ankle
situation has been bothering him for over a year.)

On December 27, 2002, Firefighter Rainer returned to duty and
worked a full 24 hour shift and did not bring a return to work
certificate from his physician.   When District Chief Petrey
inquired about the return to duty certificate the following day
(December 28, 2002), Firefighter Rainer told him that he was not
able to get an appointment to see his physician, therefore he
was unable to obtain the return to duty physician certificate.
District Chief Petrey then told Lieutenant R. L. Johnson,
Firefighter Rainer's immediate supervisor, not to report to duty
on his next duty day (December 30, 2002) without or unless he
brings the physician release to duty certificate.

On December 30,, 2002, Firefighter Rainer returned to work at
1300 hours with a copy of a physician certificate dated December
30, 2002.

On December 31, 2002, District Chief Petrey counseled with
Firefighter Rainer about following instructions, and the
importance of following guidelines of the rules and regulations

governing sick leave. Firefighter Rainer was also told by District Chief Petrey at this session that he bring on his next shift (January 2, 2003) an original physician certificate, not a copy. This was a direct order given to Firefighter Rainer by District Chief Petrey.

On January 3, 2003, a physician certificate was turned in by Firefighter Rainer. (See investigative documentation by Captain D. G. Sambor - Internal Affairs). District Chief Petrey called Firefighter Rainer and asked him about his physician's visit. District Chief Petrey stated that Firefighter Rainer avoided his questions, but then replied that the physician x-rayed his ankle and told him it was okay.

On January 9, 2003, Deputy Chief Miford Jordan assigned Captain Sambor (Internal Affairs) to make a visit to Dr. Ken Taylor's office to ascertain the authenticity of the physician's certificates presented to District Chief Petrey and Lieutenant Johnson on December 30, 2002 and January 2, 2003. Captain Sambor's interview with Dr. Taylor revealed that Dr. Taylor had not seen Firefighter Rainer in his office since September 11, 2001. Dr. Taylor did sign a return to work form that indicated that Firefighter Rainer could return to work on September 18, 2001.

January 14, 2003, Captain Sambor obtained a statement from Firefighter Rainer in the Internal Affairs Office. Captain Sambor questioned Firefighter Rainer about the return to work certificates given to his supervisor on December 30, 2002 and January 2, 2003. Firefighter Rainer in a taped interview stated that he obtained a copy of the original document dated September 11, 2001 and changed the date to December 30, 2002 using liquid paper. Firefighter Rainer also stated that the second document dated January 2, 2003 was forged from a blank return to work certificate he received from a friend. His friend traced the second document dated January 2, 2003 from the copy dated December 30, 2002. Firefighter Rainer admitted to falsifying both doctor's return to work certificates that were submitted to his supervisor on December 30, 2002 and January 2, 2003.

I have reviewed all the documentation from District Chief Petrey and Captain Sambor and have found Firefighter Rainer to be in violation of the following rules, regulations and orders governing members of the Montgomery Fire Department:

FIREFIGHTER R. L. RAINER:

In violation of the rules and regulations governing the Montgomery Fire Department:

ARTICLE XI:

Section 1101 – Members shall:

   (a)  - Adhere to the Chain of Command.

   (b)  - Familiarize themselves with their duties, responsibilities, limits of authority and official rules, regulations and orders.

   (d)  - Promote teamwork and avoid connection with any clique tending to interfere with good order.

   (e)  - Be efficient, dependable, loyal and dedicated in the performance of their duties.

   (f)  - Exercise proper judgment in the performance of their duties.

   (g)  - Refrain from conduct prejudicial to departmental reputation, order or discipline and any member who fails to pay debts incurred while in the service of the department shall be charged with violation of this section.

   (i)  - Conduct themselves in a gentlemanly manner.

   (p)  - Refrain from immoral conduct, deception, violation or evasion of law or official rule, regulation or order.

   (q)  - Refrain from false statements.

   (t)  - Understand, be familiar with and obey the rules, regulations and training manuals and shall conduct themselves in a manner that will not reflect criticism on the department.

Section 1102 – Members shall:

   (h)  - Perform such extra details and duties as may be required beyond their regular hours of services to cope

with any emergencies that may arise. i.e., large fires, manpower shortages, etc.

(i) - Accord obedience and proper respect to officers and acting officers.

Section 1103 - Members shall not:

(a) - Neglect or fail to perform any portion of their duties required by rule, regulation, order or the necessities of the situation involved.

(g) - Neglect or refuse to perform any duty or refuse to obey any order of a superior officer pertaining to the department.

MASTER LETTER FILE #1-5

See Attachment Letter - (Use of Paid Sick Leave)

Prior record also considered.

PER FORM 35
Revised 12/01

Certified Mail
Return Receipt Requested

Date:    March 3, 2003

## NOTIFICATION OF SUSPENSION

Employee's Name    _____ Firefighter R. L. Ranier _____

Street Address    _____ BY HAND _____

City/State/Zip    _____

This is to notify you that as of this date, you are herewith suspended without pay for the period of fifteen (15) calendar days.

The reason(s) for this suspension is (are) (List all charges - attach additional sheets as required):

Violation of Article IX, Section 1101 (a), (b), (d), (e), (f), (g), (i), (p), (q), (t); Section 1102 (h), (i),; Section 1103 (a) and ((g) of the rules and regulations governing the Montgomery Fire Department.

Previous record considered (List all actions considered - attach additional sheets as required):

```
SERVED BY HAND

    Served  3/3/03   [signature]
```

### APPEAL RIGHTS

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be other wise provided in Personnel Rules and Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing to the Appointing Authority and providing a copy to the Personnel Director, who is located at 520 South Court Street.

Within ten (10) days from the time for filing your answer, if you desire a hearing before the Personnel Board you must file a written request with the Personnel Director.

Consult the Montgomery City-County Personnel Department, 520 South Court Street, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on

_____3/3/03_____
/month/day/year

_____ [signature] _____
Department Head/Appointing Authority

MEMORANDUM

EXHIBIT
___10___

TO:     Mayor Bobby Bright

THRU:   Mr. Jeff Downes
        Executive Assistant to the Mayor

FROM:   Fire Chief J. W. McKee

DATE:   May 3, 2004

RE:     District Chief J. L. Jennings
        Disciplinary Action

On April 9, 2004, Assistant Chief C. E. Walker tried to counsel with District Chief J. L. Jennings on her performance at a second alarm fire at some unoccupied apartments. According to Assistant Chief Walker, District Chief Jennings became agitated and proceeded to become rude and disrespectful. He later wrote her up for insubordination and recommended that she be given a twenty-nine day suspension without pay. A Disciplinary Review Board heard the case and upheld District Chief Walker's recommendation.

I have reviewed the evidence from this incident and have read the transcript from the Disciplinary Review Board proceedings. I have also reviewed District Chief Jennings' personnel file. District Chief Jennings has several documented incidents involving her inability to accept constructive criticism or to accede to authority.

The Montgomery Fire Department is a para military organization whose entire structure is based on a chain of command and authority. To refuse to accept the fact of superior officer's authority and

to be disrespectful of that superior officers rank is not only unacceptable, it weakens the foundation of which the department is built.

From reading the documentation, I cannot ascertain of any remorse or regret that District Chief Jennings might feel. It is my opinion that staff officers should be held to a higher standard than the rank and file and certainly to the same standard. Therefore, I am concurring with the Disciplinary Review Board that District Chief Jennings be suspended without pay for twenty-nine - eight hour days.

JWM:fb

Attachments

PER FORM 35
Certified Mail
Return Receipt Requested

Date: _____812/2004_____

# NOTIFICATION OF SUSPENSION

Employee's Name _____ DISTRICT CHIEF JENNIFER JENNINGS _____

Street Address _____ BY HAND _____

City/State/Zip _____

This is to notify you that as of this date, you are herewith suspended without pay for the period of twenty-nine (29) "eight hour days"

The reason(s) for this suspension is (are) (List all charges - attach additional sheets as required):

Violation of Article XI, Section 1101 b, c, d, e, m and Section 1103 a, g, h of the Rules and Regulations governing the Montgomery Fire Department.

Previous record considered (List all actions considered - attach additional sheets as required):

SERVED BY HAND

## APPEAL RIGHTS

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be other wise provided in Personnel Rules and Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing to the Appointing Authority and providing a copy to the Personnel Director, who is located at 520 South Court Street.

Within ten (10) days from the time for filing your answer, if you desire a hearing before the Personnel Board you must file a written request with the Personnel Director.

Consult the Montgomery City-County Personnel Department, 520 South Court Street, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on

_____8/20/04_____
month/day/year

_____Bobby Bright_____
Department Head/Appointing Authority

_____
Employee

Mayor
Title

TO:       Deputy Chief Miford Jordan

FROM:     Assistant Chief C. E. Walker

DATE:     May 19, 2003

RE:       Sergeant A. C. Gibson

**EXHIBIT**

1

On May 13, 2003. Sergeant A. C. Gibson of Truck Co. No. 46 asked District Chief K. D. Gordon to make an appointment for him to see a physician for a back injury he sustained several years ago while on the job at the Drill Field.  For no apparent reason District Chief Gordon stated that Sergeant Gibson became agitated, rude and upset.  Sergeant Gibson was very disrespectful towards District Chief Gordon.

Sergeant Gibson tells District Chief Gordon that his Doctor's appointment has to be made while he is on duty, because he has to keep his children on his off duty days.

Sergeant Gibson yelled out that if his appointment is scheduled for a day while off duty he would file paperwork for overtime.

District Chief Gordon has stated in his letter to me that he had to give Sergeant Gibson orders to not talk anymore about the doctor's visit in front of the other personnel at the station.  He advised him to calm down and shut up and that the two of them could discuss the matter privately in the office.

District Chief Gordon stated that not only was Sergeant Gibson rude and disrespectful, he was talking out of control and causing a scene in front of his fellow firefighters.

I have discussed this situation with District Chief Gordon on Sergeant Gibson, and the attitude of Sergeant Gibson in this instance was clearly a display of disrespect on the part of Sergeant Gibson aimed directly towards District

Montgomery in this authority as a chief officer in the
Montgomery Fire Department.

I'm charging Sergeant Gibson with the following rules
violations of the Montgomery Fire Department:

ARTICLE XI:

All Members:

Section 1100(a) - When the actions or in-actions whether on
duty or off duty may adversely affect the efficiency,
discipline, reputation, or morale of the department.

Section 1102(i) - Members shall: Accord obedience and
proper respect to officers and acting officers.

Section 1103(g) - Members shall not: Neglect or refuse to
perform any duty or refuse to obey any order of a superior
officers pertaining to the department.

For the conduct displayed by Sergeant Gibson in this
incident at Station No. 15 on May 13, 2003, I recommend
five (5) days suspension without pay. Your attention to
this matter is very much appreciated.

CEW:fb

FROM:    K.D. Gordon, District Chief

DATE:    May 13, 2003

RE:      Sergeant A.C. Gibson

Sir:

On May 13, 2003 at approximately 1630 hours Sergeant Gibson violated several Montgomery Fire Department Rules. Listed below is a summary of the incident and the violated rules.

Sergeant Gibson went to a doctor provided by the city in regards to a back injury. The appointment was at 1540 hours. I arrived at Station 15 at approximately 1620 hours. Several people were gathered at the kitchen table. Sgt. Gibson said I need an appointment with Dr. Turner, the doctor I seen today referred me back to him. I told Sgt. Gibson I would have someone contact Ms Briley tomorrow. He stated, "The appointment has to be on Friday or Monday". I told him I could not promise the appointment would be on Friday or Monday. He started telling me this was a Fire Department injury and he was not going on his off day. I told him I would talk to him about it later in private. He continued to state he was not going on his off day and stated he had to keep his children on his off day and if he did he was going to fill out an overtime form. Sgt. Gibson was told, "Sergeant that is enough, he continued to argue. I told him to stop right now and advised him that this type of behavior was not going to be tolerated. He finally stopped arguing.

Rules Violated

✓ Section 1100 a)  When actions or in-actions whether on duty or off duty may adversely affect the efficiency, discipline, reputation, or morale of the department.

Section 1101 e)  Be efficient, dependable, loyal and dedicated in the performance of their duties.

Section 1101 g)  Refrain from conduct prejudicial to departmental reputation, order, or discipline and any member who fails to pay debts incurred while in the service of the department shall be charged with violation of this section.

Section 1101 t)  Understand, be familiar with and obey the rules, regulation and training manuals and shall conduct themselves in a manner that will not reflect criticism on the department.

✓ Section 1102 I)  Accord obedience and proper respect to officers and acting officers.

or fail to perform any portion of their duties required by rule, regulation, order or the necessities of the situation involved.

Section 1103 g)  Neglect or refuse to perform any duty or refuse to obey any order of a superior officer pertaining to the department

Respectfully,

K.D. Gordon, District Chief
Station 13, District II

# NOTIFICATION OF SUSPENSION

Employee's Name _____ Sergeant Anthony C. Gibson _____

Street Address _____ 145 Twin Oaks Lane _____

City/State/Zip _____ Wetumka, Alabama   36093 _____

This is to notify you that as of this date, you are herewith suspended without pay for the period of
five calendar days
_____

The reason(s) for this suspension is (are) (List all charges - attach additional sheets as required):

See Attachment

Previous record considered (List all actions considered - attach additional sheets as required):

None

## APPEAL RIGHTS

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be other wise provided in Personnel Rules and Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing to the Appointing Authority and providing a copy to the Personnel Director, who is located at 520 South Court Street.

Within ten (10) days from the time for filing your answer, if you desire a hearing before the Personnel Board you must file a written request with the Personnel Director.

Consult the Montgomery City-County Personnel Department, 520 South Court Street, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on

_____ June 3, 2003 _____
month/day/year

_____ Department Head/Appointing Authority

_____ *a. c. Ba____, Sgt.*
Employee

_____ Fire Chief
Title

MEMORANDUM

> **EXHIBIT**
>
> *12*

TO          Mr. Larry Armstead
            Administrative Assistant to the Mayor

FROM:       Fire Chief J. W. McKee

DATE:       January 15, 2002

RE:         Firefighter W. M. Jones
            Disciplinary Hearing


I have reviewed the file on Firefighter W. M. Jones and have
discussed the charges that have been brought against him.   He
chose not to be present at this hearing.

The charges stem from Firefighter Jones being disrespectful and
argumentative towards Sergeant A. G. Huffman on December 31,
2001 concerning his assigned duties for the day.   Firefighter
Jones demanded that the assignment be changed and went as far as
to request that the officer in the truck company intervene and
requested that the District Chief be contacted to make this
decision.

Firefighter Jones has been with the department four and one-half
years and has been counseled in the past on the same
circumstance.

This type of behavior will not be tolerated in the Montgomery
Fire Department, therefore, I am concurring with Deputy Chief
Miford Jordan that Firefighter Jones be suspended for five
calendar days without pay.


JWM:fb

Attachments



# EMPLOYEE COUNSELING RECORD

Employee: _____W.M. Jones_____     Position: __Firefighter__

Supervisor: _____A.G. Huffman, Sergeant_____     Dept.: __Fire Supression__

Date of Counseling: __12/31/01_____

Reason for Counseling *(Description of performance, conduct or commendation – give specific facts, background information, dates and times):*

On December 31, 2001 I told Firefighter J.E. Williams he was driving Engine 8. F/F Jones began to make sarcastic remarks about authority and power. He started his usual ranting and raving before coming in to the office demanding to drive. Jones rarely wants to drive. I have to make him drive. Then he will drive as if he is doing me a favor. He states all the time that driving is boreing and that he would much rather fight fire. He makes these remarks as an attempt to belittle my duties as a Sergeant. Instead of accepting my decision to let Williams drive, Jones became rude and challenged my decision by demanding to drive.

Employee's response: I don't agree about making sarcastic remarks and about authority and power because I didn't. The way this situation was percieved was totally opposite of the way I meant it.

If corrective action is required please specify the nature of the action to be taken by employee and the consequence of further infractions: I think corrective measures must be taken this time to prevent further incident. The last time F/F was not disciplined. Now for the second time Jones has broke rule sec.1102(1) accord obedience and proper respect to officers and acting officers as well as sec.1103(g) neglect or refuse to perform any duty or refuse to obey any order of a superior officer pertaining to the department.

_A. G. Huffman, Sergeant_          _12/31/01_
Supervisor                              Date

My signature indicates that the above matters were discussed with me on this __31__ day of __December__ 19_01_ and that I received a copy of this form.

_____
Employee Signature

This will certify that _____ as indicated above, was offered a copy of this form but refused to sign the Employee Counseling Record.

_____
Supervisor

Attach additional sheets as required

_B.W.U-_

# EMPLOYEE COUNSELING RECORD

Employee: __W.M. Jones__     Position: __Firefighter__

Supervisor: __A.G. Huffman, Sergeant__     Dept: __Fire__

Date of Counseling: __09/04/2000__

Reason for Counseling (*Description of performance, conduct or commendation – give specific facts, background information, dates and times*):

On September 01, 2000 Firefighter Jones showed disrespect to myself, Sgt. A.G. Huffman.
He also broke the chain of command and displayed insubordination.
I find Firefighter Jones in violation of Sec. 1101 A, 1102 I and Sec. 1103 G of the
City of Montgomery Rules and Regulations.
A memo has been attached to explain the specific facts.

Employee's response: Employee stated that he had no response.

If corrective action is required please specify the nature of the action to be taken by employee and the consequence of further infractions: __If Firefighter Jone's conduct does not improve, stronger measures may be__
needed to prevent future infractions.

*A.G. Huffman, Sergeant*                          09/04/00
_____          _____
Supervisor                                    Date

My signature indicates that the above matters were discussed with me on this __4__ day of __September__
19____ and that I received a copy of this form.
2000

_____
Employee Signature

This will certify that _____ as indicated above, was offered a copy of
this form but refused to sign the Employee Counseling Record.

*B.W. Vaughn    Captain*
_____
Supervisor

Attach additional sheets as required

Certified Mail
Return Receipt Requested

Date __January 22, 2002__

## NOTIFICATION OF SUSPENSION

Firefighter  W.  M.  Jones
<u>             (Employee's Name)       </u>

3045  Lynton  Drive
<u>           (Street Address)       </u>

Montgomery,  Alabama  36116
<u>(City)         (State)        (Zip)</u>

This is to notify you that as of this date, you are herewith suspended without pay for the period of __five calendar__

__days.__

The reason(s) for this suspension is (are) *(List all charges – attach additional sheets as required)*:

       See  attached  sheet

Previous record considered *(List all actions considered – attach additional sheets as required)*:

       See  attached  sheet

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be otherwise provided in Personnel Rules and Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing to the Appointing Authority and providing a copy to the Personnel Director in Room 224, City Hall.

Within ten (10) days from the time for filing your answer, you may file a written request with the Personnel Director for a hearing before the Personnel Board.

Consult the Montgomery City-County Personnel Board, Room 224, City Hall relative to any other rights you have under the Merit System Law.

<u>                                  </u>
              Department Head/Appointing Authority

<u>      Fire  Chief           </u>
                      Title

PER.FORM 30
Revised 11/1/02

EXHIBIT
13

# EMPLOYEE COUNSELING RECORD

EMPLOYEE: **S. R. Martin**        POSITION: **Firefighter**

SUPERVISOR: **D. S. Johnson, Lieutenant**    DEPT: **Fire**

DATE OF COUNSELING: **09-11-03**

REASON FOR COUNSELING: (Description of performance or conduct - give specific facts, background information, dates and times)

> Firefighter Martin Violated the following rules.
> Sec. 1101Q: Refrain from false statements.
> Sec. 1101A: Adhere to the Chain of Command. See attached Documents

Employee's response:

If corrective action is required please specify the nature of the action to be taken by employee and the consequence of further infractions:

_D. S. Johnson H._            _9-11-03_
        Supervisor                    Date

My signature indicates that the above matters were discussed with me or_____
                                                        (Month    Day    Year)
and that I received a copy of this form.

_____
        Employee Signature

This will certify that _____ was offered a copy of this form
but refused to sign the Employee Counseling Record.

_____
        Supervisor Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED

PER.FORM 30
Revised 11/1/02

# EMPLOYEE COUNSELING RECORD

EMPLOYEE: _S.R. Martin_          POSITION: _Firefighter_

SUPERVISOR: _D.S. Johnson, Lieutenant_    DEPT: _Fire_

DATE OF COUNSELING: _09-11-03_

REASON FOR COUNSELING: (Description of performance or conduct - give specific facts, background information, dates and times)

> Firefighter Martin Violated the following rules.
> Sec. 1101Q: Refrain from false statements.
> Sec. 1101A: Adhere to the Chain of Command. See attached Documents

Employee's response:

If corrective action is required please specify the nature of the action to be taken by employee and the consequence of further infractions\

_____          _4-11-03_
Supervisor                                Date

My signature indicates that the above matters were discussed with me or              (Month    Day    Year)

and that I received a copy of this form.

_____
Employee Signature

This will certify that _____ was offered a copy of this form
but refused to sign the Employee Counseling Record.

_____
Supervisor Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED

To:        M. Jordan, Deputy Fire Chief

From:      C. E. Walker, Assistant Fire Chief

Date:      October 5, 2005

Re:        Fire Medic A. D. Rose
           Recommendation for Suspension

EXHIBIT
14

Sir:

Fire Medic A. D. Rose has been with the Fire Department for approximately two years and eleven months and is currently assigned to the Fire Medic Division in Rescue #94 on C-Shift under the direct supervision of Lt. J. N. Owens.  Except for the sixteen weeks of Recruit School, Fire Medic A. D. Rose has been assigned to the Fire Medic Division his entire employment with the fire department.

On September 26, 2005, I receive documentation from District Chief M. H. Stoudenmier and Captain P. W. McKeown on rule violation charges against A. D. Rose by Captain Ronnie H. Bozeman of Engine Company #12 on C-Shift.  The charges against Fire Medic Rose states "Fire Medic Rose was found to be in direct violation of Rules and Regulation of the Montgomery Fire Department Section 1100 and Section 1102.

On the morning of September 24th, approximately 0700 hours, an elderly gentleman walked into Fire Station #12 to have his blood sugar checked by the Medics.  This gentleman had been in the station several times before to have this procedure done.  On this particular morning, Captain Bozeman summoned Fire Medic Rose to check the Gentleman's blood sugar. According to Captain Bozeman, Fire Medic Rose response was "Captain you are a Paramedic and you know where the kit is, why don't you check it". Captain Bozeman stated that he told Fire Medic Rose that he needed to lose that type of attitude.  All of this verbal conversation took place in the present of the patient.

Captain Bozeman went on to say that Fire Medic Rose further replied to him, "I'll tell you like I told the officers at Training, I expect my pay check every two weeks unlike you, you depend on it".  Captain Bozeman stated

Medic Rose did as he was told. Captain Bozeman met with Fire Medic Rose's Supervisor, Lt. J. Owens, and informed him of what had just happened and that Fire Medic Rose had disrespected him in the presence of the patient. Captain Bozeman further stated to Lt. Owens that he was tired of Fire Medic Rose's attitude around the station and that he needed to take care of the matter with him. (*See letter of documentation*).

On the morning of the incident in question, District Chief Stoudenmier, Captain McKeown, Captain Bozeman and Lt. Owens met with Fire Medic Rose and according to District Chief Stoudenmeir, Rose denied the validity of the charges against him from Captain Bozeman; however, a Form 30 was written on Fire Medic Rose for Disrespecting an Officer. Captain McKeown, the on-duty Medic Commander, concurred with the form 30 documentation. Fire Medic Rose refused to sign the Form 30 and it was so noted of his refusal.

In reviewing Fire Medic Rose's personnel records, Rose had (2) previously written Form 30 on him during the time he was temporarily assigned to the Training Division due to a back injury. The previously written Form 30 must be considered in this disciplinary matter. (*See Form 30 dated 3/30/05 and Form 30 dated 6/20/05*). Fire Medic Rose has also received disciplinary action on April 18, 2005 for violating the Montgomery Fire Department weight guidelines.

After reviewing all the documents concerning this incident with Fire Medic Rose, I concur with Captain Bozeman's description of what happen on the morning of September 24, 2005 and I am charging Fire Medic Rose with the following Rules and Regulation violation:

Section 1100, <u>Explanation:</u>    The rules of conduct prescribed in this article shall be confined to the official capacity of members of the Montgomery Fire Department.

    a.    When the actions or in-actions whether on duty or off duty may adversely affect the efficiency, discipline, reputation, or morale of the department.

    b.    When in uniform whether on or off duty.

Section 1101,  Members shall:

b.    Familiarize themselves with their duties, responsibilities, limits of authority and official rules, regulations and orders.

c.    Perform their duties in a prompt and energetic manner.  If they prove by aptitude or action that they lack the qualifications necessary to fulfill the requirements of their position, they may be charged with ineptitude for duty.

e.    Be efficient, dependable, loyal and dedicated in the performance of their duties.

l.    Conduct themselves in a gentlemanly manner.

m.    Be just, impartial, firm and dignified in their relation with others.

n.    Refrain from giving unauthorized orders or directions to others when giving orders from their commanders state their authority.

Section 1102,  Members shall:

i.    Accord obedience and proper respect to officers and acting officers.

There has been documented disciplinary actions taken against Montgomery Fire Department employees in the past involving disrespect to Officers and Superior Officers and in those documented cases the employees were suspended without pay.  In this case, Fire Medic Rose has clearly shown a lack of respect for an Officer and has displayed an inappropriate attitude in the process.  This type of behavior will not be tolerated in the department. Fire Medic Rose should be disciplined accordingly as previous suspensions on the same charges.  I am recommending that Fire Medic A. D. Rose be suspended for fifteen calendar days without pay.

Your attention in this matter is greatly appreciated.  If further assistance is needed, please let me know.

FIRE MEDIC A. D. ROSE:

In violation of the rules and regulations governing the Montgomery Fire Department:

ARTICLE XI – Rules and Regulations All Members:

Sec. 1100 – Explanation:   The rules of conduct prescribed in this article shall be confined to the official capacity of members of the Montgomery Fire Department.

a – When the actions or-inactions, whether on duty or off duty, may adversely affect the efficiency, discipline, reputation, or morale of the department.

b – When in uniform whether on or off duty.

c – When on property occupied or used by the Department.

Sec. 1101 – Members shall:

b – Familiarize themselves with their duties, responsibilities, limits of authority and official rules, regulations and orders.

c – Perform their duties in a prompt and energetic manner.   If they prove by aptitude or action that they lack the qualifications necessary to fulfill the requirements of their position, they may be charged with ineptitude for duty.

e – Be efficient, dependable, loyal and dedicated in the performance of their duties.

l – Conduct themselves in a professional manner.

m – Be just, impartial, firm and dignified in their relation with others.

n – Refrain from giving unauthorized orders or directions to others when giving orders from their commanders state their authority.

Sec. 1102 – Members shall:

i – Accord obedience and proper respect to officers and acting officers.

PER FORM 35
Revised 12/01

Certified Mail
Return Receipt Requested

Date: _____October 19, 2005_____

## NOTIFICATION OF SUSPENSION

Employee's Name _____Fire Medic A. D. Rose_____

Street Address _____2312 Upper Wetumpka Road_____

City/State/Zip _____Montgomery, AL  36107_____

This is to notify you that as of this date, you are herewith suspended without pay for the period of
_____Fifteen Calendar Days_____

The reason(s) for this suspension is (are) (List all charges - attach additional sheets as required):

See Attachment

Previous record considered (List all actions considered - attach additional sheets as required):

None

### APPEAL RIGHTS

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be other wise provided in Personnel Rules and Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing to the Appointing Authority and providing a copy to the Personnel Director, who is located at 520 South Court Street.

Within ten (10) days from the time for filing your answer, if you desire a hearing before the Personnel Board you must file a written request with the Personnel Director.

Consult the Montgomery City-County Personnel Department, 520 South Court Street, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on;

_10/20/05_
month/day/year

_____
Department Head/Appointing Authority

Fire Chief

EXHIBIT

_15_

MEMORANDUM

TO:        Deputy Chief Miford Jordan

FROM:      Assistant Chief C. E. Walker

DATE:      December 20, 2002

RE:        Firefighter J. A. Palmer
           Engine No. 3

On the morning of November 25, 2002 during company shift change roll call, Firefighter J. A. Palmer was rude and disrespectful toward his company officer. Lieutenant R. R. Reeves from Engine Co. No. 3 was holding roll call on that morning, when Firefighter Palmer voiced his opinion about what was passed on. Lieutenant Reeves told District Chief Kenneth Bolling, his shift supervisor, that Firefighter Palmer had a problem with the announcement at roll call, that from this point on, "All personnel will report to roll call in Class "C" Uniform." According to Firefighter Palmer, he didn't think it was right, so he began to rant in front of the two (2) shifts about how he did not agree with the information that had been passed on.

Firefighter Palmer insisted that he be allowed to call the Assistant Chief (Walker). Lieutenant Reeves denied the request. He then requested to place a call to District Chief Bolling and again the request was denied. Lieutenant Reeves stated that Firefighter Palmer picked up the phone as if to place a call after having been told twice that he couldn't. Lieutenant Reeves asked Firefighter Palmer to put in writing what he needed or why he wanted to talk to Assistant Chief C. E. Walker and District Chief Bolling.

For some time now, Firefighter Palmer has had a negative attitude for reasons I'm not absolutely sure of. The month before (in October) Firefighter Palmer was summoned to Deputy Chief Miford Jordan's office as a result of the negative way in which he filled out the United Way contribution card. He was cautioned by Deputy Chief Jordan and myself about his negative attitude. Deputy Chief Jordan told Firefighter Palmer at that time that if his attitude didn't change, he felt that it would

get him into trouble. Firefighter Palmer admitted that he did have a bad attitude and he knew it. Deputy Chief Jordan advised Firefighter Palmer that if he continued behaving in such a matter, that he could be written up on charges.

After reviewing all of the documentation, it is clear from all accounts that Firefighter Palmer was disrespectful to Lieutenant Reeves. The disrespect of an officer in this department is not and will not be tolerated by any subordinate. I have no other choice in this matter other than to charge Firefighter Palmer with the following rule violations:

ARTICLE XI – Rules and Regulations:

Section 1101 – Members shall:

   (a)  – Adhere to the Chain of Command.

   (e) – Be efficient, dependable, loyal and dedicated in the
         performance of their duty.

   (l) – Conduct themselves in a gentlemanly manner.

Section 1102 – Members shall:

   (i)     – Accord obedience and proper respect to officers and
             acting officers.

My recommendation for the above rules, regulations and violations is for a five (5) day suspension without pay for Firefighter Palmer, Engine Co. No. 3.

CEW:fb

FIREFIGHTER J. A. PALMER:

In violation of the rules and regulations governing the Montgomery Fire Department:

ARTICLE XI:

Section 1101 - Members shall:

(a) - Adhere to the Chain of Command.

(e) - Be efficient, dependable, loyal and dedicated in the performance of their duty.

(l) - Conduct themselves in a gentlemanly manner.

Section 1102 - Members shall:

(i) - Accord obedience and proper respect to officers and acting officers.

Prior record also considered.

PER FORM 35
Revised 12/01

Certified Mail
Return Receipt Requested

Date: February 3, 2003

# NOTIFICATION OF SUSPENSION

Employee's Name _____ Firefigher James A. Palmer _____

Street Address _____ 3615 Cloverdale Road _____

City/State/Zip _____ Montgomery, Alabama 36111 _____

This is to notify you that as of this date, you are herewith suspended without pay for the period of

five calendar days

The reason(s) for this suspension is (are) (List all charges - attach additional sheets as required):

See Attachment

Previous record considered (List all actions considered - attach additional sheets as required):

None

## APPEAL RIGHTS

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be other wise provided in Personnel Rules and Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing to the Appointing Authority and providing a copy to the Personnel Director, who is located at 520 South Court Street.

Within ten (10) days from the time for filing your answer, if you desire a hearing before the Personnel Board you must file a written request with the Personnel Director.

Consult the Montgomery City-County Personnel Department, 520 South Court Street, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on

_____2/4/03_____
month/day/year

_____
Department Head/Appointing Authority

Fire Chief

_____
Employee

Title

## Montgomery Fire Department
### Employee Appraisal Review Record

EMPLOYEE: L.M. Hartwell

POSITION: Sergeant

SUPERVISOR: K.D. Gordon, Sr.

DEPARTMENT: Fire

DATE OF COUNSELING: May 29, 2003

**REASON FOR COUNSELING:** (Description of performance or conduct - give specific facts, background, dates and times)

On May 19, 2003 Station 16 had their monthly inspection by District Chief Gordon. The station was obviously not ready for inspection. The station personnel had plenty of notification and time to have the station ready for inspection. This shows a disregard for station maintenance and will not be tolerated. The station had to be reinspected in March and in April of 2003. The District Chiefs did not fail the station, they gave them three more days to clean the station before being reinspected. This has become a habit and it will not continue. If station 16 fails another inspection or has to be reinspected because it is not ready, further corrective action will be forthcoming.

_How much time was Hartwell there to prepare for the time of the inspection? [illegible handwritten marginal note]_

_Supervisor Signature_

May 29, 2003
Date

My signature indicates that the above matters were discussed with me on and I have received a copy of this form.

5 29 03
Month / Day / Year

_Employee Signature_

Attach Additional Sheets as Required

Form 30B
11/14/2002

EXHIBIT
16

PER FORM 30
Revised 11/1/02

# EMPLOYEE COUNSELING RECORD

EMPLOYEE: _____ L.M. Hartwell _____     POSITION: _____ Sergeant _____

SUPERVISOR: _____ K.D. Gordon, Sr. _____     DEPT: _____ Fire _____

DATE OF COUNSELING: _____ June 1, 2003 _____

REASON FOR COUNSELING: (Description of performance or conduct - give specific facts, background information, dates and times)

On May 29, 2003 A-Shift personnel at Station 16 were being counseled using a form 30b. After being counseled each individual was directed to sign the form. Sergeant L.M. Hartwell refused to sign the form. He was given an order to sign the form and he refused. He was asked if he understands, he is being given an order. He stated," Yes and I am not signing. Sgt Hartwell violated the following rules. Section 1100 a), Section 1101 e) g) f), Section 1102 i), and Section 1103 a), g).

Employee's response:

If corrective action is required please specify the nature of the action to be taken by employee and the consequence of further infractions:

_____     _____ June 01, 2003 _____
Supervisor                                            Date

My signature indicates that the above matters were discussed with me on _____
and that I received a copy of this form.                                     (Month  Day Year)

_____
Employee Signature

This will certify that _____ L.M. Hartwell _____ was offered a copy of this form but refused to sign the Employee Counseling Record.

_____
Supervisor Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED

EXHIBIT
17

TO:    K. D. Gordon, Sr. District Chief

FROM:    L. M. Hartwell, Sergeant

DATE:    June 2, 2003

RE:    Abusing Authority

**EXHIBIT**
18

Sir:

May 23, 2003 at approximately 1630, Chief Gordon called all personnel around the table to talk to us about the station inspection and his reputation at Station 3. Chief informed Lt. Gamble, F/F Williams, F/F Martin and me that he was going to write a 30 B form on everybody at the Station and nobody was going to bump head with him on this matter. He stated to us that you do know my reputation (that was a indirect way of saying don't cross him or you will pay for your action dearly. It could even be considered a form of throwing his weight around even more now that he is Chief). He informed us that we did not want to go that way.

On May 26, 2003 Lt. Johnson talked to Chief Gordon and told him that he will not let his men sign the 30 B forms. Chief Gordon told Lt. Johnson to trash the 30 B forms he wrote earlier and he would re-write the 30 B forms. Lt. Johnson told us not to sign the 30 B forms that Chief Gordon is delivering out here, because the 30 B form should be wrote up on him and not the men because he is responsible for the Station being ready for inspection( see section 193, page 17 on Lieutenant duties ).

On May 29, 2003 at approximately 1615, Chief Gordon came into the Station and called all personnel to the table. Chief Gordon explained the 30 B form and told everybody to sign it. I looked at Lt. Johnson and noticed that he didn't have a 30 B form in front of him. I told Chief Gordon I was not signing the form. Chief Gordon informed me that I broke a direct order. I asked Chief Gordon was he giving me a direct order? He said yes. Since it was a direct order I was going to sign the form but I looked at the form and was puzzled about the work appraisal on the form. Knowing the seriousness of this form, I wanted to be aware of every aspect of the form I was signing. I was about to ask the Chief to explain it to me but he stood up from his seat and replied in a very unprofessional and angry tone of voice, "Shut up shut up don't say another word!! "Do you hear me " And he waited for me to acknowledged his loud out burst. I acknowledged him to calm him down and then asked if I could talk to Lt. Johnson. He said yes. Lt. Johnson and I stepped in the other room and he explained to me about the word appraisal on the 30 B form. I then returned and signed the form with a understanding of what I was signing my name to. After I signed the form, Chief Gordon informed me that I still broke a direct order. The form 30 B that Chief Gordon wrote didn't pertain to my duties as a Sergeant of the Montgomery Fire Department( see Captain and Lieutenant duties in section 157,163,193,196 and 206).

In the work place, having any type of poor performance form placed in your file is not good. So knowing the seriousness of the form, I should have a total understanding of what I am signing and me wanting to know that before I sign the form is my right as an employee of the City of Montgomery.

Respectfully


L. M. Hartwell, Sergeant
Station 16, District II

EXHIBIT

_19_

To: M. Jordan, Deputy Chief
From: C.E. Walker, District Chief
Date: October 31, 2001
Re: Complaint (Sergeant Lee Hartwell)

On Friday October 5, 2001 Sgt. Lee Hartwell received permission from Lt. Flynn his
company officer to speak with me on some complaints that he had against Capt. David Norman.
In Sgt. Hartwell's conversation to me he revealed two concerns that he felt very strong about:
1). Capt. Norman being bias in applying Montgomery Fire Department rules and regulations.
2). Capt. Norman's attitude concerning the tobacco policy.
According to Sgt. Hartwell Capt. Norman shows favoritism in the abuse of the tobacco policy in
that he (smokes cigarettes) with other members of the department at station two as per
Sergeant's Hartwell letter to me. Also it was a concern of Sgt. Hartwell that Capt. Norman
doesn't set a good leadership and supervisory role because he has been and is using tobacco
products with some of the other firefighters at the station while making him abide by the rules.
Sgt. Hartwell has cited some examples of Capt. Norman's actions in his attached letters to me.
Sgt. Hartwell and Capt. Norman in one previous incident involving Sgt. Hartwell washing his
vehicle at the station has caused unrest between them.
I have talked to Sgt. Hartwell and Capt. Norman on two different occasions to try and
resolve the complaints of Sgt. Hartwell. I told Capt. Norman at one point in specific to meet
with Capt. Sexon, Lt. Flynn and Sgt. Hartwell to resolve the issue. They did meet and Capt.
Norman reported back to me that they couldn't reach any resolution.( See attached letter of
meeting) Sgt. Hartwell himself has conveyed to me as well that the concerns he has involving
the complaints against Capt. Norman can't be settled through group meetings but only by Capt.
Norman doing the right thing.
It is evident to me after much discussion and observation of the issues here that what we
have is not an issue of misunderstanding nor lack of communication but a situation that has
evolved into a "you're doing it stand off", where Capt. Norman is indeed violating a serious
tobacco policy on and off duty as he has admitted. While Capt. Norman hasn't allowed Sgt.
Hartwell to wash his vehicle on weekend mornings just before getting off duty, Sgt. Hartwell
claims that to be unfair since it has been allowed on other occasions in the past.
Sgt. Hartwell having no choice in the matter of not being able to wash his vehicle except
during pre-approved designated times has agreed to abide by the rule after a written
memorandum was shown him in the latter phase of all previous discussion by his company
captain. (Dennis Sexon)
Now to the crust of the whole bases of Sgt. Hartwell's premise of rule violations and
bias. Captain David Norman has admitted to using tobacco on and off duty and has not stated
whether or not he plans to stop, as per his letter he's going to continue to use. I have never seen
Capt. Norman use tobacco but I 've smelled cigarette smoke on his clothing. There are at this
time  a number of fire officers in the department that use tobacco products in one form or
another. As an example just in District One alone three(3) District Chiefs are users. It appears
that in doing so discretion has no place either. A former fire department head once paraphrased

this quote: " If the officers of the Montgomery Fire Department doesn't provide proper supervision and leadership, the department suffers directly and the public indirectly."

     For some time now the integrity of the Fire Officers position in the department has been breached.  The Firefighters in their quest for equanimity has used this weakness of command to their individual ploys of interests as in the situation at hand.  Therefore it is my conscience consideration and recommendation as an officer of the Montgomery Fire Department to admonish swift action to rescue our integrity and unity of command through aggressive intervention of this present dilemma.  Out of respect for you Sir and Chief John McKee a long time friend I urge your consideration in this matter.

Respectfully,

Carl E. Walker, District Chief
District I

EXHIBIT

20

PER.FORM 30a
10/22/02

# EMPLOYEE COMMENDATION RECORD

EMPLOYEE: L.M. Hartwell                    POSITION: Sergeant

SUPERVISOR: D.W. Wallace, Captain          DEPT: Fire

DATE OF COMMENDATION: October 21, 2005

REASON FOR COMMENDATION: (Description of performance or conduct - give specific facts, background information, dates and times)

Sergeant Hartwell displays good skills, and a good knowledge of the rules and regulations and his territory.  He takes responsibility for his actions. Sergeant Hartwell is competent in his job and performs all assigned tasks to standard.

Sergeant L.M. Hartwell has received three form 30s', at the District level , one dated August 9, 2005, and two on August 18,2005.

* Form 30, dated August 9,2005, employee violated Section 1103g of the Montgomery Fire Dept. Rules and Regulation.
* Form 30, dated August 18, 2005, employee violated Article XI Section 1101 of the Rules and Regulation all members.
* Form 30, dated August 18,2005, employee violated Section 1101 of the Rules and Regulation.

See attached Form 30s'

_____                    October 21, 2005
Supervisor                                          Date

My signature indicates that the above matters were discussed with me on     October 21, 2005
and that I received a copy of this form.                                     (Month Day Year)

_____
Employee Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED

EXHIBIT

21

PER.FORM 30a
10/22/02

# EMPLOYEE COMMENDATION RECORD

EMPLOYEE: _L.M. Hartwell_          POSITION: _Sergeant_

SUPERVISOR: _P.M. Dean, Lieutenant_          DEPT: _Fire_

DATE OF COMMENDATION: _June 16, 2005_

REASON FOR COMMENDATION: (Description of performance or conduct - give specific facts, background information, dates and times)

Sergeant Hartwell has performed very well this tri semester.. He is a seasoned professional and his years of experience shows in his daily activities. He is efficient around the station and on emergency scenes. He knows the skills required of him and does not hesitate to take action and help others as well.

_____          _June 16, 2005_
Supervisor                                Date

My signature indicates that the above matters were discussed with me on          _June 16, 2005_
                                         (Month Day Year)
and that I received a copy of this form

_____
Employee Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED

PER.FORM 30a
10/22/02

EXHIBIT

22

# EMPLOYEE COMMENDATION RECORD

EMPLOYEE: _L.M. Hartwell_          POSITION: _Firefighter_

SUPERVISOR: _D.W. Wallace, Captain_          DEPT: _Fire_

DATE OF COMMENDATION: _January 10, 2006_

REASON FOR COMMENDATION: (Description of performance or conduct - give specific facts, background information, dates and times)

L.M. Hartwell was reassigned as a Firefighter on Engine-13 B-Shift on November 25, 2005. Firefighter Hartwell has done a good job as a Firefighter. He is very dependable. His performance around the station and on the fire ground is very good. I haven't had any problems with him. Firefighter Hartwell has a good attitude and works well with the other firefighters.

_____          01-10-2006
Supervisor                                     Date

My signature indicates that the above matters were discussed with me on    January 10, 2006
                                                                                                        (Month Day Year)
and that I received a copy of this form.

_____
Employee Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED

To:    L. M. Hartwell
From:  D. Watson


On October 7, 2004 at approximately 1100 hour, I
was going to a doctor's appointment at Baptist
Tower.  I ran into retired Lt. Provitt.  We started to
talk about the old fire department, when he asked me
about Sgt. Hartwell.  My question was, what about
Sgt. Hartwell?  He said I heard they are trying to get
Sgt. Hartwell over there at station 16.  I told him that
I had not heard about that.  Retired Lt. Provitt replied,
Lt. Gamble told me that Sgt. Hartwell was bringing
women to the station after visiting hours.  I replied if
that was true and Lt. Gamble was aware of it, why he
didn't stop it.  Lt. Provitt replied but if that is true Lt.
Gamble is just as guilty as Sgt. Hartwell because he
did nothing about the situation.  Lt. Gamble should
have done something about the situation when he
started to have suspicion.  I ended the conversation
because I had to go to my appointment.


Respectfully,

*D. Watson*

D. Watson

EXHIBIT
23

# THE BRANNAN LAW FIRM, P.C. COPY

### ATTORNEYS AT LAW
### POST OFFICE BOX 307
### MONTGOMERY, ALABAMA 36101
### EIN: 75-3030272

Telephone: 334-264-8118
Facsimile: 334-263-7598
www.brannanlaw.com

602 South Hull Street
Montgomery, AL 36104

December 16, 2004

Hon. Walter R. Byars
City Attorney
Post Office Box 1111
Montgomery, AL 36101-1111

    *Re:    Sergeant L.M. Hartwell*
           *Montgomery Fire Department*

Dear Walter:

      I represent Sergeant Lee Hartwell and I have statements from witnesses that show that defamatory comments have been published concerning Sergeant Hartwell, by officers of the Montgomery Fire Department. These comments were stated as fact that Sergeant Hartwell had brought women into the fire station in the middle of the night. The comments are untrue and have damaged Sargeant Hartwell.

      Sergeant Hartwell has also been disciplined unfairly for seeking redress for improper disciplinary action having been taken against him. He has been subjected to inaccurate entries in his personnel file. He has been "written up" for seeking redress for his treatment in the department and has been accused of violating the chain of command, when in fact, the documentary evidence establishes that he followed the chain of command.

      Sergeant Hartwell fully expects that after an investigation it will be determined that he should not have been disciplined and he further demands a retraction from those officers who have made the defamatory remarks concerning him.

Sincerely,

J. Bernard Brannan, Jr.

JJBjr/db

EXHIBIT
23





SERGEANT L. M. HARTWELL:

In violation of the rules and regulations governing the Montgomery Fire Department:

ARTICLE XI – Rules and Regulations All Members:

Sec. 1100 – The rules of conduct prescribed in this article shall be confined to the official capacity of members of the Montgomery Fire Department:

a – When the actions or in-actions whether on duty or off duty may adversely affect the efficiency, discipline, reputation, or morale of the department.

b – When in uniform whether on or off duty.

c – When on property occupied or used by the Department.

Sec. 1101 – Members shall:

a – Adhere to the Chain of Command.

m – Be just, impartial, firm and dignified in their relations with others.

p – Refrain from immoral conduct, deception, violation or evasion of law or official rule, regulation or order.

q – Refrain from false statements.

t – Understand, be familiar with and obey the rules, regulations and training and shall conduct themselves in a manner that will not reflect criticism on the department.

Sec. 1102 – Members shall:

h – Perform such extra details and duties as may be required beyond their regular yours of service to cope with any emergencies that may arise, i.e., large fires, manpower shortages, etc.

i. – Accord obedience and proper respect to Officers and acting officers.

Sec. 1103 — Members shall not:

g. Neglect or refuse to perform any duty or refuse to obey any order of a superior Officer pertaining to the department

Prior record also considered.

*City* (#2)

MEMORANDUM


TO:      File

FROM:    Assistant Chief C.E.Walker

DATE:    August 17, 2004

RE:      Sergeant Lee M.Hartwell


After reviewing the three (3) letters addressed directly to me from Sergeant L.M.Hartwell dated August 14th 2004, I ask the District Chiefs in District Two to look into the claims and accusations at Fire Station Sixteen (see attached letters) and report back to me their findings.

On September 2, 2004 D/C John Petrey gave me a written letter outlining the events and details of Sergeant Hartwell's claims and contained in the documentation the accusations and claims from Sergeant Hartwell were settled and concluded by all the District Chiefs in district two.

Also, it's very important to note that these claims from Sergeant Hartwell did not warrant him addressing them directly to me. He should have followed the chain of command with his complaints and accusations. He was informed by the District Chiefs (Holland and Petrey) that in the future he will use the proper chain of command. As a Sergeant in the department Hartwell already knew the proper procedures for written communications. There have been other occasions where he has violated the chain of command in similar matters. It appears that this individual is deliberately being defiant of instructions in this regard. Any future circumventing of the chain of command from this Sergeant in this regard when it is not necessary will result in actions taken in the form of a written reprimand.

*City    # 3*

# MEMORANDUM

TO:        File

FROM:      Assistant Chief C.E.Walker

DATE:      September 20, 2004

RE:        Sergeant L.M.Hartwell


Monday, September 20, 2004, I received a letter sealed in a hand-mail envelope. I was informed by District Chief John Petrey that the letter was from Sergeant L.M.Hartwell from Engine Company Sixteen. (See attached letter).

Again, Sergeant Hartwell has broken the chain of command by way of written communication directly to me and in the process circumventing his Company Office (Lt.R.L.Johnson), and his District Chief (John Petrey). Sergeant Hartwell continues to deliberately bypass necessary chain of command without regard for the respect of his Company Officer and District Chief. On August 14, 2004 Sergeant Hartwell did this very same thing and now it appears that he has the same defiant attitude in this inappropriate behavior yet once more.

If this blatant behavior of disrespect continues it leaves me no other choice than to bring charges against Sergeant Hartwell for failure to obey Company Officer and District Chiefs' orders pertaining to the circumventing of the chain of command.

*City #4*

# Montgomery Fire Department
## Employee Appraisal Review Record

EMPLOYEE: L.M. Hartwell

POSITION: Fire Sergeant

SUPERVISOR: J.L. Petrey, District Chief

DEPARTMENT: Fire

DATE OF COUNSELING: September 25, 2004

**REASON FOR COUNSELING:** (Description of performance or conduct - give specific facts, background, dates and times)

On August 11, 2004 Sergeant Hartwell informed me that he had written documentation of a series of incidents that had occurred at Station Sixteen that he would like to turn in. At this time I advised Sergeant Hartwell that anything he would like to submit would have to go through his chain of command. According to Montgomery Fire Department Rules and Regulations Article XI, Section 1101, Members shall: a. Adhere to the chain of command.

_____
Supervisor Signature

September 25, 2004
Date

My signature indicates that the above matters were discussed with me on and I have received a copy of this form.

9 27 04
Month / Day / Year

_____
Employee Signature

*Sgt. Hartwell refused to sign form*

Attach Additional Sheets as Required

Form 30B
11/14/2002