IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| LEE HARTWELL,<br>IN HIS INDIVIDUAL CAPACITY,<br><br>　　　Plaintiff,<br><br>vs.<br><br>THE CITY OF MONTGOMERY,<br>ALABAMA, PERSONNEL<br>BOARD OF THE CITY AND<br>COUNTY OF MONTGOMERY,<br>ALABAMA, and DISTRICT CHIEF<br>KELLY D. GORDON, IN HIS<br>INDIVIDUAL CAPACITY,<br><br>　　　Defendants. | CIVIL ACTION NO.<br>2:06cv518-MHT |

## AFFIDAVIT

BEFORE ME, the undersigned Notary Public in and for said State and County, personally appeared LEE HARTWELL, known to me and who, being by me first duly sworn, deposes and says as follows:

"My name is Lee Hartwell. I am the Plaintiff in the above styled action. I was employed with the Montgomery Fire Department for over twenty (20) years.

In 1999, I held the rank of Firefighter and made a complaint or grievance through the Fire Department concerning another Firefighter, Kelly D. Gordon, for his violation of the Montgomery Fire Department Tattoo Policy (Exhibit 1, Tattoo/Brand and Body Piercing Policy). Firefighter Kelly D. Gordon had on his bicep the tattoo of a Confederate Battle Flag with a skull and crossbones within it. I found this offensive and felt that it was in violation of the City of Montgomery's Tattoo Policy. A white male who was a District Chief, Ronnie Howard, allegedly investigated my grievance and found that the tattoo did not violate the Montgomery Fire Department Tattoo Policy. My making the complaint about the tattoo was not a part of my job description, nor was my making the complaint in any way a part of my requirements as a

Firefighter. I felt that the tattoo was of a symbol that advocated racial discrimination and on a public employee, was a matter of public concern.

The City of Montgomery later removed the Confederate Battle Flag from the seal of the City of Montgomery and therefore, it was removed from our uniforms. This was because it was determined that the Confederate Battle Flag, even without the intimidating skull and crossbones, was offensive to members of the population of the City of Montgomery and a matter of public concern (Exhibit 2, Patches).

Kelly D. Gordon was promoted through the ranks and ultimately became a District Chief. He was not one of my supervisors at any point until he became the District Chief. Soon after he became the District Chief over my shift, he began to take unfounded disciplinary action against me.

The first incident was on May 29, 2003, when District Chief Kelly D. Gordon, in violation of the Fire Department Policy, attempted to have each man at our station presented with Disciplinary Form 30B because the station had failed an inspection. Fire Department Policy calls for the officer of the station to receive the 30B for the failure of passing an inspection, rather than each man, as it is the officer's responsibility. Further, I was not on duty at the time that the station failed the inspection. When I attempted to explain these things and that I should not be required to sign the form, instead of explaining it to me, District Chief Kelly D. Gordon stood up from his seat and in an angry tone of voice stated to me, "Shut up! Shut up! Don't say another word! Do you hear me?" After I signed the form (Exhibit 3, May 29, 2003, Form 30B) on May 29, 2003, District Chief Kelly D. Gordon informed me that I still broke a direct order. On June 1, 2003, District Chief Kelly D. Gordon wrote up a disciplinary form (Exhibit 4, June 1, 2003, Form 30) stating that I refused a direct order by not signing the form, when the form clearly indicates that it was signed on May 29, 2003.

Because of the way the command within the Fire Department transfers from shift to shift and Firefighters alternate shifts, for a considerable period of time District Chief Kelly D. Gordon was not my supervisor. In August of 2005, District Chief Kelly D. Gordon was not the District Chief over my shift, but undertook to discipline me. On August 4, 2005, I had already worked one shift and agreed to work another shift on overtime. At lunch on that date, I and Lieutenant Eddie L. Stephens, ate bologna from the Fire Station freezer and I got sick. Lieutenant Stephens

stated that although he didn't get sick, the bologna made his stomach start cramping (Exhibit 5, Lieutenant Eddie L. Stephens Affidavit). Prior to getting sick, I had joked with some other Firefighters and Lieutenant Donnie Adams that I did not mind working, that Donnie Adams' men are probably the ones likely to go home sick rather than work.

    On August 7, 2005, when I came back to my next shift after being off, District Chief Kelly D. Gordon, who was not assigned as the supervisor to my shift, came in and met with me. He stated that I needed to bring in a doctor's excuse because I had left when I was working overtime. The rules of the Montgomery Fire Department do not provide for any requirement of a doctor's excuse unless a person is seeking sick leave. As I was working overtime and not eligible for sick leave, any order requiring me to furnish a doctor's excuse would be improper and unauthorized. I referred to the Montgomery Fire Department Sick Leave Policy and advised District Chief Kelly D. Gordon that my Shift Commander had not asked for a doctor's excuse and that an order directing me to get one would be contrary to the City of Montgomery's policy (Exhibit 6, Master Letter File #1-5, Use of Paid Sick Leave). He wrote an Employee Counseling Form on me, which is dated August 9, 2005 (Exhibit 7, August 9, 2005, Form 30). I did not go to PriMed and I did not tell District Chief Kelly D. Gordon that I had gone to PriMed, even though that is what he put in his memo.

    On August 18, 2005, District Chief Kelly D. Gordon issued to me another Employee Counseling Form (Exhibit 8, August 18, 2005, Form 30), which is progressive discipline, stating that on August 16, 2005, I had violated the chain of command. The allegations made by the Montgomery Fire Department against me for violating the chain of command state that I am addressing correspondence to the Assistant Chief and that it should be addressed to my immediate supervisor, which would be a Lieutenant, but that is contrary to the Montgomery Fire Department Chain of Command Policy. The Chain of Command Policy specifically states that the memorandum should be addressed to the person to ultimately receive the correspondence and that each person up the chain should receive a copy. That is what I had done and my actions did not violate the chain of command (Exhibit 9, Section 963, Proper Interdepartmental Communication). The purpose of my correspondence to Assistant Chief Walker was to advise of the mistreatment I was receiving from District Chief Kelly D. Gordon and that is was my belief that he was biased against me.

Also on August 18, 2005, District Chief Kelly D. Gordon issued another Employee Counseling Form to me. This was the third in nine (9) days. In this form he disciplined me because in my correspondence to Assistant Chief Walker I stated that it was my belief that District Chief Kelly D. Gordon had displayed bias toward me. Chief Kelly D. Gordon stated in the disciplinary form that my belief that he had shown bias toward me was untrue and that there was no evidence to support my allegations. He charged me with a violation of Fire Department Policy in that I had made false statements by stating that I believed he was biased (Exhibit 10, August 18, 2005, Form 30).

Based upon the three (3) disciplinary forms that he executed against me, District Chief Kelly D. Gordon recommended that I be demoted. I was demoted from Sergeant to Firefighter for the Montgomery Fire Department. Three (3) Form 30 disciplinary forms issue within a year prevents a Firefighter from getting his merit raise and it continues to effect his compensation, even into retirement. I was denied my merit raise based on District Chief Kelly D. Gordon's actions against me.

At the hearing before the Montgomery City-County Personnel Board, Assistant Chief Walker testified as to the charges brought against me for demotion: (1) Refusing to obey an order, (2) Being disrespectful to a superior, (3) Violating the Chain of Command, and (4) Making untrue and false accusations against a superior officer (Exhibit 11, Personnel Board Hearing Transcript Page 15, Lines 3-15).

The order I was charged with refusing to obey was the order that I bring in a doctor's excuse because I left from working overtime because I was sick. That charge did not concern whether or not I was sick, but was limited to my failure to furnish a doctor's excuse to District Chief Kelly D. Gordon. District Chief Kelly D. Gordon was not the District Chief for my shift when he stayed behind to require me to furnish a doctor's excuse (Exhibit 12, Personnel Board Hearing Transcript Page 44, Lines 12-23 and Page 45, Lines 1-16; See also Exhibit 13, Testimony before the City of Montgomery Fire Department Disciplinary Review Board on September 29, 2005, Page 17, Lines 19-22). District Chief Kelly D. Gordon did not have the authority to order me to furnish a doctor's excuse. Master Letter File 1-5 sets forth specifically when an officer or District Chief may require a doctor's excuse from an employee. It specifically states at the discretion of a company office (sic) or District Supervisor, a physician excuse may

be required from an employee using paid sick leave. There is nothing within the policy that states that a District Chief can require a doctor's excuse of an employee who is not using paid sick leave and I was not using paid sick leave (Exhibit 6, Master Letter File 1-5, Use of Paid Sick Leave).

The second charge brought against me by District Chief Kelly D. Gordon was being disrespectful to a superior. There was never any evidence presented nor was it made specific where I was being disrespectful to a superior. I assume that it was from my refusal to obey the order or from my allegedly making untrue and false accusations against a superior officer.

The third charge was that allegedly I had violated the chain of command. Assistant Chief Walker testified to the Personnel Board that I had violated the chain of command because I addressed memorandums to him rather than to my immediate supervisor or company officer, but I specifically followed Interdepartmental Communications, Section 963. The example used in the Montgomery Firefighters Policy Manual for Interdepartmental Communications was a memo from a Firefighter addressed to a District Chief. The form letter set forth in the policy manual was exactly the way that I forwarded communications to Assistant Chief Walker. From his testimony, it was apparent that he did not understand the proper procedure, as he testified that the memo sent to him should not have been addressed to him, that it should have been addressed to my company officer, which, being a Sergeant, would have been to a Lieutenant. When questioned about his misinterpretation of the policy, Assistant Chief Walker stated that the policy itself was not "common practice" (Exhibit 14, Personnel Board Hearing Transcript Page 53, Line 21-23 and Page 54, Lines 1-22; See also Exhibit 9, Section 963, Proper Interdepartmental Communication).

At the hearing before the Montgomery City-County Personnel Board, a number of memorandums sent out within the Fire Department concerning other matters were introduced as evidence in the hearing. All of them followed the procedure used by me in my memos up the chain of command and none were addressed to the immediate company officer as Chief Walker admitted was not policy, but was "common practice"(Exhibit 15, Memorandums). I was disciplined when I followed policy and according to Chief Walker, I should not have followed policy, but "common practice" (Exhibit 14, Personnel Board Hearing Transcript Page 53, Lines 21-23 and Page 54, Lines 1-22). Each memo that I sent to Assistant Chief Walker was delivered

up through the chain of command. I did not deliver any document directly to Chief Walker, but gave each to my company officer to deliver up the chain of command with a copy available for each.

Assistant Chief Walker testified that I did deliver the memos to him through the chain of command. His complaint had been that they were addressed directly to him (Exhibit 16, Personnel Board Hearing Transcript Page 24, Line 22 and Page 25, Lines 1-19). Each time I sent a letter to Assistant Chief Walker I addressed it to him as the policy stated and I gave it to my company officer to be delivered to him. Although I was trying to seek redress from Assistant Chief Walker for the way that I was being treated by District Chief Kelly D. Gordon, each time I furnished each of the officers along the chain of command a copy of my memo, including District Chief Kelly D. Gordon, and gave them a copy of the letter to be delivered through the chain of command to Assistant Chief Walker.

The fourth charge brought against me was that I had allegedly made untrue and false accusations against a superior officer. The alleged untrue and false accusations were that it was my opinion that District Chief Kelly D. Gordon was biased toward me. That statement was not untrue because it was my opinion. The fact that he claimed that he was not biased did not make my statement that I thought he was biased an untrue and false accusation against a superior officer.

I had not acted improperly and the charges brought against me by District Chief Kelly D. Gordon through Assistant Chief Walker were unfounded and were brought through retaliation as a result of my complaining about the Confederate Battle Flag with a skull and crossbones within it tattoo that District Chief Kelly D. Gordon had on his bicep.

District Chief Kelly D. Gordon, in the Affidavit that he submitted to this Court, stated that he counseled with me because I sent a memo to District Chief Walker comparing him to the Ku Klux Klan, Skinheads, and other racial hate groups. That is not true. The memorandum that I sent was to my company officer, Captain D.W. Wallace, and in that memo (Exhibit 17, Memo to D.W. Wallace, RE: Body Tattoo) I did not compare District Chief Kelly D. Gordon to the Ku Klux Klan, Skinheads and other racial hate groups, but I stated that the symbol that constituted his tattoo, a Confederate Battle Flag with a skull and crossbones within it, "has been used by the Ku Klux Klan, Skinheads, and other racial hate groups to display their feelings of prejudice" and I believe that was a true statement. In fact, the Affidavit submitted by District Chief Kelly D.

Gordon wherein he states, "after he (referring to me) delivered a memo to District Chief Walker comparing me (referring to District Chief Kelly D. Gordon) to the Ku Klux Klan, Skinheads, and other racist hate groups" was a false statement."

Respectfully submitted on this the 25 day of January, 2007.

_____
LEE HARTWELL

Sworn to and subscribed before me on this the 25 day of January, 2007.

_____
NOTARY PUBLIC

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 29, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

_____
J. BERNARD BRANNAN, JR. (BRA022)
Attorney for the Plaintiff Lee Hartwell

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
Post Office Box 307
Montgomery, AL 36101
(334) 264-8118
(334) 263-7598  facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following counsel of record, by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this the 25 day of January, 2007:

Wallace D. Mills
Attorney for the City of Montgomery
Legal Department
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111
TEL: (334) 241-2050

Robert D. Segall
Attorney for the City-County of Montgomery Personnel Department
Post Office Box 347
Montgomery, Alabama 36101
TEL: (334) 834-1180

_____
OF COUNSEL