IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| LEE HARTWELL, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|     v. | ) | 2:06cv518-MHT |
| | ) | (WO) |
| THE CITY OF MONTGOMERY, | ) | |
| ALABAMA, PERSONNEL | ) | |
| BOARD OF THE CITY AND | ) | |
| COUNTY OF MONTGOMERY, | ) | |
| ALABAMA, and DISTRICT | ) | |
| CHIEF KELLY D. GORDON, | ) | |
| in his individual | ) | |
| capacity, | ) | |
| | ) | |
|     Defendants. | ) | |

OPINION

Plaintiff Lee Hartwell, who claims he was unlawfully demoted within the City of Montgomery Fire Department, brings this lawsuit alleging a violation of his First Amendment right to free speech, as enforced through the Fourteenth Amendment and 42 U.S.C. § 1983, as well as a state-law claim challenging the sufficiency of the evidence supporting his demotion. Hartwell's federal claim is solely against defendant Kelly D. Gordon, a fire department district chief, in his individual capacity;

Hartwell claims that Gordon caused his demotion in violation of the First Amendment.[1]  Hartwell's state-law claim is against defendants City of Montgomery and Personnel Board of the City and County of Montgomery; he claims that there was insufficient evidence for the personnel board to uphold the city's action demoting him. The defendants removed his lawsuit from state to federal court, 28 U.S.C. § 1441, basing removal on federal-question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

This case is before the court on the defendants' motion for summary judgment.  For the reasons that follow, summary judgment will be granted on the federal claim, and the state-law claim will be remanded to state court.

_____

1.  Although it is arguably unclear in Hartwell's complaint which defendants are named for which claims, this matter was clarified at the pretrial hearing and made part of the record, without objection, in the pretrial order (doc. no. 28).

2

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine

3

issue exists for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 249 (1986).  In doing so, the court must
view the evidence in the light most favorable to the non-
moving party and draw all reasonable inferences in favor
of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II. FACTUAL BACKGROUND

Viewed in the light most favorable to Hartwell, the
admissible evidence reflects the following facts.  On
September 3, 1999, the Montgomery Fire Department adopted
a new policy on tattoos, brands, and body piercing for
fire department personnel.  The policy prohibited tattoos
and brands "anywhere on the body that are obscene and/or
advocate    sexual,    racial,    ethnic,    or    religious
discrimination" as well as those that "are prejudicial to
the good order and discipline or of a nature that tends to
bring discredit upon the Montgomery Fire Department and
the City of Montgomery."  Pl. Ex. 1 (doc. no. 17-3) at 1.
The policy provided that employees who obtained non-

4

compliant tattoos or brands before the policy went into
effect would be required to remove them if the fire chief
or his designee felt that the circumstances warranted such
removal; otherwise, they would be "grandfathered for
purposes of compliance with this rule and regulation."
<u>Id</u>.

In 1999, when the policy went into effect, Hartwell
and Gordon were both firefighters with the Montgomery Fire
Department.  Days after the policy took effect, Hartwell
filed an internal complaint or grievance about a tattoo on
Gordon's bicep of a skull and crossbones superimposed on
a Confederate battle flag.  Hartwell states that he was
offended by the tattoo; considered it a racially
discriminatory symbol and as such should not have been
displayed by a government employee; and alleged that it
was in violation of the fire department's tattoo policy.
(Hartwell notes by way of background that the Confederate
flag was at that time part of the seal of the City of
Montgomery, which was displayed on fire department
uniforms.  This was a matter of some public controversy,

and the city seal was later modified such that the flag is no longer displayed.) Upon receiving Hartwell's complaint, the fire department concluded that Gordon was not in violation of the tattoo policy and took no action against him.

The record contains no contemporaneous documentation of Hartwell's 1999 complaint or the fire department's response. However, the record does contain a memo (doc. 15-2, at 8) written by Gordon in 2005 in which Gordon acknowledges that in 1999 he was made aware that Hartwell and another firefighter had filed a complaint against him regarding his tattoo. Therefore, the evidence reflects not only that Hartwell complained about Gordon's tattoo in 1999 but also that Gordon was aware of Hartwell's complaint.

Gordon and Hartwell were eventually promoted through the ranks of the fire department, but evidently Gordon was promoted higher than Hartwell: Hartwell became a sergeant, while Gordon was promoted to district chief and became Hartwell's superior officer. Soon after Gordon assumed a

6

supervisory position over Hartwell, several incidents occurred resulting in Gordon taking disciplinary action against Hartwell. These incidents culminated in Hartwell's demotion from the rank of sergeant to firefighter, and Hartwell alleges that Gordon took these disciplinary actions against him in retaliation for his 1999 complaint regarding Gordon's tattoo.

The first incident occurred in May 2003, when Hartwell's fire station failed an inspection initiated by Gordon. Gordon required each firefighter in the station to sign a form acknowledging the failed inspection. Hartwell initially refused to sign the form because he was of the opinion that only the officer in charge of the station should be required to sign the form, and because he was not on duty at the time the inspection took place. When Hartwell objected, Gordon became enraged and shouted, "Shut up! Shut up! Don't say another word! Do you hear me?" Hartwell eventually signed the form as Gordon directed, but Gordon wrote him up two days later for disobeying a direct order by refusing to sign the form.

The next series of incidents occurred in August 2005, and they directly led to Hartwell's demotion.  On August 4, Hartwell volunteered to work an overtime shift because the department was low on personnel.  However, during the overtime shift, Hartwell became ill and left work.  When Hartwell returned to work on August 7, Gordon (who suspected that Hartwell had not been sick) told Hartwell to bring a doctor's excuse.  Hartwell refused to do so because he was of the opinion that department regulations required a doctor's excuse only when he takes sick leave from an assigned shift, not when he leaves sick from an overtime shift that he was not required to work in the first place.  Gordon disagreed and ordered Hartwell to produce a doctor's excuse, but Hartwell refused.  On August 9, Gordon wrote him up for disobeying a direct order.

The next incident occurred on August 16, 2005, when Hartwell wrote a memo to the assistant chief of the fire department complaining that Gordon was mistreating him and was biased against him.  Hartwell's memo gave rise to two

separate disciplinary actions against him on August 18. First, Gordon wrote him up for violating the chain of command. Fire department regulations require personnel to follow the chain of command when addressing correspondence to superior officers. According to Hartwell, he followed department procedures by addressing the memo to the assistant chief, its ultimate recipient, but delivering it to his immediate supervisor to pass it up the chain of command. However, according to the discipline form issued by Gordon, Hartwell sent a sealed envelope to the assistant chief without following the chain of command.

Second, Gordon disciplined Hartwell for making false statements. According to Gordon, Hartwell's memo to the assistant chief complaining that Gordon was biased was untrue and unfounded. Hartwell, of course, disagrees: not only does he think Gordon was biased, he also argues that his memo did not contain false statements because he was merely expressing his opinion.

Following these disciplinary incidents in August 2005, Assistant Chief Carl E. Walker wrote a memo recommending

that Hartwell be demoted.  Hartwell alleges, by affidavit, that Gordon himself recommended the demotion, though he does not state how he obtained personal knowledge of Gordon's recommendation and the record contains no admissible independent documentation that Gordon recommended the demotion.  A review of Walker's memo indicates that Walker's recommendation was based largely, though not entirely, on the incidents and disciplinary actions reported and taken by Gordon.

Walker's memo begins by recounting the August 4 incident involving Hartwell's sick leave.  Walker then reports three different letters or memos that Hartwell allegedly wrote in August: a letter to Walker on August 7 recounting the sick-leave incident; a letter to Hartwell's company officer, Captain Wallace, on August 10, accusing Gordon of bias; and another letter to Wallace, on August 17, re-alleging Gordon's violation of the tattoo policy. According to Walker's memo, Walker himself gave Hartwell "clear instructions on using the proper Chain of Command" (doc. no. 15-3, at 3).  Walker also states that he is

aware of other incidents in which Hartwell allegedly had altercations with superior officers other than Gordon regarding the chain of command, false accusations, and defiance of authority.[2]

Based on this information, Walker charged Hartwell with various rules violations, including violating the chain of command, making false statements, and refusing to carry out orders. Walker concludes as follows: "After reviewing all the documents and going through extensive interviews with D/C Gordon and others, I am recommending that Sergeant Lee Marvin Hartwell be demoted from Sergeant/Engineer to Firefighter" (doc. no. 15-3, at 6). Hartwell was demoted, and his demotion was upheld on appeal to the defendant personnel board.

---

2. Walker's memo does not mention the May 2003 incident involving Hartwell's refusal to sign the form acknowledging his station had failed an inspection.

### III. DISCUSSION

Hartwell brings one federal claim and one state claim. First, he brings suit for money damages under 42 U.S.C. § 1983 against Gordon in his individual capacity, claiming that Gordon violated his right to free speech under the First Amendment by causing his demotion in retaliation for his complaint regarding Gordon's tattoo.[3]  Second, he seeks reinstatement, backpay, and attorneys' fees via a common-law writ of certiorari to the personnel board for insufficient evidence to uphold his demotion.  See Henderson v. Montgomery City-County Personnel Bd., 695 So.2d 9 (Ala. Civ. App. 1996) (discussing right of certiorari review of decisions by the city-county personnel board).  The court will address each claim in turn.

_____

3.  At the pretrial hearing in this case, Hartwell's counsel clarified that the First Amendment claim was for retaliation based on his 1999 complaint about Gordon's tattoo, not the letters and memos he wrote in 2005.

## A. Federal Claim

Hartwell claims that Gordon violated the First Amendment by causing his demotion in retaliation for his complaint regarding Gordon's tattoo. "The law is well established that a [public] employee may not be discharged in retaliation for speech protected under the First Amendment."[4] <u>Vila v. Pardon</u>, ___ F.3d ____, ____, 2007 WL 1158227 at *4 (11th Cir. 2007) (citing <u>Rankin v. McPherson</u>, 483 U.S. 378, 383 (1987)). However, a public employee's freedom of speech is not absolute. <u>Id</u>. "To set forth a claim of retaliation, a public employee must show: (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the [government] as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action. If the plaintiff establishes these elements, the burden shifts to the defendant to prove [4] it would have made the same adverse employment

---

4.  "Congress shall make no law ... abridging the freedom of speech...."  U.S. Const. amend. I.

decision absent the employee's speech." Id. (citations
omitted); see also Cook v. Gwinnett County Sch. Dist., 414
F.3d 1313, 1318 (11th Cir. 2005); Bryson v. City of
Waycross, 888 F.2d 1562, 1565-66 (11th Cir. 1989). The
first two elements are issues of law: Was the employee's
speech constitutionally protected? Vila, ___ F.3d at
_____, 2007 WL 1158227 at *4. The third and fourth
elements are issues of fact: Was the adverse employment
action taken in retaliation for the speech? Cook, 414
F.3d at 1318.


## 1. Step One: Matter of Public Concern

The court begins with the threshold question for all
First Amendment retaliation claims, whether the employee's
speech was protected under the First Amendment. Mitchell
v. Hillsborough County, 468 F.3d 1276, 1282 (11th Cir.
2006). A public employee's speech is protected if "she
was speaking as a citizen on a matter of public concern."
Vila, ___ F.3d at _____, 2007 WL 1158227 at *4.

14

In approaching the 'public concern' inquiry, the court must consider the "content, form, and context" of the speech.  <u>Mitchell</u>, 468 F.3d at 1282 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 147 (1983)).  In doing so, the court must ask "whether the main thrust of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was."  <u>Id.</u> (internal quotation marks and citations omitted).

None of these factors alone is considered dispositive. Rather, as the Supreme Court has recently stated, the central inquiry is whether the employee is speaking as a <u>citizen</u> on matters of public concern.  <u>Garcetti v. Ceballos</u>, 547 U.S. ____, ____, 126 S.Ct. 1951, 1958 (2006); <u>see also</u> <u>Vila</u>, ___ F.3d at ____, 2007 WL 1158227 at *4.  All persons who enter the workforce, even in the public sector, accept certain limitations on their freedoms: a government that employs citizens is nonetheless an employer. <u>Ceballos</u>, 126 S.Ct. at 1958.  At

the same time, the government may not "leverage the employment relationship to restrict ... the liberties employees enjoy in their capacities as private citizens": "a citizen who works for the government is nonetheless a citizen." Id.   In other words, a citizen does not sacrifice her constitutional rights by accepting employment with the government, but the First Amendment does not "constitutionalize the employee grievance." Connick, 461 U.S. at 154, quoted in Ceballos, 126 S.Ct. at 1959.

In this case, the content of Hartwell's speech weighs in favor of concluding that Hartwell's speech was protected.  The content of Hartwell's complaint was that Gordon, a city firefighter, bore a tattoo of the Confederate flag.  The court is well aware of the intense public controversy surrounding public displays of the Confederate flag, especially in the South and especially in the City of Montgomery.  The question of whether a public employee should be permitted to display a body tattoo depicting the Confederate flag while rendering

16

public service and interacting with members of the
community at large is undoubtedly a public question.  As
the tattoo policy states, tattoos that "tend[] to bring
discredit upon" the fire department and the city are
prohibited.   Therefore, the general subject matter of
Hartwell's speech was public in nature.  See Mitchell, 468
F.3d at 1284 ("In assessing the content of a public
employee's speech, we look to whether the speech
communicates a 'subject of legitimate news interest, a
subject of general interest and of value and concern to
the public at the time'" (quoting City of San Diego v.
Roe, 543 U.S. 77, 84 (2004) (per curiam) (brackets
omitted))).

      However, the inquiry does not end with the content and
subject matter of the speech.  As the Court of Appeals has
cautioned, "even speech that, content-wise, lies near the
core of the First Amendment's protection--archetypical
public speech--may be deemed private speech."   Id.  The
key here is that the court must be convinced not only that
Hartwell's speech touches on a matter of public concern,

                              17

see <u>Mitchell</u>, 468 F.3d at 1283-84 (using the "touches" terminology); <u>City of San Diego</u>, 543 U.S. at 82-83 (same), but also that Hartwell spoke <u>as a citizen</u> on a matter of public concern.  <u>Ceballos</u>, 126 S.Ct. at 1958; <u>Vila</u>, ___ F.3d at _____, 2007 WL 1158227 at *4.  <u>See also</u> <u>Morris v. Crow</u>, 117 F.3d 449, 457 (11th Cir. 1997) ("The court must discern whether the employee spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." (internal quotations omitted)); <u>Deremo v. Watkins</u>, 939 F.2d 908, 910 (11th Cir. 1991) (noting that "the Supreme Court has directed court to consider whether the speech at issue was made in the employee's role as citizen or as employee").  To that end, the court must also examine the <u>form</u> and <u>context</u> of Hartwell's speech to assess whether he spoke in his capacity as citizen or as employee.  <u>See</u> <u>Connick</u>, 461 U.S. at 147.

    The form of Hartwell's speech suggests, at least to some extent, that Hartwell was speaking as an employee rather than as a citizen.  Hartwell's speech took the form of an internal workplace complaint about a co-worker who

was allegedly violating an internal policy regarding personal appearance. That is, Hartwell did not speak out publicly about the Confederate flag, and his complaint was a grievance about a particular individual rather than commentary on the fire department's policy overall. If Hartwell was complaining about Gordon merely because he found it personally difficult to work with someone sporting such a tattoo and wished to improve his day-to-day employment experience within the fire department, then such speech was in his capacity as an employee and not as a citizen. See Mitchell, 468 F.3d at 1283 n.17 ("An employee's quotidian, work-a-day grievances are not constitutionally protected...."); Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (finding that plaintiff's speech was not a matter of public concern where it was "an employee grievance" and "driven by her own entirely rational self-interest in improving the conditions of her employment."). That is, to the extent it is difficult to distinguish Hartwell's speech from that of a private employee complaining about her co-worker's non-compliance

with internal company regulations regarding attire and personal appearance, Hartwell's complaint does not call out for First Amendment protection.

But the court must be careful not to reject Hartwell's claim solely because he chose to convey his complaint privately to his superiors rather than publicly to the citizenry at large. The law is clear that while this is one consideration, it is not dispositive. For example, in Rankin v. McPherson, 483 U.S. 378 (1987), the plaintiff, upon hearing on the radio that there had been an assassination attempt on the President, privately remarked to her boyfriend that "if they go for him again, I hope they get him." 483 U.S. at 381. The Supreme Court held that the plaintiff's remark was protected speech, even though her remarks were made in a private rather than public setting. Id. at 386-87 & n.11. See also Ceballos, 126 S.Ct. at 1959 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive."); Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979) (holding, in a case where the

plaintiff privately complained to her employer of racial discrimination in the workplace, that "[n]either the [First] Amendment itself nor our decisions indicate that th[e] freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."); Mitchell, 468 F.3d at 1283 n.18 ("[Not] all privately communicated speech [is] necessarily outside the realm of public concern." (citing Kurtz v. Vickrey, 855 F.2d 723, 727-30 (11th Cir. 1988))). Therefore, although the form of Hartwell's speech was a private complaint rather than a public statement, that fact alone does not settle the question of whether Hartwell spoke as a citizen or as an employee.

The court next turns to the context of Hartwell's speech, and in particular his motivation in speaking. Of course, motivation is difficult to pin down with direct evidence, but it can be inferred from the facts in the record. Cf. Russo v. City of Hartford, 341 F.Supp.2d 85, 97 (D. Conn. 2004) (Hall, J.) (concluding that "a

reasonable fact finder could <u>infer</u> that Russo was motivated, at least in part, by a public concern regarding corruption within the [police department]." (emphasis added)).

On the one hand, it is certainly possible that Hartwell complained about Gordon purely out of self-interest: he was offended by Gordon's tattoo, learned that it might be prohibited by a new workplace tattoo policy, and filed a grievance because life would be more tolerable working alongside colleagues who did not sport a Confederate-flag tattoo. <u>See</u> <u>Morgan</u>, 6 F.3d at 754-55 ("While we heartily agree with Morgan that sexual harassment in the workplace is a matter of important social interest, ... [t]he record shows that Morgan's speech was driven by her own entirely rational self-interest in improving the conditions of her employment.").

On the other hand, it is equally possible that Hartwell complained about Gordon in the public interest: he felt, as a citizen, that it reflected poorly on the

22

city and the fire department for public employees to bear racially insensitive tattoos; that taxpayer dollars should not pay the salaries of such persons; and that African-Americans employed by the government should not be forced to stand by in silence while such persons contribute to racial tension in the workplace.[5]  See Cook, 414 F.3d at 1319 ("Without disrupting the workplace or neglecting any specific job duties, Cook recruited her fellow employees to join the [union].  She did so to improve a variety of conditions, not only for herself individually, but rather for the collective welfare of her fellow drivers.").  It is furthermore entirely understandable that a complaint such as Hartwell's would be brought by a firefighter rather than a member of the general public, as firefighters are more likely to know when their colleagues are abusing the public trust and are more likely to take

---

5.  Given that firefighters were then required to wear uniforms bearing the city seal, which itself depicted the Confederate flag, it is even possible that Hartwell's complaint was intended to highlight and critique a perceived inconsistency between the city seal and the fire department's new tattoo policy.

a special interest in such matters. <u>See</u> <u>Roe</u>, 543 U.S. at 82 ("[P]ublic employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public."); <u>see also</u> <u>Johnson v. Ganim</u>, 342 F.3d 105, 114 (2d Cir. 2003) ("Accepting as true the proposition that a matter is not of public concern if it personally and directly affected the speaker would mean that only those persons with the least amount of firsthand knowledge about the subject matter could utter speech without fear of government reprisal. This position is clearly not sustainable.").

It is obviously difficult to categorize definitively Hartwell's speech as completely private or completely public. As a practical matter, "[a]n employee's speech will rarely be entirely private or entirely public." <u>Morgan</u>, F.3d at 755; <u>see also</u> <u>Moore v. City of Kilgore</u>, 877 F.2d 364, 371-72 (5th Cir. 1989) (noting, in First Amendment retaliation case by firefighter challenging his suspension, that "mixed motivations are involved in most

actions we perform everyday; we will not hold Moore to herculean standards of purity of thought and speech"). This case is certainly an example of an employee speaking in both roles at once. The court must therefore "consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." Id. (quoting Kurtz, 855 F.2d at 727 (citing Connick, 461 U.S. at 147)).

In choosing between these two possibilities, the court does not have the benefit of a highly developed record. As stated, the record does not contain documentation of Hartwell's complaint. However, Hartwell's affidavit does state that he "found [the tattoo] offensive and felt that it was in violation of the City of Montgomery's Tattoo Policy.... I felt that the tattoo was a symbol that advocated racial discrimination and on a public employee, was a matter of public concern." Pl. Aff. (doc. no. 17-2) at 1-2. The second sentence quoted above, while perhaps not a model of clarity, seriously suggests that Hartwell was motivated as citizen, and not just as employee, to

complain about Gordon's tattoo. Under the summary-judgment standard, the burden of persuasion rests with Gordon, and the court must view the evidence in the light most favorable to Hartwell and draw all reasonable inferences in his favor. Although the issue is a close one, the court credits evidence in Hartwell's affidavit that suggests he was speaking as a citizen on a matter of public concern in filing a complaint about Gordon's tattoo.

The court must address one more issue, which is whether Hartwell was speaking pursuant to his official duties within the fire department. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." Ceballos, 126 S.Ct. at 1960. Here, while Hartwell's complaint was job-related, it was not pursuant to his official duty. Were Hartwell a supervisory officer reporting Gordon for non-compliance with department regulations, such reports might be unprotected. But because Hartwell held the same rank

as Gordon and it was not part of his duty to monitor compliance with the tattoo policy, the court concludes that the Ceballos rule for speech pursuant to official duties does not apply in this case.

In sum, the court finds that Hartwell spoke as a citizen on a matter of public concern when he complained that Gordon, a public employee and fellow firefighter, bore a tattoo of the Confederate flag in violation of the fire department's tattoo policy. The court finds that there is sufficient evidence that Hartwell spoke in his capacity as citizen rather than in his capacity as employee. Of course, because this is a question of law for the court and not a question of fact for the jury, the court may always revisit its conclusion once it hears more evidence during trial or even at a pretrial hearing. But on the record as it currently exists, Gordon has not demonstrated he is entitled to judgment as a matter of law as to the first element of Hartwell's First Amendment retaliation claim.

## 2. Step Two: Balancing Test

The court now proceeds to the second element of a First Amendment retaliation claim, whether the plaintiff's interests as a citizen outweighed the interests of the government as an employer.  This balancing test has its origins in Pickering v. Board of Education, 391 U.S. 563 (1968), which instructs courts to "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. at 568.  In Connick, the Supreme Court clarified that Pickering balancing was the second step of analysis, undertaken only if the employee was speaking as a citizen on a matter of public concern. Connick, 461 U.S. at 146; see also Roe, 543 U.S. at 82-83. Because public employees who do not speak as citizens on matter of public concern are not entitled to First Amendment protection, the government as employer need not justify its employment decisions, as they are a matter of

28

business judgment. But once the court determines that a public employee did speak as a citizen on a matter of public concern, the court must weigh the First Amendment interests involved against whatever legitimate justification the government had, qua employer, in taking an adverse employment action. Connick, 461 U.S. at 149-51. "[T]he state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression," id. at 150, and the government has "the prerogative to remove employees whose conduct hinders efficient operation," id. at 151 (quoting Arnett v. Kennedy, 416 U.S. 134, 168 (1974) (Powell, J., concurring).

The Pickering balancing test is designed to ensure that public employees' exercise of their free-speech rights as citizens do not substantially impede public employers from maintaining "efficiency and integrity in the discharge of official duties[] and ... proper discipline in the public service," Connick, 461 U.S. at 150-51 (quoting Ex parte Curtis, 106 U.S. 371, 373

(1882)). When the protected speech occurs in a time, place, and manner that disrupts workplace operations to an extent disproportionate to the First Amendment interests served, the balancing test weighs against the employee. See id. at 151-54; see also Bryson, 888 F.2d at 1567 ("Although [police captain] Bryson could not have been lawfully demoted or terminated for expressing his displeasure with the chief [of police] under the proper circumstances, his speech was not protected when it disrupted the efficient functioning of the police department."). A public employer need not accommodate the free-speech interests of its employee if doing so entails a complete breakdown in workplace morale, substantially inhibits the effective delivery of public services, or disrupts other important aspects of normal business operations.

Here, the court concludes that, under the circumstances presented, Hartwell's interests as citizen outweighs Gordon's interests as employer. Hartwell alleges that he was disciplined, and ultimately demoted,

30

in retaliation for complaining about Gordon's Confederate tattoo. Assuming, as the court must at this stage of the case, that Hartwell's allegations are true, Gordon had no legitimate interest in demoting Hartwell for filing a complaint regarding his tattoo. Although it is particularly important that a fire department operate smoothly and without internal personnel disturbances that could impact the city's vital fire-suppression services, see Anderson v. Burke County, 239 F.3d 1216, 1222 (11th Cir. 2001) (noting that "a paramilitary organization[] such as a fire department has a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers" (internal quotation marks and citations omitted)), there is no evidence that Hartwell's complaint itself disrupted the efficient operation of the fire department. Indeed, by adopting a new tattoo policy, the department's senior officers surely expected that they would be called upon to enforce it from time to time. Although Hartwell's complaint may have

contributed to a strain in the working relationship between him and Gordon, it stands to reason that some tension already existed by virtue of the controversial nature of Gordon's tattoo.  If the fire department was uninterested in disciplining Gordon for wearing a tattoo that was potentially offensive to black firefighters, it is difficult to comprehend its interest in disciplining a firefighter who filed a single good-faith complaint regarding that tattoo pursuant to a new official tattoo policy promulgated by the department itself.

Gordon's argument misunderstands the factual assumptions required under the Pickering balancing test. He argues that the fire department was justified in demoting Hartwell because it is imperative, in an organization such as the fire department, that firefighters obey orders, follow the chain of command, and strictly comply with department rules and policies.  But his argument improperly assumes that Hartwell was demoted because of the rules violations for which Gordon disciplined him, not, as Hartwell alleges, that he was in

fact demoted in retaliation for his complaint regarding
Gordon's tattoo.  At this stage of the proceedings, and
under the <u>Pickering</u> balancing test, the court must assume
that Hartwell was demoted for the reason Hartwell alleges
(in retaliation for his speech), not for the reason that
Gordon alleges (rules violations).[6]  The purpose of the
<u>Pickering</u> balancing test is to consider whether Hartwell's
speech itself, and events and circumstances incident to
his speech, had disruptive effects[7] that justified his
demotion.  The record in this case contains no evidence
that Hartwell's complaint regarding Gordon's tattoo was
itself violative of the chain of command or any other rule

_____

6.  Of course, Gordon may argue separately that there
are no facts in the record to suggest that Hartwell's
complaint played a substantial or motivating role in his
demotion or that he would have been demoted even absent
his complaint.  But such arguments address the third and
fourth elements of a First Amendment retaliation claim,
<u>see</u> <u>Vila</u>, ___ F.3d at ____, 2007 WL 1158227 at *4, not
<u>Pickering</u> balancing under the second element.

7.  Or whether Hartwell's speech had the serious
potential for disruption.  <u>See</u> <u>Connick</u>, 461 U.S. at 152
("[W]e do not see the necessity for an employer to allow
events to unfold to the extent that the disruption of the
office and the destruction of working relationships is
manifest before taking action.").

or regulation.    See Cook, 414 F.3d at 1320 ("[T]he
defendants were unable to point to any specific job duties
that Cook neglected as a result of her [protected]
speech."").    So assuming Gordon did retaliate against
Hartwell for his complaint regarding Gordon's tattoo,
which is an assumption the court must make at this stage
of the proceedings, such retaliation would be unjustified.
In sum, under the circumstances of this case, Hartwell's
interest in speaking as a citizen on a matter of public
concern outweighed the interests of Gordon as a superior
officer in causing him to be demoted for that speech.

### 3. Steps Three and Four: Causation

Once the court finds as a matter of law that the
plaintiff's speech touches on a matter of public concern
and that the plaintiff's interests outweighed those of the
employer, the third and fourth inquiries are issues of
fact related to causation: whether the speech played a
substantial or motivating role in the adverse employment
action and whether the defendant would have made the same

adverse employment decision absent the employee's speech. Although these two issues are for the finder of fact, at the summary-judgment stage the court would ordinarily examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In this case, however, Gordon contends that only steps one and two of the First Amendment inquiry--whether Hartwell was speaking as a citizen on a matter of public concern and whether his interests as a citizen outweighed those of the fire department as his employer--are "at issue in this argument." Def. Br. (doc. no. 15-1) at 6. Gordon provides the court with no argument regarding steps three and four of the First Amendment inquiry and therefore apparently concedes that, should the court find in Hartwell's favor on steps one and two, this case may proceed to trial on steps three and four, without the need

for summary-judgment adjudication on those issues.  While
this court is somewhat perplexed by such a litigation
strategy, the court is also reluctant to decide issues
that have not been briefed when such issues can be
resolved at a later stage of the litigation--namely,
trial.  Accordingly, the court will not address whether
there is a genuine issue as to any material fact regarding
whether Hartwell's complaint regarding Gordon's tattoo
played a substantial or motivating role in his demotion
and whether he would have been demoted absent the
complaint.


### 4. Affirmative Defense: Qualified Immunity

Because Hartwell sues Gordon in his individual
capacity for money damages, Gordon argues that he is
entitled to qualified (or good-faith) immunity.  See
Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Holmes v.
Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003).  Under the
qualified-immunity rule, "government officials performing
discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; see also Holmes, 321 F.3d at 1077-78.

a.

Hartwell points out that qualified immunity is an affirmative defense that must be pleaded by the defendant official and is otherwise deemed waived. Harlow, 457 U.S. at 815; Moore v. Morgan, 922 F.3d 1553, 1557 (11th Cir. 1991). Here, Gordon did not raise the affirmative defense of qualified immunity in a motion to dismiss or a responsive pleading. In fact, Hartwell argues that Gordon filed no responsive pleading at all, given that the only answer to the amended complaint (doc. no. 13) was by the City of Montgomery, not Gordon. The City of Montgomery raised the qualified-immunity defense in its answer, but of course qualified immunity is not available to municipalities. Owen v. City of Independence, 445 U.S.

37

622, 638 (1980); <u>Moore</u>, 922 F.3d at 1556.  Hartwell now argues that the court should deny Gordon qualified immunity because he waived that affirmative defense by not pleading it in an answer.

The court declines to deem the qualified-immunity defense waived.  First, the court treats the city's answer as Gordon's answer as well.  Gordon and the city are represented by the same attorney; the docket annotation indicates that the clerk of the court treated the answer filed by that attorney as the answer of both his clients; and Hartwell did not object to that annotation. Furthermore, Hartwell did not move for default judgment against Gordon when the deadline for responsive pleadings had passed.  <u>See</u> Fed. R. Civ. P. 55(b)(2) (requiring the plaintiff to apply to the court for default judgment).

Second, although it is a waivable defense, the Eleventh Circuit Court of Appeals has held that "qualified immunity can be pled at various stages in a case," including "on a summary judgment motion pursuant to Rule 56" of the Federal Rules of Civil Procedure, which is what

Gordon has done in this case.  Skrtich v. Thornton, 280

F.3d 1295, 1306 (11th Cir. 2002).  Even if the defense is

waivable if not raised in the first responsive pleading,

see Fed. R. Civ. P. 8(c), this court has discretion to

consider the defense when doing so will not prejudice the

plaintiff.  As the Eleventh Circuit Court of Appeals

stated in Hassan v. U.S. Postal Service, 842 F.2d 260

(11th Cir. 1988):

> "Admittedly, the general rule is that,
> when a party fails to raise an
> affirmative defense in the pleadings,
> that party waives its right to raise the
> issue at trial.  However, the liberal
> pleading rules established by the
> Federal Rules of Civil Procedure apply
> to the pleading of affirmative defenses.
> We must avoid hypertechnicality in
> pleading requirements and focus,
> instead, on enforcing the actual purpose
> of the rule.
>
> "The purpose of Rule 8(c) is simply to
> guarantee that the opposing party has
> notice of any additional issue that may
> be raised at trial so that he or she is
> prepared to properly litigate it.  When
> a plaintiff has notice that an
> affirmative defense will be raised at
> trial, the defendant's failure to comply
> with Rule 8(c) does not cause the
> plaintiff any prejudice.  And, when the

> failure to raise an affirmative defense
> does not prejudice the plaintiff, it is
> not error for the trial court to hear
> evidence on the issue."

842 F.2d at 263 (citations omitted).  See also Johnson v.
Johnson, 385 F.3d 503, 516 n.7 (5th Cir. 2004) ("While
failure to raise an affirmative defense in the answer
generally results in a waiver, noncompliance can be
excused if the defendant raises the issue at a
'pragmatically sufficient' time and there is no prejudice
to the plaintiff." (quoting Giles v. Gen. Elec. Co., 245
F.3d 474, 491-92 (5th Cir. 2001)).

Here, the defendants provided Hartwell notice of
Gordon's qualified-immunity defense when they moved for
summary judgment, which gave Hartwell an opportunity to
rebut the defense in his opposition brief.  Hartwell makes
no argument that he was prejudiced by Gordon providing
late notice of his qualified-immunity defense, and this
court can discern none.  Accordingly, the court will
proceed to consider Gordon's qualified-immunity defense.

b.

The court applies a two-step analysis in determining whether qualified immunity applies to an official sued in his individual capacity.  First, the defendant official must demonstrate that during the alleged conduct, he acted within the scope of discretionary authority.  If this is shown, the burden shifts to the plaintiff to demonstrate that the conduct in question violated clearly established law.  <u>Sims v. Metro. Dade County</u>, 972 F.2d 1230, 1236 (11th Cir. 1992); <u>Flood v. Ala. Dep't of Indus. Relations</u>, 948 F.Supp.2d 1535, 1547 (M.D. Ala. 1996) (Thompson, J.).

In this case, it is clear that Gordon's conduct was within his discretionary authority.  Gordon, as Hartwell's superior officer, had authority to write him up for various rules violations and recommend to the assistant chief that he be demoted based on various instances of misconduct.  Even if Gordon used these disciplinary procedures merely as a pretext for retaliation, he was nonetheless acting within the scope of his authority by taking disciplinary action against a lower-ranked officer.

41

See <u>Holloman v. Harland</u>, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (explaining that the inquiry is whether the defendant was performing a legitimate job-related function through means that were within his power to utilize, temporarily putting aside the fact that it may have been unconstitutional).

The next question is whether Gordon's conduct violated clearly established law.  Viewing the evidence in the light most favorable to Hartwell and drawing all reasonable inferences in his favor, the court has already determined that Gordon violated Hartwell's First Amendment right to free speech.  But the court has not yet determined whether that right was a clearly established one.  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of

pre-existing law the unlawfulness must be apparent." Hope
v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation
marks and citations omitted).

When it comes to a First Amendment claim for
retaliation, the Eleventh Circuit has observed that the
plaintiff's burden is a heavy one: "Because Pickering
requires a balancing of competing interests on a
case-by-case basis, our decisions tilt strongly in favor
of immunity by recognizing that only in the rarest of
cases will reasonable government officials truly know that
the termination or discipline of a public employee
violated 'clearly established' federal rights.  When no
bright-line standard puts the reasonable public employer
on notice of a constitutional violation, the employer is
entitled to immunity except in the extraordinary case
where Pickering balancing would lead to the inevitable
conclusion that the act taken against the employee was
unlawful." Hansen v. Soldenwagner, 19 F.3d 573, 576 (11th
Cir. 1994) (internal quotation marks, citation, and
footnote omitted).

In light of more recent Supreme Court discussion on qualified immunity, this court is uncertain of the extent to which the appellate court's observation in <u>Hansen</u> retains its authority.  In <u>Hope</u>, 536 U.S. 730, the Supreme Court rejected the Eleventh Circuit's then "unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations."  <u>Holloman</u>, 370 F.3d at 1277.  The Eleventh Circuit has therefore concluded that much of its pre-<u>Hope</u> law on qualified immunity was too rigorous for plaintiffs.  <u>See</u> <u>id</u>. at 1277-78.  Under <u>Hope</u>, "there need not be a case 'on all fours,' with materially identical facts," in order to defeat qualified immunity.  Nor is it required that "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  <u>Wood v. City of Lakeland</u>, 203 F.3d 1288, 1291-92 (11th Cir. 2000), <u>quoted and discussed in</u> <u>Holloman</u>, 370 F.3d at 1277-78.  Rather, "the salient

**44**

question is whether the state of the law at the time of the events in question gave [the defendants] fair warning that their alleged treatment of the plaintiff was unconstitutional." Holloman, 370 F.3d at 1278 (quoting Hope, 536 U.S. at 741 (internal brackets and ellipses omitted)). Because Hope "abrogated many of the ... standards articulated" in Eleventh Circuit case law, id., and because the Eleventh Circuit has recognized Hope's significance in this regard, see id. at 1277-78; see also Holmes v. Kucynda, 321 F.3d 1069, 1077-78 (11th Cir. 2003) (describing qualified-immunity standard without reference to pre-Hope circuit case law), the court is cautious in applying this circuit's pre-Hope authority, such as Hansen, in qualified-immunity cases.[8]

---

8. Some district courts have continued to rely on Hansen, implicitly distinguishing the case-by-case balancing nature of First Amendment retaliation inquiries from the bright-line nature of Hope's Eighth Amendment holding: "Even since Hope, courts have been hesitant to hold that the case-by-case First Amendment retaliation analysis espoused in Pickering and Connick applies with obvious clarity to a defendant's conduct." Braswell v. Bd. of Regents, 369 F.Supp.2d 1371, 1379 (N.D. Ga. 2005) (Thrash, J.); see also Collier v. Clayton County Cmty.
(continued...)

But in this case, the court need not resolve the question of whether Hansen and Hope can co-exist, because even by applying the Hope standard alone the court is confident that Gordon is entitled to qualified immunity. As stated, the question of whether Hartwell spoke as a citizen on a matter of public concern was a close one for this court. Had the court gone the other way, Gordon's retaliation would not have implicated Hartwell's constitutional right to free speech. Because the court finds it difficult to define the contours of the constitutional right in question, it cannot expect that a reasonable district chief at the fire department would

---

8. (...continued)
Serv. Bd., 236 F.Supp.2d 1345, 1369 (N.D. Ga. 2002) (Carnes, J.) (citing Hansen post-Hope), aff'd, 82 Fed. Appx. 222 (11th Cir. 2003). The court notes that Holloman, 370 F.3d 1252, which called pre-Hope case law into question, did involve a First Amendment challenge but not Pickering balancing. By contrast, Thomas v. Roberts, 323 F.3d 950 (11th Cir. 2003), which reaffirmed qualified immunity after the Supreme Court vacated its previous decision for reconsideration in light of Hope, did involve a Pickering-like multi-factor balancing test, albeit under the Fourth Amendment. 323 F.3d at 953-54.

know that Hartwell's complaint was protected by the First Amendment.

Hartwell argues that it was clearly established, at the time Gordon took retaliatory action against Hartwell, that a public employer may not retaliate against an employee for that employee's exercise of constitutionally protected speech. But this rule is too general and merely begs the question of whether Hartwell's speech was constitutionally protected. The court has reviewed the relevant case law and has not encountered binding precedent clearly establishing the unlawfulness of retaliating against speech such as Hartwell's. Rather, the court has reached the conclusion that such speech is protected based upon a reasoned synthesis of the fact patterns and legal principles in those cases. The court weighed several factors, as the law instructs, applied them to the facts of this case, and ultimately concluded that Hartwell was speaking as a citizen on a matter of public concern. But a reasonable government official

might weigh the factors differently and reach the opposite conclusion.

The Fourth Circuit Court of Appeals recently reached the same conclusion under similar circumstances. In Campbell v. Galloway, ___ F.3d ____, 2007 WL 1166101 (4th Cir. 2007), the court concluded that the plaintiff's sexual-harassment complaint was protected speech because, under the circumstances and facts of that case, the court could not rule out the possibility that the plaintiff was speaking as a citizen on a matter of public concern. When it came to qualified immunity, however, the appellate court held that a reasonable official may not have known that such speech was protected: "In our view, the speech at issue in this case falls within the gray area between speech that clearly is a matter of public concern and speech that clearly is not a matter of public concern.... Although we have concluded that Campbell's complaints do touch on a matter of public concern, ... the question is a close one.... Because the facts of this case are close enough to the ill-defined line between private speech and

speech involving matters of public concern, we cannot hold the defendants responsible for their reasonable but incorrect guess about how the law would apply to the facts of this case." Campbell, 2007 WL 1166101 at *9. This court believes that such reasoning applies to this case as well and adopts it accordingly.

Because in light of pre-existing law the unlawfulness of Gordon's retaliatory action would not necessarily have been clear to a reasonable government official, Hope, 536 U.S. at 739--indeed, because this is a relatively close case on the question of whether Hartwell spoke as a citizen on a matter of public concern--the court concludes that Gordon is entitled to qualified immunity on Hartwell's claim. Accordingly, summary judgment will be granted in his favor.

## B. Supplemental State-Law Claim

This court "may decline to exercise supplemental jurisdiction over a claim if ... [it] has dismissed all claims over which it has original jurisdiction." 28

49

U.S.C. § 1367(c)(3).  Because summary judgment is due to be granted on Hartwell's federal claim, the court declines to exercise supplemental jurisdiction over his common-law certiorari claim.  Accordingly, this state-law claim will be remanded to state court.  <u>See</u> <u>City of Chicago v. Int'l Coll. of Surgeons</u>, 522 U.S. 156, 172-73 (1997); <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343 (1988); <u>Engelhardt v. Paul Revere Life Ins. Co.</u>, 139 F.3d 1346, 1350 (11th Cir. 1998).

\* \* \*

For the foregoing reasons, the court concludes that summary judgment should be granted in favor of Gordon on Hartwell's federal claim and that his state-law claim should be remanded to state court.

An appropriate judgment will be entered.

DONE, this the 10th day of May, 2007.

<u>    /s/ Myron H. Thompson    </u>
UNITED STATES DISTRICT JUDGE